1 | DANIEL H. REISS (SBN 150573)
JACQUELINE L. RODRIGUEZ (SBN 198838)
2 | LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Blvd., Suite 1700
3 | Los Angeles, CA 90067
Telephone: (310) 229-1234
4 | Facsimile: (310) 229-1244
5 | E-Mail: dhr@lnbrb.com; jlr@lnbrb.com

6 | Attorneys for DAKS, LLC, Debtor and Debtor in Possession

7

**UNITED STATES BANKRUPTCY COURT**

8

**CENTRAL DISTRICT OF CALIFORNIA**

9

**(SANTA ANA DIVISION)**

10

|  |  |
|---|---|
| In re | Case No.: 8:07-bk-12044 RK |
| | Chapter 11 |
| DAKS, LLC, a California limited liability corporation, | |
| Debtor and Debtor in Possession. | **NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING AND APPROVING: (1) SALE OF REAL PROPERTY AND CERTAIN PERSONAL PROPERTY ASSETS PURSUANT TO 11 U.S.C. § 363 FREE AND CLEAR OF ALL LIENS, CLAIMS, AND INTERESTS; AND (2) ASSUMPTION AND ASSIGNMENT OF LEASE UNDER 11 U.S.C. § 365; MEMORANDUM OF POINTS AND AUTHORITIES, AND RELATED RELIEF; DECLARATIONS OF RICHARD H. GOLUBOW AND VICKI LEE IN SUPPORT THEREOF** |
| | Hearing: |
| | DATE:   May 19, 2010 |
| | TIME:   11:30 a.m. |
| | PLACE:  Courtroom 5D |
| | 411 West Fourth Street |
| | Santa Ana, CA 92701-4593 |

1

# **TABLE OF CONTENTS**

2

**Page**

3

4     MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 5

5     I.    JURISDICTION AND VENUE .......................................................................... 5

6     II.   STATEMENT OF FACTS ................................................................................. 6

7           A.    Background ........................................................................................... 6

8           B.    The Harbor Island Property Has Been Thoroughly Marketed for Sale ... 8

9
            C.    The Brokers Have Earned Their Commission .......................................... 12
10
            D.    Brief Description of Terms of Sale of The Harbor Island Property ......... 13
11
12          E.    The Auction of the Property ...................................................................... 14

13          F.    The Liens, Claims, Interests and Other Encumbrances ............................ 15

14                1.    The Preliminary Title Report ......................................................... 15

15                2.    The Proofs of Claims ...................................................................... 17

16
            G.    The Commission ...................................................................................... 18
17
            H.    The Expense Reimbursement .................................................................... 19
18
19          I.    The Proposed Payment of Liens, Claims and/or Interests Out of
                  Escrow ....................................................................................................... 19
20
                  1.    Required Payments ......................................................................... 19
21
22                2.    Optional Payments ......................................................................... 20

23                3.    The Transfer of the Disputed Liens, Claims and Interests from
                        the Harbor Island Property to the Net Proceeds ............................ 20
24
      III.  DISCUSSION ................................................................................................... 21
25
26          A.    The Court Should Authorize The Debtor To Sell The Harbor Island
                  Property And The Personal Property Free And Clear Of All Liens,
27                Claims and/or Interests .............................................................................. 21

28

i

1.   The Debtor Has Complied With All Notice Requirements Under the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules Governing the Sale of the Harbor Island Property and the Personal Property ............. 21

2.   The Sale Motion Should Be Approved Because Good Business Reasons Exist To Approve the Sale of the Property, The Purchase Price for the Property is Fair and Reasonable, and the Proposed Sale is in the Best Interests of the Debtor's Estate and Its Creditors .................................................................. 23

    a.   Sound Business Purpose .................................................... 24

    b.   Fair and Reasonable Price ................................................ 25

    c.   Adequate Marketing ........................................................... 26

    d.   Good Faith .......................................................................... 26

    e.   Accurate and Reasonable Notice ....................................... 27

3.   The Sale of the Property Should Be Free and Clear of All Liens, Claims, and Interests Under 11 U.S.C. §363(f) ................ 27

    a.   The Sales Should Be Approved Under 11 U.S.C. § 363 (f)(2) ......................................................... 28

    b.   The Sale Should Be Approved Under 11 U.S.C. § 363 (f)(3) ......................................................... 28

    c.   The Sale Should Be Approved Under 11 U.S.C. § 363 (f)(5) ......................................................... 29

B.   The Court Should Authorize The Debtor To Enter Into The Post-Petition Sale Contract With The Stalking Horse Bidder Or Another Successful Bidder ..................................................................................... 31

IV.   THE DEBTOR SHOULD BE AUTHORIZED TO ASSUME AND ASSIGN THE TIDELANDS LEASE TO THE SUCCESSFUL BIDDER ........................... 33

V.   THE DEBTOR REQUESTS THAT THE COURT WAIVE THE TEN-DAY WAITING PERIOD SET FORTH IN BANKRUPTCY RULE 6004(H) ............. 35

VI.   CONCLUSION ................................................................................................... 35

DECLARATION OF RICHARD H. GOLUBOW ............................................................... 38

1 | DECLARATION OF VICKI LEE ........................................................................... 54

2 | EXHIBIT 1 ............................................................................................................. 60

3 | EXHIBIT 2 ............................................................................................................. 86

4 | EXHIBIT 3 ............................................................................................................. 112

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2
<u>Page(s)</u>

3
### FEDERAL CASES

4
<u>Big Shanty Land Corp. v. Comer Properties, Inc.</u>
5
 61 B.R. 272 (Bankr. N.D. Ga. 1985) ............................................................. 25

6
<u>Clear Channel Outdoor, Inc. v. Knupfer</u> (In re PW, LLC)
7
 391 B.R. 25 (9th Cir. B.A.P. 2008) ("Clear Channel") ............................................. 29, 30

8
<u>In re Abbotts Dairies</u>
 788 F.2d............................................................................................. 26

9
<u>In re AEG Acquisition Corp.</u>
10
 127 B.R. 34 (Bankr. C.D. Cal. 1991), aff'd 161 B.R. 50 (9th Cir. B.A.P. 1993)............. 34

11
<u>In re Alpha Industries, Inc.</u>
12
 84 B.R. 703 (Bankr. Mont. 1988)................................................................. 25

13
<u>In re Bowman</u>
 194 B.R. 227 (Bankr. D. Ariz. 1995)............................................................. 34

14
<u>In re Canyon Partnership</u>
15
 55 B.R. 520 (Bankr. S.D. Cal. 1985)............................................................. 25

16
<u>In re Central Fla. Metal Fabrication, Inc.</u>
17
 190 B.R. 119 (Bankr. N.D. Fla. 1995)............................................................ 33

18
<u>In re Chateaugay Corp.</u>
 973 F.2d. 141 (2nd Cir. 1992) ................................................................... 32

19
<u>In re Continental Country Club, Inc.</u>
20
 114 B.R. 763 (Bankr. M.D. Fla. 1990) ......................................................... 33

21
<u>In re Crystal Apparel, Inc.</u>
22
 220 B.R. 816 (Bankr. S.D.N.Y. 1998)........................................................... 31, 32

23
<u>In re Ernst Home Center, Inc.</u>
 209 B.R. 974 (Bankr. W.D. Wash. 1997) ...................................................... 32

24
<u>In re Gucci</u>
25
 193 B.R. 411 (S.D.N.Y. 1996) ................................................................... 33

26
<u>In re Jolan, Inc.</u>
 2009 WL 1163928 (Bankr. W.D. Wash. 2009)................................................... 30, 31

27
<u>In re Karpe</u>
28
 84 B.R. 926 (Bankr. M.D.Pa. 1988) ............................................................. 27

In re Klein Sleep Products, Inc.
   78 F.3d 18 (2d. Cir. 1996)............................................................. 33

In re The Landing
   156 B.R. 246 (Bankr. E.D. Mo. 1993).......................................... 23

In re Lionel Corp.
   722 F.2d 1063 (2d Cir. 1983).................................................. 23, 32

In re Mama's Original Foods, Inc.
   234 B.R. 500 (C.D. Cal. 1999)...................................................... 23

In re Management Tech. Corp.
   56 B.R. 337 (Bankr. D.N.J. 1985) ................................................. 32

In re Prime Motors Inns
   124 B.R. 378 (Bankr. S.D. Fla. 1991)........................................... 33

In re Whittemore
   37 B.R. 93 (Bankr. D. Or. 1984) ................................................... 28

In re Wilde Horse Enterprises, Inc.
   136 B.R. 830 (Bankr. C.D. Cal. 1991)............................... 23, 25, 26

Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines, Inc. (In re
Continental Airlines, Inc.)
   780 F.2d 1223 (5th Cir. 1986)...................................................... 32

Walter v. Sunwest Bank (In re Walter)
   83 B.R. 14 (9th Cir. B.A.P. 1988) ........................................... 24, 32

## FEDERAL STATUTES

11 U.S.C. § 101(31)............................................................................ 26

11 U.S.C. § 102(1)(A) ........................................................................ 21

11 U.S.C. § 363(b)(1) ............................................................. 21, 26, 32

11 U.S.C. § 363(f) ....................................................................... 27, 28

11 U.S.C. § 363(f)(2) ......................................................................... 28

11 U.S.C. § 363(f)(3) ......................................................................... 28

11 U.S.C. § 363(f)(5) ............................................................. 29, 30, 31

11 U.S.C. § 365 ............................................................................ 1, 15

11 U.S.C. § 365(b)(1) ......................................................................... 34

v

11 U.S.C. § 365(f)(2)..................................................................................................34

11 U.S.C. § 705 ........................................................................................................22

11 U.S.C. § 1102 .....................................................................................................22

11 U.S.C. § 1107 ........................................................................................................5

11 U.S.C. § 1108 ........................................................................................................5

28 U.S.C. § 157 ..........................................................................................................5

28 U.S.C. § 157(b)(2)(A)...........................................................................................5

28 U.S.C. § 157(b)(2)(G)...........................................................................................5

28 U.S.C. § 157(b)(2)(M) ..........................................................................................5

28 U.S.C. § 157(b)(2)(O)...........................................................................................5

28 U.S.C. § 1334 ........................................................................................................5

28 U.S.C. § 1408 ........................................................................................................5

28 U.S.C. § 1409 ........................................................................................................5

**CALIFORNIA STATUTES**

California Civil Code § 2924 ...................................................................................31

**OTHER STATE STATUTES**

Uniform Commercial Code.........................................................................................31

**OTHER AUTHORITIES**

2 COLLIER ON BANKRUPTCY ¶ 105.01, at 105-3 (15th ed., rev. 2003)......................................31

3 COLLIER ON BANKRUPTCY ¶ 363.06[3] at 363-51 (15th Ed. Rev. 2008)..............................28

**PLEASE TAKE NOTICE** that, on May 19, 2010 at 11:30 a.m. before the Honorable Robert W. Kwan, United States Bankruptcy Judge, DAKS, LLC, the debtor and debtor-in-possession in the above-entitled bankruptcy case ("DAKS" or the "Debtor") will move the Bankruptcy Court for the entry of an order authorizing and approving: (1) the sale of the Debtor's real property located at 18 Harbor Island Drive, Newport Beach, California (the "Harbor Island Property") and of certain related personal property described in the attached Memorandum of Points and Authorities (the "Personal Property") free and clear of all liens, claims and/or interests pursuant to Section 363 of 11 U.S.C. §§ 101 *et al.* (the "Bankruptcy Code") and (2) the assumption and assignment of a lease of a dock adjacent to the Harbor Island Property which is described more fully in the attached Memorandum of Points and Authorities (the "Tidelands Lease")[1] pursuant to Section 365; and granting certain additional relief requested herein and in the attached Memorandum of Points and Authorities.

Gwendolyn Wilson, the Trustee of the Telluride Trust dated February 21, 2010 (the "Stalking Horse Bidder") has made an offer to purchase the Harbor Island Property and the related Personal Property which the Debtor has accepted subject to Court approval and overbid. The Court has authorized and instructed the Debtor to conduct an auction of the Harbor Island Property and the Personal Property. By and through this Motion, the Debtor seeks the approval of the sale of the Harbor Island Property and the Personal Property to the Stalking Horse Bidder or to a successful overbidder (the "Successful Bidder") and the additional relief set forth below.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon this Notice of Motion and Motion, Sections 363, 365 and 105 of the Bankruptcy Code, Federal Rules

---

[1] A copy of the Tidelands Lease is attached as Exhibit 2 to the Declaration of Richard H. Golubow appended hereto.

1

1  of Bankruptcy Procedure 2002, 4001, 6004 and 6006, and Local Bankruptcy Rules 6004-1,

2  the attached Memorandum of Points and Authorities, the Declarations of Richard H.

3  Golubow and Vicki Lee submitted herewith, the entire record in this Chapter 11 case, and

4  such additional evidence and argument as may be presented at or before the hearing on the

5  Motion.

6

7  **PLEASE TAKE FURTHER NOTICE** that any party wishing to respond to the

8  Motion must file a written response with the Bankruptcy Court and must serve that written

9  response on counsel for the Debtor at least 14 days before the hearing. The failure to

10  timely file and serve a response in accordance with the Local Bankruptcy Rules may be

11  deemed by the Bankruptcy Court to be consent to the granting of the relief requested in the

12  Motion.

13

14  **WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

15  (1)     finding that notice of the Motion was adequate and appropriate under the

16  circumstances;

17  (2)     granting the Motion in its entirety;

18  (3)     authorizing and approving the sale of the Harbor Island Property and the

19  Personal Property to the Stalking Horse Bidder or other Successful Bidder free and clear of

20  all liens, claims and/or interests;

21

22  (4)     finding that the Stalking Horse Bidder is a good faith purchaser for the

23  purposes of Section 363(m);

24  (5)     authorizing and approving the assumption and assignment of the Tidelands

25  Lease to the Stalking Horse Bidder or other Successful Bidder;

26  (6)     authorizing the Debtor to take all necessary and reasonable steps to

27  consummate the sale of the Harbor Island Property and the Personal Property (jointly

28

2

1  referred to herein as "the Property:) and to complete the assumption and assignment of the

2  Tidelands Lease;

3      (7)    authorizing the payment of the commission of the Debtor's real estate brokers

4  in connection with the sale (the "Commission") upon the close of escrow;

5
6      (8)    authorizing the payment of $1,595.00 to Robert A. Giem, Inc. upon the close

7  of escrow as reimbursement for out-of-pocket expenses related to preparing the Harbor Island

8  Property for sale;

9      (9)    authorizing payment of the liens, claims and interests in the Harbor Island

10  Property to the extent set forth in the Memorandum of Points and Authorities;

11     (10)    authorizing the payment of all amounts due under the Tidelands Lease prior to

12  its assumption and assignment upon the close of escrow;

13
14     (11)    authorizing the payment of taxes arising from the sale of the Harbor Island

15  Property and all escrow, closing and recording costs, as well as the cost of any title insurance

16  endorsements (the "Closing Costs") upon the close of escrow;

17     (12)    transferring and attaching all remaining liens, claims and/or interests or

18  portions of liens, claims and interests (collectively referred to as the "Liens, Claims and

19  Interests") still unpaid upon the close of escrow from the Harbor Island Property to the net

20  proceeds of the sale of the Harbor Island Property (the "Net Proceeds") with the same force,

21  effect, validity and priority that any and all such liens, claims or interests had with respect to

22
23  the Harbor Island Property;

24     (13)    authorizing the Debtor to deposit the portion of the Net Proceeds attributable to

25  the Liens, Claims and Interests into a segregated interest bearing account pending further

26  order of the Court;

27

28

3

1    (14)    compelling all holders of the Liens, Claims and Interests to execute any and all

2    documentation that may be required to allow escrow to close;

3    (15)    waiving the ten-day waiting period set forth in Bankruptcy Rule 6004(g); and

4    (16)    granting such other and further relief as the Court deems just and proper under

5    the circumstances.

6

7    Dated: April 28, 2010          LEVENE, NEALE, BENDER, RANKIN &
                                     BRILL L.L.P.,

8

9                                   By    /s/ Jacqueline L. Rodriguez
                                          DANIEL H. REISS
10                                        JACQUELINE L. RODRIGUEZ
                                          Attorneys for DAKS, LLC, Debtor and Debtor in
11                                        Possession

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.**

3

**JURISDICTION AND VENUE**

4       DAKS, LLC, the debtor and debtor in possession herein (the "Debtor"), commenced
5   its bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code
6   on July 9, 2007 ("Petition Date"). The Debtor continues to operate its business and manage
7   its financial affairs as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108. By
8   the Motion, the Debtor seeks the entry of an order: (1) approving the sale of the Debtor's
9   real property located at 18 Harbor Island Drive, Newport Beach, California (the "Harbor
10  Island Property"), and certain related personal property[2] (collectively referred to herein as
11  the "Property"), free and clear of all liens, claims, encumbrances and other interests
12  pursuant to Section 363 of the Bankruptcy Code, (2) approving the assumption and
13  assignment of the easement and rights related to a certain dock leased from the County of
14  Orange pursuant to that certain lease dated May 1, 1996 by and between the County of
15  Orange, as lessor, and Robert McNulty, as lessee, recorded April 1, 1999 as No.
16  19990240772 and lease recorded July 16, 2001 as No. 20010476486 (jointly referred to
17  herein as the "Tidelands Lease"),[3] and (3) granting related relief.

18      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.
19  This matter relates to the administration of the Debtor's bankruptcy estate and is
20  accordingly a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (G), (M) and (O).
21  Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The
22  statutory predicates for the relief requested in this Motion are Section 105, 363 and 365 of

23

24  [2] As described in Paragraph 6 of "Addendum No. 1 to Counter Offer No. 1," which is attached to and included
25  within the Stalking Horse Bid Agreement which is attached as Exhibit 1 to the Declaration of Richard H.
    Golubow, the personal property being purchased by the Stalking Horse Bidder as part of the purchase of the
    Harbor Island Property consists of all of the built-in appliances, washers, dryers, security systems, drapes and
26  curtains located in the Harbor Island Property. Notwithstanding the foregoing, as also set forth in Paragraph 6,
    the other personal property located at, or used in connection with, the Harbor Island Property, including but not
27  limited to, furniture, fixtures, art, vehicles, clothing, jewelry, safes, furs, watercraft, two downstairs hallway light
    fixtures/chandeliers and chandeliers in the middle living room and library area, is not included in the proposed
28  sale to the Stalking Horse Bidder.
    [3] A copy of the Tidelands Lease is attached as Exhibit 2 to the Declaration of Richard H. Golubow.

5

1  the United States Code as amended (the "Bankruptcy Code"), and Rules 2002, 4001, 6004

2  and 6006 of the Federal Rules of Bankruptcy Procedure.

## II.

## STATEMENT OF FACTS

5  **A.    Background.**

6          As of the Petition Date, the Debtor's managing member was Mr. Arnold Simon ("Mr.

7  Simon"). By order of this Court entered on July 14, 2009, Mr. Richard H. Golubow became

8  the manager of the Debtor (the "Debtor's Manager"). The Debtor was formed in March 2001

9  for the primary purpose of buying and selling residential real property. Since its formation,

10 the Debtor has purchased four residential real properties for investment, three of which have

11 been sold.

12         The Harbor Island Property was purchased in mid-2001 for $14 million. The Harbor

13 Island Property and the Tidelands Lease are the Debtor's only remaining real property assets.

14         When purchased, the Harbor Island Property was subject to a recorded first right of

15 refusal (the "First Right of Refusal"), held by Elizabeth C. Adams, Trustee of the Carver

16 Trust No. 1 dated September 22, 1988 and Leroy L. Carver III (collectively and individually,

17 "Carver"). The First Right of Refusal provides for, among other alleged rights, a specified

18 period of time for Carver to match the purchase price for a proposed sale of the Harbor Island

19 Property. Carver filed a proof of claim in this case in the amount of $15,250,000 based on the

20 First Right of Refusal (the "Carver Proof of Claim").[4]

21         On April 13, 2010, at the hearing on the Debtor's motion for order establishing

22 procedures with respect to the sale of the Harbor Island Property (the "Sale Procedures

23 Motion"), the Court ruled that the requirements of the First Right of Refusal had been

24 satisfied and they are further satisfied by the service of this Motion on Carver. The Sale

25 Procedures Motion was approved by the Court at the hearing on April 13, 2010, and the

26

27

28 [4]   The Court is respectfully requested to take judicial notice of the Carver Proof of Claim, which was filed on
October 29, 2007, and which the Clerk of the Court designated as Claim No. 8.

1   proposed order granting the Sale Procedures Motion was lodged with the Court on April 19,
2   2010. See, Declaration of Richard H. Golubow (the "Golubow Declaration").

3       The Harbor Island Property is a very unique and valuable residence. It consists of
4   approximately 18,000 square feet of living space, with multiple bedrooms and bathrooms,
5   including a staff apartment with bedrooms and bathrooms. Other amenities include a secured,
6   subterranean multiple car garage, an elevator, walk-in wine cellar, six fireplaces, a waterfront
7   tile pool, a limestone outdoor barbeque, and the aforementioned large leased dock in Newport
8   Harbor, which is the subject of the Tidelands Lease. There is substantial equity in the Harbor
9   Island Property.[5]

10      DAKS is the title holder of record of the Harbor Island Property. On January 9, 2004,
11  Arnold Simon's former wife, Debra Simon, who is now deceased, filed a Petition for
12  Dissolution of Marriage (the "Dissolution Petition") and thereby commenced a divorce
13  proceeding entitled In re Marriage of Simon, Case No. 04D000159 (the "Family Court
14  Action") in the Superior Court of the State of California, County of Orange. On January 12,
15  2004, in connection with the Family Court Action, Debra Simon caused a Notice of Pendency
16  of Action to be recorded against the Harbor Island Property (the "Debra Simon Lis Pendens").

17      In early 2003, the Debtor and YSA, LLC ("YSA") entered into a purchase agreement
18  with respect to the Harbor Island Property, and an escrow was opened in March 2003. After
19  numerous offers and counter-offers, escrow was cancelled on June 24, 2003. The Harbor
20  Island Property then sat on the market for another six months. On January 14, 2004, YSA and
21  the Debtor entered into another sales contract for the purchase price of $15,750,000, which
22  allegedly expired on its own terms.

23      YSA then commenced the action entitled YSA, LLC v. DAKS, LLC, Case No.
24  05CC08045, on June 8, 2005 in the Superior Court for the State of California, County of
25  Orange (the "YSA Action") seeking specific performance of the expired January 14, 2004
26  purchase agreement, damages for breach of said purchase agreement, and certain declaratory
27  and/or injunctive relief. The Debtor removed the YSA Action to this Court by filing a

28
---
[5] See Section F below describing the liens, claims and/or interests against the Harbor Island Property.

7

1  removal petition on October 5, 2007. YSA filed a proof of claim on October 22, 2007. Prior

2  to the removal, the YSA Action had been ordered to arbitration, which was pending at the

3  time of removal.

4        The claims of YSA in this case have been resolved by an agreement (the "YSA

5  Agreement")[6] approved by order of this Court entered on July 14, 2009. Pursuant to the YSA

6  Agreement, YSA was granted a secured claim of $2.8 million plus interest and certain

7  additional charges as set forth in the YSA Agreement (the "YSA Claim"), enforcement rights

8  relating thereto, an opportunity to credit bid in a sale under Bankruptcy Code § 363, and

9  YSA's agreement to remove its lis pendens – which lis pendens was removed in accordance

10 with the terms of the YSA Agreement. The Debra Simon Lis Pendens shall be removed in

11 connection with a close of a sale of the Harbor Island Property consistent with the YSA

12 Agreement.

13 **B.    The Harbor Island Property Has Been Thoroughly Marketed for Sale.**

14       The Harbor Island Property has been thoroughly marketed for an extended period of

15 time by highly qualified real estate professionals. Some time ago the Court approved the

16 employment of HÔM Real Estate Group ("HÔM") and Willis Allen Real Estate ("Willis

17 Allen" and with HÔM the "Brokers") as co-listing real estate brokers approved by the

18 Bankruptcy Court. HÔM has marketed the Harbor Island Property aggressively for the benefit

19 of the Debtor's bankruptcy estate since April 2008.[7] Among the many tasks performed

20 throughout the past 28 months, in addition to listing the Harbor Island Property in the multiple

21 listing service, HÔM:

22              a.    hired two of the most, if not the most, respected local real estate

23                    photographers for day and night, interior and exterior color photos;

24

25 [6] The Debtor respectfully requests that the Court take judicial notice of the YSA Agreement, which is attached as Exhibit A to the motion filed by the Debtor seeking approval of the YSA Agreement, which was filed with the Court on June 16, 2009 and was assigned Docket No. 199.

26 [7] The Debtor requests that the Court take judicial notice of its application and orders entered with respect to the Brokers' employment (Docket Nos. 133, 140, 207, 214, 216 and 227) and, in particular of the Court's order

27 entered on or about March 9, 2010 (Docket No. 227) approving the Commission and the employment application filed by the Debtor on or about August 13, 2009 (Docket No. 207) and the order approving that application (the

28 "Application") as modified (Docket No. 214) seeking to have the Commission paid upon the close of escrow and without further order of the Court (see, Application at p. 3 ¶ 10).

1      b.      commissioned the use of a large yacht so that the photographer

2      could take photos of the Harbor Island Property from the water;

3      c.      arranged for aerial photography of the Harbor Island Property;

4      d.      contracted for and directed the design of a highly detailed,

5      flattering customized brochure to be used to advertise the Harbor Island

6      Property to its best advantage;[8]

7      e.      created a property specific web site to showcase the Harbor

8      Island Property;

9      f.      exposed the Harbor Island Property on dozens of property

10      websites, globally, including The Wall Street Journal Online, The Los Angeles

11      Times online, The Robb Report online, christiesgreatestates.com, realtor.com,

12      luxuryportfolio.com and dozens of others;[9]

13      g.      published a hard back multi page book of detailed photos and

14      descriptions of the Harbor Island Property for potential select purchasers;

15      h.      placed advertisements in select print publications including *The*

16      *Wall Street Journal, The New York Times, The International Herald Tribune,*

17      *The Robb Report, Christie's Great Estates, Christie's* (the auction house

18      magazine), *Christie's Interiors, Riviera Magazine, Newport Beach Magazine,*

19      *Laguna Beach Magazine, The Los Angeles Antiques Show* (catalog), *The Daily*

20      *Pilot, The Los Angeles Times, The Laguna Beach Independent, The HÔM*

21      *Review, The HÔM Features;*

22      i.      coordinated its advertising efforts with the marketing

23      department at Christie's Great Estates to reach a more select group of potential

24      buyers and agents;

25      j.      distributed marketing materials and other information regarding

26      the Harbor Island Property to a list of 145 real estate brokers who together

27

28      [8] More than 130 luxury real estate brokerages, in over 33 countries around the world, received copies of the multiple-page, color property presentation.
[9] Tens of thousands of views of the Harbor Island Property have occurred on these sites.

9

1    produce annual sales of over $100 billion;

2        k.    distributed marketing materials by direct mail, contacted by

3    telephone and/or email all of HÔM's past and potential qualified clients, as

4    well as the other brokers and agents and non-realtor individuals that comprise

5    or represent the Harbor Island Property's target market;

6        l.    created additional exposure through its efforts in editorial

7    commentary online and in print, as well as through other exclusive and

8    proprietary exposure efforts, including sponsorship of nationally televised

9    charitable golf tournaments (The Toshiba Classic) and tennis events (Newport

10    Beach Breakers).

11        m.    featured the Harbor Island Property prominently in banners and

12    in guide books with respect to sponsored sporting events; and

13        n.    sponsored multiple private previews of the Harbor Island

14    Property to familiar and experienced brokers and agents from throughout

15    Southern California.

16        HÔM has incurred and paid costs associated with all of these endeavors in excess of

17    $70,000 to date. Additionally, since the recent approval of the application extending the terms

18    of HÔM's employment, HÔM has placed further advertising and has ordered a new multi-

19    page, full color brochure for the Harbor Island Property.

20        In addition to the foregoing, HÔM has experienced numerous challenges and

21    problems associated with selling the Harbor Island Property.    HÔM has encountered

22    reluctance from buyers' agents and prospective buyers to enter into a contract for the Harbor

23    Island Property because, among other things, the Harbor Island Property:

24        a.    is subject to a bankruptcy proceeding;

25        b.    is subject to an acrimonious divorce proceeding;

26        c.    was subject to a specific performance lawsuit;

27        d.    is subject to a deeded first right of refusal;

28        e.    had multiple, but now corrected or correctable, title defects;

10

1                   f.     has erroneous recorded liens, assessments, etc.;

2                   g.     has a recorded property tax default;

3                   h.     has a deed of trust in default;

4                   i.     has a ground lease in default;

5                   j.     was rumored to have structural issues with subject property;

6                   k.     is perceived to have been inadequately maintained for a

7 property of this value;

8                   l.     was the location of Mrs. Simon's recent purported suicide;

9                   m.     was rumored to be subject to issues of authority to negotiate or

10 sell, as well the rumored inability to transfer clean title;

11                   n.     is subject to bankruptcy court approval, and the sale process

12 will include a competitive overbid process in which the buyer's privacy cannot

13 be assured;

14                   o.     is subject to an "as-is" sale, without the benefit of customary

15 disclosures regarding property history and condition, per the seller(s), as

16 exempted by law;

17                   p.     has been difficult to show to qualified and interested parties

18 while previously occupied;

19                   q.     did not "show well" due to improper staging for showings;

20                   r.     was originally offered at a list price exceeding the highest price

21 ever paid for a single family residence in Orange County, at the beginning of

22 an obviously declining real estate market;

23                   s.     limited in functional and aesthetic appeal to a customary buyer

24 of this type of property, in similar locations, and at similar price-points;

25                   t.     is subject to the near complete eradication of traditional sources

26 and programs of lending for this type of a purchase transaction, thus severely

27 diminishing the field of prospective purchasers. Where these programs

28 currently exist, their requirements and parameters are far less accommodating

11

1 than they have been in the past.

2 **C.     The Brokers Have Earned Their Commission.**

3 Despite all of the challenges, the Brokers' efforts have generated four offers, two of
4 which were at a price acceptable to the Debtor, and one that has now been accepted by the
5 Debtor subject to Court approval.

6 Moreover, in addition to its efforts in marketing the Harbor Island Property since
7 September 2009, HÔM has directly overseen the maintenance, cleaning, repair and
8 improvement of the entire property and its contents. This has included scheduling, meeting,
9 overseeing and directing gardeners, tree trimmers, appliance and mechanical repairmen, boat
10 dock service and inspectors, cleaning crews, movers, decorators and consulting brokers.

11 HÔM has continued to market the Harbor Island Property in an endeavor to obtain the
12 highest possible price for the Debtor's estate. The Harbor Island Property has been shown
13 three times since the Stalking Horse Bid Agreement (defined below) was accepted. HÔM
14 will continue its efforts to obtain back up offers and inform all interested, qualified parties of
15 the overbid timeline and procedure. HÔM will help keep any escrows moving forward and
16 follow through with continued service to the Debtor.

17 In recent weeks, HÔM's services have included monitoring the Harbor Island Property
18 at least twice a week, since it is now vacant, meeting several inspectors over a period of two
19 full days and another three days to meet with the Stalking Horse Bidder's architects and
20 designers, determining that one of the major systems in the house was not functioning and
21 meeting with service technicians to make repairs, working closely with Richard Golubow to
22 review, discuss and determine that the current escrow with the Stalking Horse Bidder will be
23 successful. See, Declaration of Vicki Lee ("Lee Declaration") appended hereto.

24 The Debtor believes that the sales process conducted by the Debtor and its real estate
25 professionals was, and continues to be, thorough and adequate to obtain the highest and best
26 price for the Harbor Island Property, subject to the opportunity for others to participate by the
27 proposed sale procedures.

28

12

1   Based on all of the foregoing, assuming that Court approves the sale of the Property
2   and that escrow closes, the Debtor believes that its Brokers should be paid their commission
3   (described in Section G below) upon the close of escrow without the need for the entry of a
4   further order of the Court as previously authorized by the Court.[10]

5   **D.    Brief Description of Terms of Sale of The Harbor Island Property.**

6   The foregoing marketing efforts have produced an offer to purchase the Harbor Island
7   Property pursuant to the terms set forth in that certain "California Residential Purchase
8   Agreement and Joint Escrow Instructions" (the "Stalking Horse Bid Agreement") between the
9   Debtor and the buyer, designated as Gwendolyn Wilson, Trustee of the Telluride Trust dated
10  February 21, 2010 (the "Stalking Horse Bidder").[11]   A copy of the Stalking Horse Bid
11  Agreement is attached hereto as Exhibit 1 to the Golubow Declaration.  By way of summary,
12  the principal terms of the Stalking Horse Bid Agreement are as follows:

13      1.    an aggregate Purchase Price $27,000,000, which consists of cash in the
14  amount of $18,000,000 and two parcels of improved residential real property with an
15  agreed value of $9,000,000;

16      2.    the Harbor Island Property will be sold "as-is";

17      3.    the Debtor shall assign the above-mentioned Tidelands Lease with the
18  County of Orange dated by May 1, 1996 respect to certain real property adjacent to the
19  Newport Harbor that offers private dock access for the resident of the Harbor Island
20  Property to the Stalking Horse Bidder;[12] and

21      4.    as described in Paragraph 6 of "Addendum No. 1 to Counter Offer No.
22  1," which is attached to and included within the Stalking Horse Bid Agreement which
23  is attached as Exhibit 1 to the Declaration of Richard Golubow, the personal property
24  being purchased by the Stalking Horse Bidder as part of the purchase of the Harbor

25  ----
26  [10] See, Docket No. 207 at p. 3 ¶ 10 which sets forth the arrangement with respect to the payment of the Commission upon the close of escrow without the need for further Court order and Docket No. 214, the Court's order approving that provision.
27  [11] The Stalking Horse Bid Agreement is redacted to accommodate the Stalking Horse Bidder's request for confidentiality throughout the sale process.
28  [12] The Tidelands Lease was assumed by the Debtor early in this case, which assumption was approved by order of this Court entered on February 4, 2008.

13

1    Island Property consists of all of the built-in appliances, washers, dryers, security

2    systems, drapes and curtains located in the Harbor Island Property.  Notwithstanding

3    the foregoing, as also set forth in Paragraph 6, the other personal property located at,

4    or used in connection with, the Harbor Island Property, including but not limited to,

5    furniture, fixtures, art, vehicles, clothing, jewelry, safes, furs, watercraft, two

6    downstairs hallway light fixtures/chandeliers and chandeliers in the middle living

7    room and library area, is not included in the proposed sale to the Stalking Horse

8    Bidder; and

9         5.    the sale to the Stalking Horse Bidder shall close no later than 60 days

10    after the Debtor provides notice to the Stalking Horse Bidder of the final approval of

11    the Stalking Horse Bid Agreement.

12    **E.    The Auction of the Property.**

13    Consistent with the procedures recently approved by the Court at the hearing on the

14    Sale Procedures Motion:[13]

15         1.    the Harbor Island Property is still being marketed:

16         2.    an auction (the "Auction Sale") shall be held on May 13, 2010 at 10:00

17    a.m. at the offices of Winthrop Couchot Professional Corporation, 660 Newport

18    Center Drive, Suite 400, Newport Beach, CA 92660;

19         3.    any party who would like to bid on the Harbor Island Property during

20    the Auction Sale must submit evidence of financial resources sufficient to close a sale

21    of the Harbor Island Property to the Debtor's Manager, the Debtor's Counsel and the

22    Debtor's Broker no later than May 3, 2010 in order to become an "Eligible

23    Overbidder" (as defined in the Sale Procedures Motion) and to participate at the

24    Auction Sale;

25         4.    Eligible Overbidders must submit their bids no later than 5:00 p.m.

26    prevailing Pacific Time on May 10, 2010; each Overbid must include a proposed

27

28    [13] The Debtor respectfully requests that the Court take judicial notice of the Sale Procedures Motion, which was
filed on or about April 1, 2010 and assigned Docket No. 230.

14

1    purchase agreement, an explanation of how the Overbid differs from the Stalking

2    Horse Bidder's Purchase Agreement, and a good faith deposit of $780,000 by

3    cashier's check or other cash equivalent;

4           5.     if an Overbid is not all cash or cash equivalents, the Overbid must be at

5    least equal to $27,100,000 (the "Minimum Overbid") of which a minimum of $18

6    million must be cash or cash equivalents;

7           6.     if an Overbid is all cash or cash equivalents, the Overbid must be at

8    least equal to $26,550,000, which takes into account the present cash value of an all

9    cash offer, as compared with the present cash value of the purchase price set forth in

10   the Stalking Horse Bid Agreement;

11          7.     the Court will hold a hearing on this Motion seeking the entry of an

12   order approving the sale of the Harbor Island Property and certain personal property to

13   the Stalking Horse Bidder or a successful overbidder (the "Successful Bidder") free

14   and clear of liens, interests and encumbrances pursuant to 11 U.S.C. § 363 and

15   authorizing the assumption and assignment of the Tidelands Lease under 11 U.S.C. §

16   365 and the other relief requested herein on May 19, 2010 at 11:30 a.m.; and

17          8.     if the Stalking Horse Bidder is not the Successful Bidder, a break-up

18   fee of $60,000 (the "Breakup Fee") shall be paid to the Stalking Horse Bidder in

19   accordance with the terms of the Sale Procedures Motion.

20   F.   **The Liens, Claims, Interests and Other Encumbrances**

21          There are several liens, claims, interests and other encumbrances currently asserted

22   against the Harbor Island Property.

23          1.    The Preliminary Title Report

24          According to the Preliminary Title Report ("PTR") appended to the Golubow

25   Declaration as Exhibit 3, the Harbor Island Property appears to have the following liens,

26   claims, interests and/or other encumbrances recorded against it (which may or may not be

27   valid):

28

15

a.    a lien in favor of Orange County for unpaid property taxes totaling $311,262.64 for fiscal years 2007 and 2008 (PTR at item no. 2);[14]

b.    a lien in favor of Orange County for unpaid property taxes totaling $166,997.06 in base property taxes and $16,745.70 in penalties for the tax years 2008 through 2010 (PTR at item nos. 2 and 3);

c.    various easements and covenants (item nos. 8 – 16);

d.    the Right of First Refusal (PTR item no. 17) as clarified by that certain judgment of the Orange County Superior Court (PTR item no. 18);[15]

e.    a lien in favor of Orange County and/or the City of Newport Beach with respect to pier permits in an unspecified amount (PTR at item no. 19);

f.    a deed of trust in favor of First Federal Bank of California ("First Federal") in the amount of $6 million (PTR at item no. 20);

g.    the Debra Simon Lis Pendens (PTR at item no. 21);

h.    a lien in favor of the homeowners' association of which the Debtor is a member as a result of its ownership of the Harbor Island Property in the amount of $3,667.95 (PTR at item no. 22);

i.    a deed of trust in favor of YSA in the amount of $2.8 million dollars (PTR at item no. 23);

j.    two liens for unsecured property taxes in favor of Orange County totaling $6,313.74 (PTR at item nos. 24 and 25); and

k.    a notice of lien recorded by Duane Morris LLP ("Duane Morris"), the former counsel for Debra Simon and currently counsel for the Estate of Debra Simon, for an unspecified amount of attorneys' fees related to the pending distribution of

---

[14] The PTR does not specify how much of the alleged property tax lien is a result of base property taxes and how much is a result of alleged penalties.

[15] By its approval of the Sale Procedures Motion, the Court determined that the Debtor complied with and satisfied all requirements under the Carver First Right of Refusal. Given the Court's ruling and as a result of the service of this Motion (which has been made upon Carver as required by the Court), the Debtor has performed all obligations under the Carver Right of First Refusal and will be finally discharged from all such obligations upon the close of the sale of the Harbor Island Property.

16

1  property in connection with the dissolution of the Simon marriage (PTR at item no.

2  26).

3  2.    The Proofs of Claims

4  Additionally, the following entities have filed proofs of claims asserting that they have

5  claims allegedly secured by, or interests in, the Harbor Island Property:

6  a.    the Orange County Treasurer-Tax Collector ("OCTC") filed a proof of

7  claim on or about July 11, 2007 asserting a secured claim in the amount of

8  $160,665.00, which claim was designated by the Clerk of the Court as Claim No. 1;[16]

9  on or about October 24, 2007, the OCTC amended Claim No. 1 to reduce the amount

10  of its alleged secured claim to $160,665.00 via an amendment designated by the Clerk

11  of the Court as Claim No. 10;[17] on or about December 12, 2007, the OCTC further

12  reduced its alleged secured claim to $82,764.84 as a result of an amendment

13  designated by the Clerk of the Court as Claim No. 14.[18] As a result, by its remaining

14  claim the OCTC asserts an entitlement to a secured claim of $80,065.39 against the

15  Debtor's estate (the "OCTC Claim");[19]

16  b.    the OCTC also filed an administrative expense claim against the

17  Debtor's estate on or about April 19, 2010 for alleged *secured* property taxes for the

18  period from 2008 through 2010 in the sum of $558,086.02 (consisting of base taxes in

19  the amount of $500,539.12 for the tax years 2008 through 2010, penalties in the

20  amount of $57,500.90, fees in the amount of $46.00 and "arrearages" in the amount of

21  $204,029.26);[20]

22  c.    First Federal filed a proof of claim on or about October 10, 2007

23  asserting a secured claim in the amount of $6,235,639.82 (consisting of principal in

24

25  [16] By that proof of claim the OCTC also asserted a priority unsecured claim in the amount of $2,774.45.

26  [17] The amendment also served to reduce the amount of the OCTC's alleged priority unsecured claim to $2,699.45.

[18] By this amendment, the OCTC's priority unsecured claim was further reduced by a few cents to $2,699.39.

27  [19] The Debtor respectfully requests that the Court take judicial notice of Claim Nos. 1, 10 and 14 filed by the OCTC.

28  [20] The Debtor is not sure what the OCTC means by "arrearages" (see p. 2 of OCTC's Administrative Expense Claim).

17

the amount of $5,875,464.23, interest as of July 9, 2007 in the amount of $161,174.24, late charges through July 1, 2007 of $9,530.16, foreclosure fees in the amount of $15,647.79, property tax advances in the amount of $173,276.00, interest on property tax advances in the amount of $372.40 as of July 9, 2007, and prepay tax advance service fees of $175.00; the Debtor is informed that, with interest, attorneys' fees and other charges, First Federal now alleges that its secured claim totals approximately $7 million; and

          d.     Debra Simon filed a proof of claim asserting an interest in the Harbor Island Property on or about October 30, 2007.[21]

Based on all of the foregoing, the liens and/or secured claims asserted against the Harbor Island Property should total somewhere between $10,500,000 and $11,000,000 (not including any interest asserted by the probate estate of Debra Simon).[22] As the purchase price offered for the Property is equal to approximately $27,000,000, there is substantial equity in the Harbor Island Property.

## G. The Commission

Pursuant to the terms of the Broker's employment HÔM and Willis are entitled to payment of a 4% commission (the "Commission") upon the closing of a sale of the Harbor Island Property. The Commission is estimated to be $1,080,000 based on the offer made by the Stalking Horse Bidder of which $940,000 would be paid to HÔM and $135,000 would be paid to the Willis Allen brokerage firm as per the arrangement approved by the Court.[23]

///

---

[21] Coldwell Banker Residential Brokerage ("Coldwell Banker") also filed a proof of claim, which claim was designated by the Clerk of the Court as Claim No. 7 on or about October 21, 2007 asserting a secured claim in the amount of $662,500. However, Coldwell Banker withdrew that claim or about April 20, 2010 (see Docket No. 243).

[22] Although the amounts of the liens listed on the PTR and the secured claims that appear on the claim register for the same claimants differ in amount somewhat, it appears that the OCTC asserts a secured claim of approximately $640,000, First Federal asserts a secured claim of approximately $7 million, YSA asserts a secured claim of approximately $2.8 million plus interest, and the HOA asserts a secured claim of approximately $3,700 for a total of $10,443,700 plus interest. The Debtor does not agree that all of the amounts asserted are owed. However, the Debtor is confident that the total amount of secured claims against the Harbor Island Property will not exceed $11 million.

[23] See, Docket No. 207 at p. 3 ¶ 9 which sets forth the arrangement with respect to the division of the Commission and Docket No. 214, the Court's order approving that arrangement.

18

1 **H.     The Expense Reimbursement**

2         At the request of the Brokers and the Debtor's Manager, Robert A. Giem, Inc.
3 ("RAGI") incurred out-of-pocket expenses in the amount of $1,595.00 in connection with: (1)
4 arranging for the "staging" of the Harbor Island Property and the moving of excess furniture
5 located on the premises into the basement of the Harbor Island Property at the cost of
6 $570.00, (2) arranging for gardening services, including but not limited to tree trimming, on
7 the Harbor Island Property to ensure that the real property was properly maintained and
8 showed well to prospective buyers at the cost of $875.00, and (3) the payment of a $150.00
9 fee associated with a Residential Building Report, a report that real property sellers in
10 Newport Beach must acquire for buyers when selling real property.   As the Debtor believes
11 that all of the foregoing expenses were necessary to preserve and sell the Harbor Island
12 Property and they are expenses that would normally be borne by sellers of real property or
13 their agents (and later reimbursed to such agents out of escrow in a typical sale of real
14 property in Newport Beach), the Debtor respectfully requests the authority to reimburse RAGI
15 for these expenses out of escrow.

16 **I.     The Proposed Payment of Liens, Claims and/or Interests Out of Escrow**

17         1.     Required Payments

18         By this Motion, the Debtor proposes that it be authorized to pay the following
19 amounts to the following entities out of escrow:

20         a.     the base secured property tax amounts owed to the OCTC for the fiscal
21         years 2007, 2008, 2009 and 2010 as reflected in the proofs of claims filed by the
22         OCTC as amended and referenced above;

23         b.     the principal balance due to First Federal on its deed of trust;

24         c.     the principal balance due to YSA on its deed of trust;

25         d.     the principal balance owed to the HOA on its lien;

26         e.     the Commission;

27         f.     the Expense Reimbursement;

28         g.     fees due to the Office of the United States Trustee; and

19

1      h.     all escrow, closing and recording costs, as well as the cost of any title
2 insurance endorsements (the "Closing Costs").

3 The aforementioned amounts will be referred to herein as the "Undisputed Liens, Claims and
4 Interests". All other liens, claims and/or interests and/or portions of liens, claims and/or
5 interests will be referred to herein as the "Disputed Liens, Claims and Interests".

6      2.     Optional Payments

7      In addition, the Debtor requests the authority, at its discretion, to pay the following
8 additional amounts to the following entities out of escrow (the "Optional Amounts"):

9      a.     the amount of the estimated tax liability of the Debtor's estate to the
10 FTB arising from its sale of the Harbor Island Property;

11      b.     the amount of the estimated tax liability of the Debtor's estate to the
12 Internal Revenue Service ("IRS") from its sale of the Harbor Island Property; and

13      c.     any amount as agreed to by and between the Debtor and the holder of a
14 Disputed Lien, Claim or Interest prior to the close of escrow.

15      3.     The Transfer of the Disputed Liens, Claims and Interests from the Harbor
16      Island Property to the Net Proceeds

17 By this Motion, the Debtor also proposes that the Court should enter an order:

18      a.     transferring the Disputed Liens, Claims and Interests from the Harbor
19 Island Property to the proceeds of the sale of the Harbor Island Property net of the
20 payment of the Undisputed Liens, Claims and Interests and any Optional Amounts
21 (the "Net Proceeds") with the same force, effect, validity, priority and extent that the
22 Disputed Liens, Claims and Interests had in the Harbor Island Property; and

23      b.     authorizing and instructing the Debtor to deposit the portion of the Net
24 Proceeds attributable to the Disputed Liens, Claims and Interests into a segregated
25 interest-bearing account pending further order of the Court.

26 ///
27 ///
28 ///

20

III.

DISCUSSION

A.    **The Court Should Authorize The Debtor To Sell The Harbor Island Property And The Personal Property Free And Clear Of All Liens, Claims and/or Interests**

     1.    The Debtor Has Complied With All Notice Requirements Under the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules Governing the Sale of the Harbor Island Property and the Personal Property.

Section 363(b)(1) provides that the Debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 102(1) defines "after notice and a hearing" as *after such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances.* 11 U.S.C. § 102(1)(A) (emphasis added).

Rule 6004(a) of the Federal Rules of Bankruptcy Procedure provides in pertinent part that notice of a proposed sale not in the ordinary course of business must be given pursuant to Federal Rules of Bankruptcy Procedure. 2002(a)(2), (c)(1), (i) and (k), and, if applicable, in accordance with section 363(b)(2) of the Bankruptcy Code. Federal Rule of Bankruptcy Procedure. 6004(a). Rule 2002(a)(2) requires at least 20 days' notice by mail of a proposed sale of property of the estate other than in the ordinary course of business, unless the Court for cause shown shortens the time or directs another method of giving notice. Fed. R. Bankr. P. 2002(a)(2). Rule 2002(c)(1) requires that the notice of a proposed sale include the date, time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. It also provides that the notice of sale or property is sufficient if it generally describes the property. Fed. R. Bankr. P. 2002(c)(1). Rule 2002(i)

21

1  requires that the notice be mailed to committees elected pursuant to 11 U.S.C. § 705 or

2  appointed pursuant to 11 U.S.C. § 1102.[24] Fed. R. Bankr. P. 2002(i). Rule 2002(k) requires

3  that the notice be given to the United States Trustee. Fed. R. Bankr. P. 2002(k).

4          Rule 6004(c) provides that a motion for authority to sell property free and clear

5  of liens or other interests must be made in accordance with Rule 9014 and must be served on

6

7  the parties who have liens or other interests in the property to be sold. Fed. R. Bankr. P.

8  6004(c).

9          Local Bankruptcy Rule 9013-1(d)(2) requires that a notice of motion and motion

10 be served at least 21 days before the hearing on the date specified in the notice.  L.B.R.

11 9013-1(d)(2).

12         In addition, Local Bankruptcy Rule 6007-1(f) requires that an additional copy of

13 the notice of motion be submitted to the Clerk of the Bankruptcy Court together with a

14

15 document Form 6004-2 at the time of filing for purposes of publication. L.B.R. 6007-1(f).

16         The Debtor has complied with all of the above provisions of the Bankruptcy

17 Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules.  The

18 Debtor has complied with Federal Rules of Bankruptcy Procedure. 6004(a) and 2002(a)(2),

19 (c)(1), (i) and (k), because this Notice of Motion and Motion has been filed

20 contemporaneously herewith, which includes the date, time and place of the sale and the

21

22 deadline for objecting thereto, was served on the United States Trustee, all of the Debtor's

23 known creditors, and all parties requesting special notice.  The Debtor has complied with

24 Rule 6004(c), because this Notice and Motion were also served upon the parties who have

25 alleged liens, claims and/or interests in the Property.[25]  The Debtor has complied with the

26

27

---

28 [24] As of the date of this Motion, no official committee of unsecured creditors has been appointed in this case.
[25] To the Debtor's knowledge, no one other than the estate of Debra Simon asserts an interest in the Personal Property, and her estate consents to the sale of the Personal Property.

22

1 requirements of Local Bankruptcy Rule 6007-1(f) because the Debtor has filed the Notice

2 and Form 6004-2 with the Clerk of the Bankruptcy Court.

3    2.    The Sale Motion Should Be Approved Because Good Business Reasons Exist

4          To Approve the Sale of the Property, the Purchase Price for the Property is

5          Fair and Reasonable, and the Proposed Sale is in the Best Interests of the

6          Debtor's Estate and Its Creditors.

7

8    As a general matter, a Court considering a motion to approve a sale under Section

9 363(b) should determine from the evidence presented before it that a "good business reason"

10 exists to grant such a motion.  In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).  In

11 addition, the Court must further find it is in the best interest of the estate.  To make this

12 determination, a Court should consider whether:

13

14    (1)    the sale is fair and reasonable (i.e., the price to be paid is

15          adequate);

16    (2)    the property has been given adequate marketing;

17    (3)    the sale is in good faith, i.e., there is an absence of any

18          lucrative deals with insiders, and

19    (4)    adequate notice has been provided to creditors.

20 In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 841-2 (Bankr. C.D. Cal. 1991); In re The

21 Landing, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993); In re Mama's Original Foods, Inc., 234

22 B.R. 500, 502-505 (C.D. Cal. 1999).  The Debtor submits that the proposed sale of the

23 Harbor Island Property and the Personal Property free and clear of liens, claims, and

24 interests, pursuant to the terms the Stalking Horse Bid Agreement (or pursuant to the terms

25 of any other agreement entered into by and between the Debtor and a Successful Bidder),

26 satisfy each of these requirements.

27

28

23

a.    SOUND BUSINESS PURPOSE

The Ninth Circuit Bankruptcy Appellate Panel in Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b).    The facts pertaining to the sale at issue here amply substantiate the Debtor's business decision that the contemplated sale of the Harbor Island Property to the Stalking Horse Bidder or a successful overbidder serves the best interests of the estate's creditors and merits the Court's approval.    As discussed above, the Debtor has been actively marketing the Harbor Island Property for almost 2 ½ years.    As previously described, to reach its target demographic and in order to attract the best possible offers, the Debtor and its Brokers commissioned professional photographs of the Harbor Island Property, contracted for the creation of flattering multi-page full color brochures and a hard cover book to advertise the property, created a website to showcase the Harbor Island Property, advertised the Harbor Island Property on dozens of property websites and in select print publications including *The Wall Street Journal, The New York Times, The International Herald Tribune, The Robb Report, Christie's Great Estates, Christie's* (the auction house magazine), and *The Los Angeles Times,* among others, coordinated its advertising efforts with the marketing department at Christie's Great Estates to reach a more select group of potential buyers and agents, distributed marketing materials and other information regarding the Harbor Island Property to a list of the top145 real estate brokers in the area, and, among other things, created additional exposure through its exclusive and proprietary exposure efforts, including sponsorship of nationally televised charitable golf tournaments and tennis events.

Given current market conditions and based upon the Debtor's marketing efforts and the fact that the Debtor will conduct an Auction Sale at which qualified overbidders will have the opportunity to overbid on the Harbor Island Property, the Debtor believes that the Harbor Island Property cannot realistically be sold at a price in excess of that proposed to be paid by the Stalking Horse Bidder or a different Successful Bidder at the Auction Sale.

1  As a result, the proposed sale of the Property should result in the Debtor obtaining

2  the highest and best price for the Property.  As set forth in the Golubow Declaration, the

3  Debtor projects the sale of the Property will generate substantial funds to pay the claims of

4  the Debtor's secured and unsecured creditors.  Thus, the Debtor believes that the proposed

5
6  sale of the Harbor Island Property and the Personal Property are in the best interests of the

7  Debtor's estate and its creditors.

8          b.    FAIR AND REASONABLE PRICE.

9  In order for a sale to be approved under Section 363(b), the purchase price must be

10  fair and reasonable.  See generally, In re Canyon Partnership, 55 B.R. 520 (Bankr. S.D. Cal.

11  1985).  The trustee (or debtor in possession) is given substantial discretion in this regard.  Id.

12  In addition, Courts have broad discretion with respect to matters under section 363(b).  See

13
14  Big Shanty Land Corp. v. Comer Properties, Inc., 61 B.R. 272, 278 (Bankr. N.D. Ga. 1985).

15  In any sale of estate assets, the ultimate purpose is to obtain the highest price for the property

16  sold.  Wilde Horse Enterprises, Inc., 136 B.R. at 841 (citing In re Chung King, Inc., 753 F.2d

17  547 (7th Cir. 1985)), In re Alpha Industries, Inc., 84 B.R. 703, 705 (Bankr. Mont. 1988).

18  As discussed above, the Debtor has extensively marketed the Harbor Island Property.

19  Thus, based on the response to the foregoing efforts and the Debtor's familiarity with current

20
21  market conditions, and the fact that the Harbor Island Property was auctioned, the Debtor

22  believes that the price offered for the Harbor Island Property and the Personal Property by

23  the Stalking Horse Bidder or a different Successful Bidder represents the fair market value of

24  the Property. As a result, the Debtor submits that the final purchase price to be paid by the

25  Stalking Horse Bidder or a different Successful Bidder represents a fair and reasonable price

26  for the Property.

27  / / /

28

c.    ADEQUATE MARKETING.

As discussed above, the efforts of the Debtor and its Brokers to market the Property have been extraordinary.  Based on the foregoing, the Debtor submits that the Property has been more than adequately marketed.

d.    GOOD FAITH

When a bankruptcy Court authorizes a sale of assets pursuant to Section 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser.  In re Abbotts Dairies, 788 F.2d at 149.  Such a procedure ensures that Section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11, and as such, it mirrors the requirement of Section 1129 that the Bankruptcy Court independently scrutinizes the debtor's reorganization plan and makes a finding that it has been proposed in good faith.  Id. at 150.  With respect to the Debtor's conduct in conjunction with the sale of the Harbor Island Property and the Personal Property, the good faith requirement focuses principally on whether there is any evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  Abbotts Dairies, 788 F.2d at 147; Wilde Horse Enterprises, 136 B.R. at 842.

As noted above, the Debtor negotiated the Stalking Horse Bid Agreement at arm's length, the Harbor Island Property was auctioned in a public auction sale, and the Successful Bidder (whether that is the Stalking Horse Bidder or someone else) is not an "insider" of the Debtor as that term is defined in the Bankruptcy Code.  11 U.S.C. 101(31).  Moreover, there has been no fraud or collusion in connection with the proposed sale because everyone who expressed an interest in the Property had an opportunity to make an offer on it and the property was eventually sold at auction.  Based on the foregoing, the Debtor submits that the Successful Bidder is a "good faith" purchaser.

26

e.    ACCURATE AND REASONABLE NOTICE

The purpose of the notice is to provide an opportunity for objections and hearing before the Court if there are objections. In re Karpe, 84 B.R. 926, 930 (Bankr. M.D.Pa. 1988). A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections. Id.

As set forth above, the Debtor served this Notice of Motion and Motion on the United States Trustee, all of the Debtor's known creditors and all parties requesting special notice. The Notice includes the date, time and place of the sale and the time fixed for filing objections thereto. This Notice and Motion were served upon the parties who have liens and/or claims against, or interests in, the Harbor Island Property, and the Debtor filed the Notice and Form 6004-2 with the Clerk of the Bankruptcy Court, as required by Local Bankruptcy Rule 6007-1(f), so that the Clerk of the Bankruptcy Court could publish information regarding the proposed sale. Thus, the Debtor submits that the notice of the sale should be deemed adequate, accurate and reasonable by the Court.

3.    The Sale of the Property Should Be Free and Clear of All Liens, Claims, and Interests Under 11 U.S.C. §363(f).

Bankruptcy Code §363(f) provides that a debtor may sell property of the estate "free and clear of any interest in such property" if:

(1)    applicable non-bankruptcy law permits the sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

27

1          (4)     such interest is in bona fide dispute; or

2          (5)     such entity could be compelled, in a legal or

3                  equitable proceeding, to accept a money satisfaction

4                  of such interest.

5

6    11 U.S.C. §363(f). Because Section 363(f) is in the disjunctive, the Debtor must only meet

7    one of the five subsections of Section 363(f) in order to sell the Harbor Island Property free

8    and clear of all liens, claims and/or interests.[26]  In re Whittemore, 37 B.R. 93, 94 (Bankr. D.

9    Or. 1984).

10                 a.      THE SALES SHOULD BE APPROVED UNDER 11 U.S.C. § 363(F)(2).

11         Section 363(f)(2) of the Bankruptcy Code authorizes a sale to be free and clear of an

12   interest if the interest holder consents to the sale. "[C]onsent may be express or may be

13   implied from circumstances surrounding the sale." 3 COLLIER ON BANKRUPTCY ¶ 363.06[3]

14
     at 363-51 (15th Ed. Rev. 2008).
15

16         In this case, the Debtor believes that all of the holders of liens, claims and/or interests

17   in the Harbor Island Property (the "Interest Holders") consent to the sale of the Harbor Island

18   Property, and the Debtor believes that no one holds any interest in the Personal Property with

19   the exception of the Debtor. As a result, to the extent that a party served with this Notice of

20   Motion and Motion does not object to the relief sought herein, the Court should deem such a

21
     party to consent to the relief requested herein, and the Court should find that the proposed sale
22

23   satisfies the requirements of section 363(f)(2).

24                 b.      THE SALE SHOULD BE APPROVED UNDER 11 U.S.C. § 363(F)(3).

25         Section 363(F) provides that a sale may be free and clear if the purchase price is

26   greater than the total amount of liens on the property. In this case, as explained in Section F

27

28   ─────────────────
     [26] The Debtor does not believe that anyone holds any liens, claims or interests in the Personal Property. As a
     result, the sale of that Property should be free and clear as well.

                                                 28

1  above, the total secured claims and/or liens (which does not include any interest asserted by

2  the probate estate of Debra Simon) against the Harbor Island Property should not exceed $11

3  million and the proposed purchase price is equal to approximately $27 million.  As a result,

4  there is substantial equity in the Harbor Island Property, and the sale should be approved free

5  and clear.

6

7          c.      THE SALES SHOULD BE APPROVED UNDER 11 U.S.C. § 363(F)(5).

8          The Bankruptcy Appellate Panel for the Ninth Circuit recently scrutinized section

9  363(f)(5) in the context of the sale of real property.  See Clear Channel Outdoor, Inc. v.

10 Knupfer (In re PW, LLC), 391 B.R. 25 (9th Cir. B.A.P. 2008) ("Clear Channel").  In Clear

11 Channel, the senior secured creditor attempted to purchase the debtor's real property by way

12 of a credit bid, free and clear of the interest of a nonconsenting junior lienholder outside of a

13 plan of reorganization.  The Bankruptcy Court approved the sale to the senior lender under

14 section 363(f)(5) of the Bankruptcy Code, finding that section 363(f)(5) permits a sale free

15 and clear of the creditor's interest in property "whenever a claim can be paid with money."

16

17 391 B.R. at 42.

18          In reversing the Bankruptcy Court's decision, the Bankruptcy Appellate Panel found

19 that section 363(f)(5) requires that "(1) a proceeding exists or could be brought, in which (2)

20 the nondebtor could be compelled to accept a money satisfaction of (3) its interest."  Id. at 41.

21 Taking up these factors in reverse order, the Bankruptcy Appellate Panel concluded that a

22 lien, such as the lien, claims and/or interests of all of the Interest Holders referenced above,

23 constitutes an "interest" for purposes of section 363(f)(5).  With respect to the second factor,

24 the Bankruptcy Appellate Panel ruled that section 363(f)(5) refers to those proceedings in

25 which the creditor "could be compelled to take *less* than the value of the claim secured by the

26 interest."  Id.  In order to approve a sale free and clear under section 363(f)(5), the Court must

27

28

1  "make a finding of the existence of ... a mechanism [to address extinguishing the lien or

2  interest without paying such interest in full] and the [debtor in possession] must demonstrate

3  how satisfaction of the lien 'could be compelled.'" Id. at 45. Finally, the Bankruptcy

4  Appellate Panel held that section 363(f)(5) requires that there be, "or that there be the

5  possibility of, some proceeding, either at law or at equity, in which the nondebtor could be

6  forced to accept money in satisfaction of its interest." Id.

7

8       Here, all of the factors set forth in Clear Channel for a sale free and clear of the

9  Bank's interest are satisfied. The Debtor does not dispute that the interest of each of the

10 Interest Holders (if valid) could constitute an "interest" in the Property.

11      Similarly, any party who asserts an "interest" in the Harbor Island Property which is

12 junior to the lien, claim or interest of each Interest Holder could be compelled, in a legal or

13

14 equitable proceeding, to accept a money satisfaction of its interest. Recently, the Bankruptcy

15 Court in In re Jolan, Inc., 2009 WL 1163928 (Bankr. W.D. Wash. 2009) provided an analysis

16 of the Bankruptcy Appellate Panel's decision in Clear Channel and suggested that the scope

17 of the Panel's ruling in Clear Channel should be narrowly construed to the facts of that

18 particular case. The Court in Jolan noted that the appellees defending the sale free and clear

19 in Clear Channel never argued that there were any qualifying "legal or equitable proceedings"

20

21 beyond the cramdown under § 1129 and that the Panel, in turn, exercised its prerogative to

22 limit its ruling to the arguments presented by the parties. Id. at 3. Accordingly, the Panel in

23 Clear Channel did not address whether any non-contractual mechanisms exist whereby a

24 lienholder might get less than full payment yet lose the lien. Id. at 3. The Court in Jolan,

25 however, did address the issue and concluded that there are a number of legal and equitable

26 proceedings available in Washington in which a junior lienholder could be compelled to

27 accept a money satisfaction including, without limitation, "a senior secured party's

28

1  disposition of collateral under the default remedies provided in part VI of Article 9" of

2  Washington's Uniform Commercial Code (specifically, RCW 62A.9A-617), and the

3  disposition of real property through "judicial and nonjudicial foreclosures, which operate to

4  clear junior lienholders' interests, with their liens attaching to proceeds in excess of the costs

5
   of sale and the obligation or judgment foreclosed." Id. at 3-4.  There are legal and equitable
6
7  proceedings available in California which parallel the proceedings discussed by the Court in

8  Jolan.[27]  Based on the foregoing, the Debtor respectfully submits that the holder of interest

9  who asserts a junior lien against the Harbor Island Property could be compelled, in a legal or

10 equitable proceeding, to accept a money satisfaction of its interest.    Under these

11 circumstances, the sale should be approved under section 363(f)(5) of the Bankruptcy Code.

12 **B.    The Court Should Authorize The Debtor To Enter Into The Post-Petition Sale**

13      **Contract With The Stalking Horse Bidder Or Another Successful Bidder.**

14

15      Sections 105(a) and 363(b)(1) of the Bankruptcy Code allow a court to authorize a

16 debtor to enter into transactions outside the ordinary course of business following notice and a

17 hearing.  In re Crystal Apparel, Inc., 220 B.R. 816, 829-30 (Bankr. S.D.N.Y. 1998).  Section

18 105(a) of the Bankruptcy Code provides as follows: "The court may issue any order, process,

19 or judgment that is necessary or appropriate to carry out the provisions of this title."  11
20
   U.S.C. § 105(a).  This section provides bankruptcy courts with broad authority and discretion
21
22 to enforce the provisions of the Bankruptcy Code under either specific statutory or equitable

23 common law principles.  The purpose of section 105(a) is to "assure the bankruptcy court['s]

24 power to take whatever action is appropriate or necessary in aid of the exercise of its

25 jurisdiction."  2 COLLIER ON BANKRUPTCY ¶ 105.01, at 105-3 (15th ed., rev. 2003).  Thus,

26

27 _____
   [27] Specifically, a junior lienholder in California could be compelled to accept a money satisfaction upon a senior
   secured party's disposition of collateral under the default remedies provided in § 9617 of California's Uniform
28 Commercial Code, and upon the judicial or nonjudicial foreclosure of real property under applicable California
   law, including California Civil Code §2924.

31

1    section 105(a) essentially codifies the bankruptcy court's inherent equitable powers. <u>See</u> <u>In re</u>
2    <u>Management Tech. Corp.</u>, 56 B.R. 337, 339 (Bankr. D.N.J. 1985) (court's equitable power is
3    derived from section 105).

4        Section 363(b)(1) of the Bankruptcy Code allows a court to authorize a debtor to enter
5    into transactions outside the ordinary course of business following notice and a hearing. <u>In re</u>
6
7    <u>Crystal Apparel, Inc.</u>, 220 B.R. 816, 829-30 (Bankr. S.D.N.Y. 1998).  Section 363(b)(1) of the
8    Bankruptcy Code does not set forth a standard for determining when it is appropriate for a
9    court to authorize a transaction outside the ordinary course of business.  However, many
10   courts, including the Court of Appeals for the Ninth Circuit have followed the lead established
11   by the Second Circuit Court of Appeals in <u>Committee of Equity Security Holders v. Lionel</u>
12   <u>Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1070-1071 (2nd Cir. 1983) (the court may approve
13
14   a transaction if the movant has established "some articulated business justification for the
15   transaction"); <u>see also</u> <u>Walter v. Sunwest Bank (In re Walter)</u>, 83 B.R. 14, 19-20 (9th Cir. BAP
16   1988) ("...there must be some articulated business justification for using, selling, or leasing
17   the property outside the ordinary course of business...[.] Whether the proffered business
18   justification is sufficient depends on the case").  Thus, the approval of a transaction outside
19   the ordinary course of business should be based upon the debtor's reasonable business
20   judgment.  <u>See</u> <u>Institutional Creditors of Continental Airlines, Inc. v. Continental Airlines,</u>
21
22   <u>Inc. (In re Continental Airlines, Inc.)</u>, 780 F.2d 1223, 1226 (5th Cir. 1986) (the decision must
23   be based on the debtor's reasonable business judgment); <u>In re Chateaugay Corp.</u>, 973 F.2d.
24   141 (2nd Cir. 1992) (holding that a judge determining a § 363(b) application must find from
25   the evidence presented that a good business reason to grant such application exists); <u>In re</u>
26   <u>Ernst Home Center, Inc.</u>, 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).
27
28

1    In this case, the Debtor is seeking authority to enter into the Stalking Horse Bid

2  Agreement or such better purchase agreement as may be determined by the Debtor during or

3  prior to the Auction Sale and consummate the sale of the Property pursuant to the terms and

4  conditions set forth in such an agreement.  There is a good business justification for the

5
   Debtor to enter into the proposed agreement because the terms of the agreement are fair and
6
7  reasonable, and the consummation of the sale will generate substantial funds to pay the

8  claims of the Debtor's creditors.  Accordingly, in an exercise of its business judgment, the

9  Debtor believes that entering into the Stalking Horse Bid Agreement or into such better

10 agreement as proposed by such an agreement is in the best interest of the Debtor's estate and

11 its creditors, and the Debtor should therefore be authorized to do so.

12

**IV.**

13

**THE DEBTOR SHOULD BE AUTHORIZED TO ASSUME AND ASSIGN**

14

**THE TIDELANDS LEASE TO THE SUCCESSFUL BIDDER**

15
        Barring exceptions not herein relevant, Sections 365(a) and 1107(a) authorizes a
16
   debtor in possession, "subject to the Court's approval, ... [to] assume or reject any executory
17
   contract or unexpired lease of the debtor."  A debtor in possession may assume or reject
18
   executory contracts for the benefit of the estate.  In re Klein Sleep Products, Inc., 78 F.3d 18,
19
   25 (2d. Cir. 1996); In re Central Fla. Metal Fabrication, Inc., 190 B.R. 119, 124 (Bankr. N.D.
20
   Fla. 1995); In re Gucci, 193 B.R. 411, 415 (S.D.N.Y. 1996).  In reviewing a debtor in
21
   possession's decision to assume or reject an executory contract, a bankruptcy court should
22
   apply the "business judgment test" to determine whether it would be beneficial to the estate to
23
   assume it.  In re Continental Country Club, Inc., 114 B.R. 763, 767 (Bankr. M.D. Fla. 1990);
24
   see also In re Gucci, 193 B.R. at 415.  The business judgment standard requires that the court
25
   follow the business judgment of the debtor unless that judgment is the product of bad faith,
26
   whim, or caprice.  In re Prime Motors Inns, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991), *citing*
27

28

33

1  Lubrizol Enterprises v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert.*
2  *denied*, 475 U.S. 1057 (1986).

3       Pursuant to 11 U.S.C. § 365(f)(2), a debtor may assign its executory contracts and
4  unexpired leases, provided the debtor first assumes such executory contracts and unexpired
5  leases in accordance with Section 365(b)(1), and provides adequate assurance of future
6  performance by the assignee. Pursuant to Section 365(b)(1), a debtor cannot assume an
7  executory contract or unexpired lease unless the debtor: (a) cures any existing defaults under
8  such agreements; (b) compensates all non-debtor parties to such agreements for any actual
9  pecuniary loss resulting from the defaults; and (c) provides adequate assurance of future
10 performance under the contract or lease.[28]

11      In this case, by entry of the Court's order dated February 4, 2008, the Court authorized
12 the Debtor to assume the Tidelands Lease prior to the confirmation of a plan.[29]  The Debtor
13 proposes to cure any monetary defaults on the Tidelands Lease out of escrow. Therefore, the
14 first and second requirements for the assumption of an unexpired lease are satisfied.  In
15 addition, the Debtor submits that third requirement for the assumption of the Tidelands Lease
16 is satisfied because the Debtor submits that the financial wherewithal of the Stalking Horse
17 Bidder to purchase the very expensive Harbor Island Property should also be considered
18 adequate assurance of future performance on the lease.

19      The Tidelands Lease is an important asset of the Debtor's estate and its assumption
20 and assignment is (and will be) a condition to the sale of the Harbor Island Property (to the
21 Stalking Horse Bidder or any other Successful Bidder). If the relief requested by this Motion
22 is granted, the Debtor will be able to satisfy the requirements for assumption of the Tidelands
23 Lease. Thus, the assumption and the assignment of the Tidelands Lease is permissible and
24 undoubtedly a sound exercise of the Debtor's business judgment, and the assumption and
25 assignment of the Tidelands Lease should be approved.

26

27

28 [28] 11 U.S.C. § 365(b)(1); see also In re Bowman, 194 B.R. 227, 230 (Bankr. D. Ariz. 1995), In re AEG Acquisition Corp., 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), *aff'd* 161 B.R. 50 (9th Cir. B.A.P. 1993).
[29] The Debtor requests that the Court take judicial notice of that order (Docket No. 105).

34

## V.

## THE DEBTOR REQUESTS THAT THE COURT WAIVE THE TEN-DAY WAITING PERIOD SET FORTH IN BANKRUPTCY RULE 6004(H).

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the sale of property is stayed until the expiration of ten days after entry of the order, unless the Court orders otherwise. Here, all parties with a lien, claim or interest in the Property have been served with notice of the sale and an opportunity to object and the ten-day waiting period could only operate to delay the closing of escrow or the removal of any buyer's contingencies. As a result, under these circumstances, the Court should waive the ten-day stay of Bankruptcy Rule 6004(h) to permit the Debtor to proceed with the close of escrow on the sale as soon as possible.

## VI.

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

(1)    finding that notice of the Motion was adequate and appropriate under the circumstances;

(2)    granting the Motion in its entirety;

(3)    authorizing and approving the sale of the Harbor Island Property and the Personal Property to the Stalking Horse Bidder or other Successful Bidder free and clear of all liens, claims and/or interests;

(4)    finding that the Stalking Horse Bidder is a good faith purchaser for the purposes of Section 363(m);

(5)    authorizing and approving the assignment of the Tidelands Lease to the Stalking Horse Bidder or other Successful Bidder;

1    (6)    authorizing the Debtor to take all necessary and reasonable steps to

2    consummate the sale of the Harbor Island Property and the Personal Property (jointly

3    referred to herein as "the Property:) and to complete the assignment of the Tidelands Lease;

4    (7)    authorizing the payment of the commission of the Debtor's real estate brokers

5    in connection with the sale (the "Commission") upon the close of escrow;

6

7    (8)    authorizing the payment of $1,595.00 to Robert A. Giem, Inc. upon the close

8    of escrow as reimbursement for out-of-pocket expenses related to preparing the Harbor Island

9    Property for sale;

10    (9)    authorizing payment of the liens, claims and interests in the Harbor Island

11    Property to the extent set forth herein;

12    (10)    authorizing the payment of any amounts due under the Tidelands Lease prior

13    to its assignment upon the close of escrow;

14

15    (11)    authorizing the payment of taxes arising from the sale of the Harbor Island

16    Property and all escrow, closing and recording costs, as well as the cost of any title insurance

17    endorsements (the "Closing Costs") upon the close of escrow;

18    (12)    transferring and attaching all remaining liens, claims and/or interests or

19    portions of liens, claims and interests (collectively referred to as the "Liens, Claims and

20    Interests") still unpaid upon the close of escrow from the Harbor Island Property to the net

21    proceeds of the sale of the Harbor Island Property (the "Net Proceeds") with the same force,

22

23    effect, validity and priority that any and all such liens, claims or interests had with respect to

24    the Harbor Island Property;

25    (13)    authorizing the Debtor to deposit the portion of the Net Proceeds attributable to

26    the Liens, Claims and Interests into a segregated interest bearing account pending further

27    order of the Court;

28

36

1    (14)    compelling all holders of the Liens, Claims and Interests to execute any and all

2    documentation that may be required to allow escrow to close;

3    (15)    waiving the ten-day waiting period set forth in Bankruptcy Rule 6004(g); and

4    (16)    granting such other and further relief as the Court deems just and proper under

5    the circumstances.

6
7    Dated: April 28, 2010                    LEVENE, NEALE, BENDER, RANKIN &
                                              BRILL L.L.P.
8
9                                             By    /s/ Jacqueline L. Rodriguez
                                                   DANIEL H. REISS
10                                            Attorneys for DAKS, LLC, Debtor and Debtor in
                                              Possession
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

37

## DECLARATION OF RICHARD H. GOLUBOW

I, RICHARD H. GOLUBOW, hereby declare as follows:

1.    I am the manager of DAKS, LLC, the debtor and debtor in possession ("Debtor") in the above-entitled Chapter 11 bankruptcy case. In addition to serving as the Debtor's manager, I am a licensed attorney, having devoted my practice to insolvency related matters. Also, since 1993 I have been a real estate broker licensed by the California Department of Real Estate (License No. 01172101). Unless otherwise set forth herein, I have personal knowledge of the facts set forth herein and, if called to testify, would and could competently testify thereto.

2.    This declaration is offered in support of the Debtor's motion (the "Motion") seeking the entry of an order: authorizing and approving: (1) the sale of the Debtor's real property located at 18 Harbor Island Drive, Newport Beach, California (the "Harbor Island Property") and of certain related personal property described in the Motion (the "Personal Property") free and clear of all liens, claims and/or interests pursuant to Section 363 of 11 U.S.C. §§ 101 *et al.* (the "Bankruptcy Code") and (2) the assumption and assignment of a lease of a dock adjacent to the Harbor Island Property which is described in the Motion (the "Tidelands Lease") pursuant to Section 365; and granting certain additional relief requested therein. I have reviewed the Motion in its entirety and agree with its contents. To the extent necessary to prepare this declaration, I have reviewed the Debtor's books and records created in the ordinary course of the Debtor's business and I have reviewed the pleadings and exhibits to pleadings filed in the Debtor's bankruptcy case which are maintained by the Debtor's bankruptcy counsel in the ordinary course.

3.    The Debtor continues to manage its affairs as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108. As of the Petition Date, the Debtor's managing member was

38

Mr. Arnold Simon ("Mr. Simon"). By order of this Court entered on July 14, 2009, I became the manager of the Debtor.

4.    The Debtor was formed in March 2001 for the primary purpose of buying and selling residential real property. Since its formation, the Debtor has purchased four residential real properties for investment, three of which have been sold.

5.    The Harbor Island Property was purchased in mid-2001 for $14 million. The Harbor Island Property and the Tidelands Lease are the Debtor's only remaining real property assets.

6.    When purchased, the Harbor Island Property was subject to a recorded first right of refusal (the "First Right of Refusal"), held by Elizabeth C. Adams, Trustee of the Carver Trust No. 1 dated September 22, 1988 and Leroy L. Carver III (collectively and individually, "Carver"). The First Right of Refusal provides for, among other alleged rights, a specified period of time for Carver to match the purchase price for a proposed sale of the Harbor Island Property. Carver filed a proof of claim in this case in the amount of $15,250,000 based on the First Right of Refusal (the "Carver Proof of Claim").

7.    On April 13, 2010, at the hearing on the Debtor's motion for order establishing procedures with respect to the sale of the Harbor Island Property (the "Sale Procedures Motion"), the Court ruled that the requirements of the First Right of Refusal had been satisfied and they are further satisfied by the service of this Motion on Carver. The Sale Procedures Motion was approved by the Court at the hearing on April 13, 2010, and the proposed order granting the Sale Procedures Motion was lodged with the Court on April 19, 2010.

8.    The Harbor Island Property is a very unique and valuable residence. It consists of approximately 18,000 square feet of living space, with multiple bedrooms and bathrooms,

including a staff apartment with bedrooms and bathrooms. Other amenities include a secured, subterranean multiple car garage, an elevator, walk-in wine cellar, six fireplaces, a waterfront tile pool, a limestone outdoor barbeque, and the aforementioned large leased dock in Newport Harbor, which is the subject of the Tidelands Lease. As reflected by the lien, claim and interest information provided below, there is substantial equity in the Harbor Island Property.

9. DAKS is the title holder of record of the Harbor Island Property. On January 9, 2004, Arnold Simon's former wife, Debra Simon, who is now deceased, filed a Petition for Dissolution of Marriage (the "Dissolution Petition") and thereby commenced a divorce proceeding entitled In re Marriage of Simon, Case No. 04D000159 (the "Family Court Action") in the Superior Court of the State of California, County of Orange. On January 12, 2004, in connection with the Family Court Action, Debra Simon caused a Notice of Pendency of Action to be recorded against the Harbor Island Property (the "Debra Simon Lis Pendens").

10. In early 2003, the Debtor and YSA, LLC ("YSA") entered into a purchase agreement with respect to the Harbor Island Property, and an escrow was opened in March 2003. After numerous offers and counter-offers, escrow was cancelled on June 24, 2003. The Harbor Island Property then sat on the market for another six months. On January 14, 2004, YSA and the Debtor entered into another sales contract for the purchase price of $15,750,000, which allegedly expired on its own terms.

11. YSA then commenced the action entitled YSA, LLC v. DAKS, LLC, Case No. 05CC08045, on June 8, 2005 in the Superior Court for the State of California, County of Orange (the "YSA Action") seeking specific performance of the expired January 14, 2004 purchase agreement, damages for breach of said purchase agreement, and certain declaratory and/or injunctive relief. The Debtor removed the YSA Action to this Court by filing a removal petition on October 5, 2007. YSA filed a proof of claim on October 22, 2007. Prior

40

1  to the removal, the YSA Action had been ordered to arbitration, which was pending at the
2  time of removal.

3      12.      The claims of YSA in this case have been resolved by an agreement (the "YSA
4  Agreement") approved by order of this Court entered on July 14, 2009.  Pursuant to the YSA
5
6  Agreement, YSA was granted a secured claim of $2.8 million plus interest and certain
7  additional charges as set forth in the YSA Agreement (the "YSA Claim"), enforcement rights
8  relating thereto, an opportunity to credit bid in a sale under Bankruptcy Code § 363, and
9  YSA's agreement to remove its lis pendens – which lis pendens was removed in accordance
10 with the terms of the YSA Agreement.  The Debra Simon Lis Pendens shall be removed in
11 connection with a close of a sale of the Harbor Island Property consistent with the YSA
12 Agreement.
13
14     13.      The Harbor Island Property has been thoroughly marketed for an extended
15 period of time by highly qualified real estate professionals. Some time ago the Court approved
16 the employment of HÔM Real Estate Group ("HÔM") and Willis Allen Real Estate ("Willis
17 Allen" and with HÔM the "Brokers") as co-listing real estate brokers approved by the
18 Bankruptcy Court. HÔM has marketed the Harbor Island Property aggressively for the benefit
19 of the Debtor's bankruptcy estate since April 2008.  As described in the Declaration of Vicki
20 Lee (the "Lee Declaration") appended to the Motion (which I have also reviewed), among the
21
22 many tasks performed throughout the past 28 months, in addition to listing the Harbor Island
23 Property in the multiple listing service, HÔM:

24          a.      hired two of the most, if not the most, respected local real estate
25          photographers for day and night, interior and exterior color photos;
26          b.      commissioned the use of a large yacht so that the photographer
27          could take photos of the Harbor Island Property from the water;
28          c.      arranged for aerial photography of the Harbor Island Property;

41

1              d.     contracted for and directed the design of a highly detailed,

2  flattering customized brochure to be used to advertise the Harbor Island

3  Property to its best advantage;

4              e.     created a property specific web site to showcase the Harbor

5  Island Property;

6              f.     exposed the Harbor Island Property on dozens of property

7  websites, globally, including The Wall Street Journal Online, The Los Angeles

8  Times online, The Robb Report online, christiesgreatestates.com, realtor.com,

9  luxuryportfolio.com and dozens of others;

10              g.     published a hard back multi page book of detailed photos and

11  descriptions of the Harbor Island Property for potential select purchasers;

12              h.     placed advertisements in select print publications including *The*

13  *Wall Street Journal, The New York Times, The International Herald Tribune,*

14  *The Robb Report, Christie's Great Estates, Christie's* (the auction house

15  magazine), *Christie's Interiors, Riviera Magazine, Newport Beach Magazine,*

16  *Laguna Beach Magazine, The Los Angeles Antiques Show* (catalog), *The Daily*

17  *Pilot, The Los Angeles Times, The Laguna Beach Independent, The HÔM*

18  *Review, The HÔM Features;*

19              i.     coordinated its advertising efforts with the marketing

20  department at Christie's Great Estates to reach a more select group of potential

21  buyers and agents;

22              j.     distributed marketing materials and other information regarding

23  the Harbor Island Property to a list of 145 real estate brokers who together

24  produce annual sales of over $100 billion;

25              k.     distributed marketing materials by direct mail, contacted by

26  telephone and/or email all of HÔM's past and potential qualified clients, as

27  well as the other brokers and agents and non-realtor individuals that comprise

28  or represent the Harbor Island Property's target market;

42

1         l.      created additional exposure through its efforts in editorial

2      commentary online and in print, as well as through other exclusive and

3      proprietary exposure efforts, including sponsorship of nationally televised

4      charitable golf tournaments (The Toshiba Classic) and tennis events (Newport

5      Beach Breakers).

6         m.      featured the Harbor Island Property prominently in banners and

7      in guide books with respect to sponsored sporting events; and

8         n.      sponsored multiple private previews of the Harbor Island

9      Property to familiar and experienced brokers and agents from throughout

10      Southern California.

11      14.      HÔM has incurred and paid costs associated with all of these endeavors in

12 excess of $70,000 to date. Additionally, since the recent approval of the application extending

13 the terms of HÔM's employment, HÔM has placed further advertising and has ordered a new

14 multi- page, full color brochure for the Harbor Island Property.

15      15.      In addition to the foregoing, HÔM has experienced numerous challenges and

16 problems associated with selling the Harbor Island Property. HÔM has encountered

17 reluctance from buyers' agents and prospective buyers to enter into a contract for the Harbor

18 Island Property because, among other things, the Harbor Island Property:

19         a.      is subject to a bankruptcy proceeding;

20         b.      is subject to an acrimonious divorce proceeding;

21         c.      was subject to a specific performance lawsuit;

22         d.      is subject to a deeded first right of refusal;

23         e.      had multiple, but now corrected or correctable, title defects;

24         f.      has erroneous recorded liens, assessments, etc.;

25         g.      has a recorded property tax default;

26         h.      has a deed of trust in default;

27         i.      has a ground lease in default;

28         j.      was rumored to have structural issues with subject property;

43

1                   k.     is perceived to have been inadequately maintained for a

2       property of this value;

3                   l.     was the location of Mrs. Simon's recent purported suicide;

4                   m.    was rumored to be subject to issues of authority to negotiate or

5       sell, as well the rumored inability to transfer clean title;

6                   n.     is subject to bankruptcy court approval, and the sale process

7       will include a competitive overbid process in which the buyer's privacy cannot

8       be assured;

9                   o.     is subject to an "as-is" sale, without the benefit of customary

10      disclosures regarding property history and condition, per the seller(s), as

11      exempted by law;

12                  p.     has been difficult to show to qualified and interested parties

13      while previously occupied;

14                  q.     did not "show well" due to improper staging for showings;

15                  r.     was originally offered at a list price exceeding the highest price

16      ever paid for a single family residence in Orange County, at the beginning of

17      an obviously declining real estate market;

18                  s.     limited in functional and aesthetic appeal to a customary buyer

19      of this type of property, in similar locations, and at similar price-points;

20                  t.     is subject to the near complete eradication of traditional sources

21      and programs of lending for this type of a purchase transaction, thus severely

22      diminishing the field of prospective purchasers. Where these programs

23      currently exist, their requirements and parameters are far less accommodating

24      than they have been in the past.

25     16.     Despite all of the challenges, the Brokers' efforts have generated four offers,

26 two of which were at a price acceptable to the Debtor, and one that has now been accepted by

27 the Debtor subject to Court approval.

28

17.     Moreover, in addition to its efforts in marketing the Harbor Island Property since September 2009, HÔM has directly overseen the maintenance, cleaning, repair and improvement of the entire property and its contents. This has included scheduling, meeting, overseeing and directing gardeners, tree trimmers, appliance and mechanical repairmen, boat dock service and inspectors, cleaning crews, movers, decorators and consulting brokers.

18.     HÔM has continued to market the Harbor Island Property in an endeavor to obtain the highest possible price for the Debtor's estate. The Harbor Island Property has been shown three times since the Stalking Horse Bid Agreement (defined below) was accepted. HÔM will continue its efforts to obtain back up offers and inform all interested, qualified parties of the overbid timeline and procedure. HÔM will help keep any escrows moving forward and follow through with continued service to the Debtor.

19.     As also set forth in the Lee Declaration, in recent weeks, HÔM's services have included monitoring the Harbor Island Property at least twice a week, since it is now vacant, meeting several inspectors over a period of two full days and another three days to meet with the Stalking Horse Bidder's architects and designers, determining that one of the major systems in the house was not functioning and meeting with service technicians to make repairs, working closely with me to review, discuss and determine that the current escrow with the Stalking Horse Bidder will be successful.

20.     I believe that the sales process conducted by the Debtor and its real estate professionals was, and continues to be, thorough and adequate to obtain the highest and best price for the Harbor Island Property, subject to the opportunity for others to participate by the proposed sale procedures.

21.     Based on all of the foregoing, assuming that the Court approves the sale of the Property and that escrow closes, I believe that the Brokers should be paid their commission (described below) upon the close of escrow without the need for the entry of a further order of the Court as previously authorized by the Court.

22.     The foregoing marketing efforts have produced an offer to purchase the Harbor Island Property pursuant to the terms set forth in that certain "California Residential Purchase

45

1   Agreement and Joint Escrow Instructions" (the "Stalking Horse Bid Agreement") between the
2   Debtor and the buyer, designated as Gwendolyn Wilson, Trustee of the Telluride Trust dated
3   February 21, 2010 (the "Stalking Horse Bidder").    A copy of the Stalking Horse Bid
4   Agreement (redacted to a certain extent to honor the Stalking Horse Bidder's request for
5   confidentiality) is attached hereto as Exhibit 1.

6         23.    By way of summary, the principal terms of the Stalking Horse Bid Agreement
7   are as follows:

8            a.    an aggregate Purchase Price of $27,000,000, which consists of cash in
9   the amount of $18,000,000 and two parcels of improved residential real property with
10   an agreed value of $9,000,000;

11            b.    the Harbor Island Property will be sold "as-is";

12            c.    the Debtor shall assign the above-mentioned Tidelands Lease, a copy of
13   which is attached hereto as Exhibit 2, to the Stalking Horse Bidder; and

14            d.    as described in Paragraph 6 of "Addendum No. 1 to Counter Offer No.
15   1," which is attached to and included within the Stalking Horse Bid Agreement, the
16   personal property being purchased by the Stalking Horse Bidder as part of the
17   purchase of the Harbor Island Property consists of all of the built-in appliances,
18   washers, dryers, security systems, drapes and curtains located in the Harbor Island
19   Property; notwithstanding the foregoing, as also set forth in Paragraph 6, the other
20   personal property located at, or used in connection with, the Harbor Island Property,
21   including but not limited to, furniture, fixtures, art, vehicles, clothing, jewelry, safes,
22   furs, watercraft, two downstairs hallway light fixtures/chandeliers and chandeliers in
23   the middle living room and library area, is not included in the proposed sale to the
24   Stalking Horse Bidder; and

25            e.    the sale to the Stalking Horse Bidder shall close no later than 60 days
26   after the Debtor provides notice to the Stalking Horse Bidder of the final approval of
27   the Stalking Horse Bid Agreement.

28

24.     Consistent with the procedures recently approved by the Court at the

hearing on the Sale Procedures Motion:

      a.     the Harbor Island Property is still being marketed:

      b.     an auction (the "Auction Sale") shall be held on May 13, 2010 at 10:00 a.m. at the offices of Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660;

      c.     any party who would like to bid on the Harbor Island Property during the Auction Sale must submit evidence of financial resources sufficient to close a sale of the Harbor Island Property to the Debtor's Manager, the Debtor's Counsel and the Debtor's Broker no later than May 3, 2010 in order to become an "Eligible Overbidder" (as defined in the Sale Procedures Motion) and to participate at the Auction Sale;

      d.     Eligible Overbidders must submit their bids no later than 5:00 p.m. prevailing Pacific Time on May 10, 2010; each Overbid must include a proposed purchase agreement, an explanation of how the Overbid differs from the Stalking Horse Bidder's Purchase Agreement, and a good faith deposit of $780,000 by cashier's check or other cash equivalent;

      e.     if an Overbid is not all cash or cash equivalents, the Overbid must be at least equal to $27,100,000 (the "Minimum Overbid") of which a minimum of $18 million must be cash or cash equivalents;

      f.     if an Overbid is all cash or cash equivalents, the Overbid must be at least equal to $26,550,000, which takes into account the present cash value of an all cash offer, as compared with the present cash value of the purchase price set forth in the Stalking Horse Bid Agreement;

      g.     the Court will hold a hearing on the Motion seeking the entry of an order approving the sale of the Harbor Island Property and certain personal property to the Stalking Horse Bidder or a successful overbidder (the "Successful Bidder") free and clear of liens, interests and encumbrances

47

1    pursuant to 11 U.S.C. § 363 and authorizing the assumption and assignment of

2    the Tidelands Lease under 11 U.S.C. § 365 and the other relief requested

3    herein on May 19, 2010 at 11:30 a.m.; and

4    h.    if the Stalking Horse Bidder is not the Successful Bidder, a break-up

5    fee of $60,000 (the "Breakup Fee") shall be paid to the Stalking Horse Bidder

6    in accordance with the terms of the Sale Procedures Motion.

7    25.    There are several liens, claims, interests and other encumbrances currently

8    asserted against the Harbor Island Property.

9    26.    According to the Preliminary Title Report ("PTR") of the Harbor Island

10   Property, a copy of which is attached hereto as Exhibit 3, the Harbor Island Property appears

11   to have the following liens, claims, interests and/or other encumbrances recorded against it

12   (which may or may not be valid):

13   a.    a lien in favor of Orange County for unpaid property taxes totaling

14   $311,262.64 for fiscal years 2007 and 2008 (PTR at item no. 2);

15   b.    a lien in favor of Orange County for unpaid property taxes totaling

16   $166,997.06 in base property taxes and $16,745.70 in penalties for the tax years 2008

17   through 2010 (PTR at item nos. 2 and 3);

18   c.    various easements and covenants (item nos. 8 – 16);

19   d.    the Right of First Refusal (PTR item no. 17) as clarified by that certain

20   judgment of the Orange County Superior Court (PTR item no. 18);

21   e.    a lien in favor of Orange County and/or the City of Newport Beach

22   with respect to pier permits in an unspecified amount (PTR at item no. 19);

23   f.    a deed of trust in favor of First Federal Bank of California ("First

24   Federal") in the amount of $6 million (PTR at item no. 20);

25   g.    the Debra Simon Lis Pendens (PTR at item no. 21);

26   h.    a lien in favor of the homeowners' association of which the Debtor is a

27   member as a result of its ownership of the Harbor Island Property in the amount of

28   $3,667.95 (PTR at item no. 22);

48

i.      a deed of trust in favor of YSA in the amount of $2.8 million dollars (PTR at item no. 23);

j.      two liens for unsecured property taxes in favor of Orange County totaling $6,313.74 (PTR at item nos. 24 and 25); and

k.      a notice of lien recorded by Duane Morris LLP ("Duane Morris"), the former counsel for Debra Simon and currently counsel for the Estate of Debra Simon, for an unspecified amount of attorneys' fees related to the pending distribution of property in connection with the dissolution of the Simon marriage (PTR at item no. 26).

27.     Additionally, the following entities have filed proofs of claims asserting that they have claims allegedly secured by, or interests in, the Harbor Island Property:

a.      the Orange County Treasurer-Tax Collector ("OCTC") filed a proof of claim on or about July 11, 2007 asserting a secured claim in the amount of $160,665.00, which claim was designated by the Clerk of the Court as Claim No. 1; on or about October 24, 2007, the OCTC amended Claim No. 1 to reduce the amount of its alleged secured claim to $160,665.00 via an amendment designated by the Clerk of the Court as Claim No. 10; on or about December 12, 2007, the OCTC further reduced its alleged secured claim to $82,764.84 as a result of an amendment designated by the Clerk of the Court as Claim No. 14. As a result, by its remaining claim the OCTC asserts an entitlement to a secured claim of $80,065.39 against the Debtor's estate (the "OCTC Claim");

b.      the OCTC also filed an administrative expense claim against the Debtor's estate on or about April 19, 2010 for alleged *secured* property taxes for the period from 2008 through 2010 in the sum of $558,086.02 (consisting of base taxes in the amount of $500,539.12 for the tax years 2008 through 2010, penalties in the amount of $57,500.90, fees in the amount of $46.00 and "arrearages" in the amount of $204,029.26);

c.     First Federal filed a proof of claim on or about October 10, 2007 asserting a secured claim in the amount of $6,235,639.82 (consisting of principal in the amount of $5,875,464.23, interest as of July 9, 2007 in the amount of $161,174.24, late charges through July 1, 2007 of $9,530.16, foreclosure fees in the amount of $15,647.79, property tax advances in the amount of $173,276.00, interest on property tax advances in the amount of $372.40 as of July 9, 2007, and prepay tax advance service fees of $175.00; the Debtor is informed that, with interest, attorneys' fees and other charges, First Federal now alleges that its secured claim totals approximately $7 million; and

d.     Debra Simon filed a proof of claim asserting an interest in the Harbor Island Property on or about October 30, 2007.

28.     Although the amounts of the liens listed on the PTR and the secured claims that appear on the claim register for the same claimants differ in amount somewhat, it appears that the OCTC asserts a secured claim of approximately $640,000, First Federal asserts a secured claim of approximately $7 million, YSA asserts a secured claim of approximately $2.8 million plus interest, and the HOA asserts a secured claim of approximately $3,700 for a total of $10,443,700 plus interest. Accordingly, the liens and/or secured claims asserted against the Harbor Island Property should total somewhere between $10,500,000 and $11,000,000 (not including any interest asserted by the probate estate of Debra Simon). The Debtor does not agree that all of the amounts asserted are owed. However, the Debtor is confident that the total amount of secured claims against the Harbor Island Property will not exceed $11 million.

29.     As the purchase price offered for the Property is equal to approximately $27,000,000, there is substantial equity in the Harbor Island Property.

30.     Pursuant to the terms of the Broker's employment HÔM and the Willis Allen brokerage are entitled to payment of a 4% commission (the "Commission") upon the closing of a sale of the Harbor Island Property. The Commission is estimated to be $1,080,000 based on the offer made by the Stalking Horse Bidder of which $940,000 would be paid to HÔM

50

1  and $135,000 would be paid to the Willis Allen brokerage firm as per the arrangement
2  approved by the Court.

3      31.    At my request and the request of the Brokers, Robert A. Giem, Inc. ("RAGI")
4  incurred out-of-pocket expenses in the amount of $1,595.00 in connection with: (1) arranging
5  for the "staging" of the Harbor Island Property and the moving of excess furniture located on
6  the premises into the basement of the Harbor Island Property at the cost of $570.00, (2)
7  arranging for gardening services, including but not limited to tree trimming, on the Harbor
8  Island Property to ensure that the real property was properly maintained and showed well to
9  prospective buyers at the cost of $875.00, and (3) the payment of a $150.00 fee associated
10 with a Residential Building Report, a report that real property sellers in Newport Beach must
11 acquire for buyers when selling real property.  As I believe that all of the foregoing expenses
12 were necessary to preserve and sell the Harbor Island Property and they are expenses that
13 would normally be borne by sellers of real property or their agents (and later reimbursed to
14 such agents out of escrow in a typical sale of real property in Newport Beach), I on behalf of
15 the Debtor respectfully request the authority to reimburse RAGI for these expenses out of
16 escrow.

17     32.    By the Motion, the Debtor proposes that it be authorized to pay the following
18 amounts to the following entities out of escrow:

19          a.    the base secured property tax amounts owed to the OCTC for the fiscal
20          years 2007, 2008, 2009 and 2010 as reflected in the proofs of claims filed by the
21          OCTC as amended and referenced above;

22          b.    the principal balance due to First Federal on its deed of trust;
23          c.    the principal balance due to YSA on its deed of trust;
24          d.    the principal balance owed to the HOA on its lien;
25          e.    the Commission;
26          f.    the Expense Reimbursement;
27          g.    fees due to the Office of the United States Trustee; and
28

51

1          h.      all escrow, closing and recording costs, as well as the cost of any title

2      insurance endorsements (the "Closing Costs").

3  The aforementioned amounts will be referred to herein as the "Undisputed Liens, Claims and

4  Interests".  All other liens, claims and/or interests and/or portions of liens, claims and/or

5  interests will be referred to herein as the "Disputed Liens, Claims and Interests".

6      33.     In addition, the Debtor requests the authority, at its discretion, to pay the

7  following additional amounts to the following entities out of escrow (the "Optional

8  Amounts"):

9          a.      the amount of the estimated tax liability of the Debtor's estate, if any,

10     to the FTB arising from its sale of the Harbor Island Property;

11         b.      the amount of the estimated tax liability of the Debtor's estate, if any,

12     to the Internal Revenue Service ("IRS") from its sale of the Harbor Island Property;

13     and

14         c.      any amount as agreed to by and between the Debtor and the holder of a

15     Disputed Lien, Claim or Interest prior to the close of escrow.

16     34.     By the Motion, the Debtor also proposes that the Court should enter an order:

17         a.      transferring the Disputed Liens, Claims and Interests from the Harbor

18     Island Property to the proceeds of the sale of the Harbor Island Property net of the

19     payment of the Undisputed Liens, Claims and Interests and any Optional Amounts

20     (the "Net Proceeds") with the same force, effect, validity, priority and extent that the

21     Disputed Liens, Claims and Interests had in the Harbor Island Property;

22         b.      authorizing and instructing the Debtor to deposit the portion of the Net

23     Proceeds attributable to the Disputed Liens, Claims and Interests into a segregated

24     interest-bearing account pending further order of the Court; and

25         c.      among other relief set forth in the Motion, finding the Stalking Horse

26     Bidder or a different Successful Bidder to be a good faith purchaser under Section

27     363(m) of the Bankruptcy Code.

28

52

35.     I believe that the requirements for the approval of the proposed sale to the Stalking Horse Bidder or to another successful bidder free and clear of all liens, claims and interests and for the assumption and assignment of the Tidelands Lease have been satisfied and that the relief requested by the Motion is in the best interests of the Debtor's estates and its creditors.

36.     Based on all of the foregoing, I respectfully request, on the Debtor's behalf, that the Court enter an order granting the Motion in its entirety.

I declare that the foregoing is true and correct under penalty of perjury.

Executed this 28th day of April 2010 at Newport Beach California.

RICHARD H. GOLUBOW

53

1

## **DECLARATION OF VICKI LEE**

2        I, Vicki Lee, hereby declare as follows:

3        1.        I am an adult over the age of 18, and except as otherwise stated, the facts set
4   forth in this Declaration are personally known to me, and, if called as a witness, I could and
5   would testify competently with respect thereto.

6        2.        I am a realtor with HÔM Real Estate Group ("HÔM"). I have been a realtor
7   licensed by the State of California for 30 years, all in Newport Beach. I am an established real
8   estate professional specializing in waterfront and view properties in Newport Beach and
9   Laguna Beach. Prior to joining HÔM three years ago, I was associated with Coldwell Banker
10  Previews International, where I was ranked among Coldwell Banker's top one hundred agents
11  in 2004 and was awarded membership in the prestigious International President's Elite for the
12  past five years.

13       3.        HÔM has been representing DAKS, LLC (the "Debtor") as its co-listing broker
14  in connection with the sale of its real property located at 18 Harbor Island Drive, Newport
15  Beach, CA (the "Harbor Island Property").

16       4.        I make this declaration in support of the Debtor's motion to sell the Harbor
17  Island Property to Gwendolyn Wilson, Trustee of the Telluride Trust dated February 21, 2010
18  (the "Stalking Horse Bidder") or to a different successful overbidder at the auction scheduled
19  to be held with respect to the Harbor Island Property in a few weeks. I am familiar with the
20  relief requested by the Motion.

21       5.        I believe that the Motion should be approved because, in my professional
22  opinion, the price offered for the Harbor Island Property is fair and reasonable and the Harbor
23  Island Property has been more than adequately marketed for sale.

24       6.        During my career I have represented buyers and sellers of bay front, oceanfront
25  and view properties throughout coastal Orange County, California including Linda Isle, Lido
26  Isle, Newport Island, the Balboa Peninsula and West Newport, Laguna Beach oceanfront and
27  exclusive communities including Lagunita and Mystic Hills in Laguna Beach, Shady Canyon

28

1   in Irvine, Huntington Harbour in Huntington Beach and Capistrano Bay in Dana Point. In
2   several of these communities, I have achieved record breaking sales prices.

3       7.      To properly represent the Debtor in the sale of the Harbor Island Property, I
4   added Rob Giem to my marketing team. Mr. Giem has been a licensed real estate agent in
5   California since 1990. Since 1990, his entire career focus has been specifically directed
6   towards waterfront and water-oriented properties between Newport Beach and Laguna Beach.
7   During his career selling residential real estate locally, he has participated as the agent in the
8   following transactions:

9           a.      The highest price paid for a residence in Orange County;
10          b.      The highest price paid for a bay front residence in Newport
11                  Beach;
12          c.      The highest price paid for an oceanfront residence in Laguna
                    Beach; and
13          d.      The highest price paid for an off-water residence in Orange
14                  County.

15      8.      To date, most of these transactions still stand as the records they were at the
16  time they took place.

17      9.      Mr. Giem has also participated in six local closed transactions with listed
18  prices above $15 million and four local closed transactions with listed prices above $25
19  million.

20      10.     Mr. Giem currently has the majority of actively listed properties in Orange
21  County with asking prices above $25 million.

22      11.     In 2008 (the most recent year for which records are available), Mr. Giem's
23  production ranked him as the 32nd most productive agent in the United States.

24      12.     HÔM has marketed the Harbor Island Property aggressively for the benefit of
25  this bankruptcy estate since April 2008. Among the many tasks performed throughout the
26  past 28 months, in addition to listing the Harbor Island Property in the multiple listing service,
27  HÔM:

28          a.      hired two of the most, if not the most, respected local real estate

55

photographers for day and night, interior and exterior color photos;

    b.    commissioned the use of a large yacht so that the photographer could take photos of the Harbor Island Property from the water;

    c.    arranged for aerial photography of the Harbor Island Property;

    d.    contracted for and directed the design of a highly detailed, flattering customized brochure to be used to advertise the Harbor Island Property to its best advantage - more than 130 luxury real estate brokerages, in over 33 countries around the world, received copies of the multiple-page, color property presentation;

    e.    created a property specific web site to showcase the Harbor Island Property. Additionally, the Harbor Island Property has been exposed on dozens of property websites, globally, including The Wall Street Journal Online, The Los Angeles Times online, The Robb Report online, christiesgreatestates.com, realtor.com, luxuryportfolio.com and dozens of others - tens of thousands of views of the Harbor Island Property have occurred on these sites;

    f.    published a hard back multi page book of detailed photos and descriptions of the Harbor Island Property for potential select purchasers;

    g.    placed advertisements in select print publications including *The Wall Street Journal, The New York Times, The International Herald Tribune, The Robb Report, Christie's Great Estates, Christie's* (the auction house magazine), *Christie's Interiors, Riviera Magazine, Newport Beach Magazine, Laguna Beach Magazine, The Los Angeles Antiques Show* (catalog), *The Daily Pilot, The Los Angeles Times, The Laguna Beach Independent, The HÔM Review, The HÔM Features*;

    h.    coordinated its advertising efforts with the marketing department at Christie's Great Estates to reach a more select group of potential buyers and agents;

    i.    distributed marketing materials and other information regarding the Harbor Island Property to a list of 145 real estate brokers who together produce annual sales of over $100 billion;

    j.    distributed marketing materials by direct mail, contacted by

56

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

telephone and/or email all of HÔM's past and potential qualified clients, as well as the other brokers and agents and non-realtor individuals that comprise or represent the Harbor Island Property's target market;

    k.    created additional exposure through its efforts in editorial commentary online and in print, as well as through other exclusive and proprietary exposure efforts, including sponsorship of nationally televised charitable golf tournaments (The Toshiba Classic) and tennis events (Newport Beach Breakers). The Harbor Island Property was featured prominently throughout both venues on banners and in guide books.

    l.    sponsored multiple private previews of the Harbor Island Property to familiar and experienced brokers and agents from throughout Southern California. HÔM has also shown the Harbor Island Property to various qualified parties as represented by ourselves and other brokers.

    m.    since September 2009, has directly overseen the maintenance, cleaning, repair and improvement of the entire property and its contents. This has included scheduling, meeting, overseeing and directing gardeners, tree trimmers, appliance and mechanical repairmen, boat dock service and inspectors, cleaning crews, movers, decorators and consulting brokers. Recently the responsibility has come almost entirely at our expense, with the majority of these service providers having been compensated by us (at a cost of thousands of dollars) exclusively. HÔM has incurred and paid costs associated with all of these endeavors in excess of $70,000 to date. Additionally, since the recent approval of the application extending the terms of HÔM's employment, HÔM has placed further advertising and has ordered a new multi page, full color brochure for the Harbor Island Property.

    13.    In addition to the foregoing, HÔM has experienced numerous challenges and problems associated with selling the Harbor Island Property. I have encountered reluctance from buyer's agents and prospective buyers to enter into a contract for the Harbor Island Property because, among other things, the Harbor Island Property:

    a.    is subject to a bankruptcy proceeding;

    b.    is subject to an acrimonious divorce proceeding;

    c.    was subject to a specific performance lawsuit;

57

d.    is subject to a deeded first right of refusal;

e.    had multiple, but now corrected or likely correctable, title defects;

f.    has erroneous recorded liens, assessments, etc.;

g.    has a recorded property tax default;

h.    has a deed of trust in default;

i.    has a ground lease in default;

j.    was rumored to have structural issues with subject property;

k.    is perceived to have been inadequately maintained for a property of this value;

l.    was the location of Mrs. Simon's recent purported suicide;

m.    was rumored to be subject to issues of authority to negotiate or sell, as well the rumored inability to transfer clean title;

n.    is subject to bankruptcy court approval, and the sale process will include a competitive overbid process in which the buyer's privacy cannot be assured;

o.    is subject to an "as-is" sale, without the benefit of proper and full disclosure regarding property history and condition, per the seller(s), as exempted by law in which the transfer of title is proposed to be done with a quitclaim deed that is always suspect to a buyer, their counsel and lender;

p.    has been difficult to show to qualified and interested parties while previously occupied;

q.    did not "show well" due to improper staging for showings;

r.    was originally offered at a list price exceeding the highest price ever paid for a single family residence in Orange County, at the beginning of an obviously declining real estate market;

s.    limited in functional and aesthetic appeal to a customary buyer of this type of property, in similar locations, and at similar price-points.

t.    is subject to the near complete eradication of traditional sources and programs of lending for this type of a purchase transaction, thus severely diminishing the field of prospective purchasers. Where these programs currently exist, their requirements and parameters are far less accommodating

58

1   than they have been in the past.

2   14.   Despite all of the challenges we faced, we have been able to generate 4 offers,

3   2 of which were at a price acceptable to the Debtor, and one that has now been accepted.

4   15.   HÔM has continued to market and show the Harbor Island Property and will

5   continue its efforts to obtain back up offers and inform all interested, qualified parties of the

6   overbid timeline and procedure. HÔM will keep any escrows moving forward and follow

7   through with continued service to the Debtor.

8   16.   Based on all of the foregoing, I believe that the Harbor Island Property has

9   been properly marketed, that the price offered for the property is reasonable, and that the

10   Debtor's brokers have earned their 4% commission, which I believe should be paid upon the

11   close of escrow.

12   I declare and verify under penalty of perjury under the laws of the United States of

13   America that the foregoing is true and correct to the best of my knowledge.

14   Executed on this 26th day of April 2010 at Newport Beach, California

16   VICKI LEE

59

# EXHIBIT "1"

01/14/2010   19:22                                    DOCS45                              PAGE  02/11

**CALIFORNIA
ASSOCIATION
OF REALTORS®**

CALIFORNIA
RESIDENTIAL PURCHASE AGREEMENT
AND JOINT ESCROW INSTRUCTIONS
For Use With Single Family Residential Property — Attached or Detached
(C.A.R. Form RPA-CA, Revised 1/06)

01/14/2010  19:22                                    CMG46                          PAGE  83/11

15 Harbor Island

Property Address: _____                                Date: January 14, 2010

C. Tenant-occupied property: (i) Property shall be vacant at least ☐ for ☐ _____ ) Days Prior to Close Of Escrow, unless otherwise agreed in writing. Note to Seller: If you are unable to deliver Property vacant in accordance with rent control and other applicable Law, you may be in breach of this Agreement.

OR (ii) (if checked) ☐ Tenant to remain in possession. The attached addendum is incorporated into this Agreement (C.A.R. Form PAA, paragraph 3.)

OR (iii) (if checked) ☐ This Agreement is contingent upon Buyer and Seller entering into a written agreement regarding occupancy of the Property within the time specified in paragraph 14B(1). If no written agreement is reached within this time, either Buyer or Seller may cancel this Agreement in writing.

D. At Close Of Escrow, Seller assigns to Buyer any assignable warranty rights for items included in the sale and shall provide any available Copies of such warranties. Brokers cannot and will not determine the assignability of any warranties.

E. At Close Of Escrow, unless otherwise agreed in writing, Seller shall provide keys and/or means to operate all locks, mailboxes, security systems, alarms and garage door openers. If Property is a condominium or located in a common interest subdivision, Buyer may be required to pay a deposit to the Homeowners' Association ("HOA") to obtain keys to accessible HOA facilities.

4. ALLOCATION OF COSTS (if checked): Unless otherwise specified here, this paragraph only determines who is to pay for the report, inspection, test or service mentioned. If not specified here or elsewhere in this Agreement, the determination of who is to pay for any work recommended or identified by any such report, inspection, test or service shall be by the method specified in paragraph 14B(2).

A. WOOD DESTROYING PEST INSPECTION:

(1) ☐ Buyer ☐ Seller shall pay for an inspection and report for wood destroying pests and organisms ("Report") which shall be prepared by _____, a registered structural pest control company. The Report shall cover the accessible areas of the main building and attached structures and, if checked: ☐ detached garages and carports, ☐ detached decks, ☐ the following other structures or areas _____. The Report shall not include roof coverings. If Property is a condominium or located in a common interest subdivision, the Report shall include only the separate interest and any exclusive-use areas being transferred and shall not include common areas, unless otherwise agreed. Water tests of shower pans on upper level units may not be performed without consent of the owners of property below the shower.

OR (2) ☐ (if checked) The attached addendum (C.A.R. Form WPA) regarding wood destroying pest inspection and allocation of cost is incorporated into this Agreement.

B. OTHER INSPECTIONS AND REPORTS:

(1) ☐ Buyer ☐ Seller shall pay to have septic or private sewage disposal systems inspected _____
(2) ☐ Buyer ☐ Seller shall pay to have domestic wells tested for water quantity and productivity _____
(3) ☐ Buyer ☐ Seller shall pay for a natural hazard zone disclosure report prepared by _____
(4) ☐ Buyer ☐ Seller shall pay for the following inspection or report _____
(5) ☐ Buyer ☐ Seller shall pay for the following inspection or report _____

C. GOVERNMENT REQUIREMENTS AND RETROFIT:

(1) ☐ Buyer ☐ Seller shall pay for smoke detector installation and/or water heater bracing, if required by Law. Prior to Close Of Escrow, Seller shall provide Buyer a written statement of compliance in accordance with state and local Law, unless exempt.
(2) ☐ Buyer ☐ Seller shall pay the cost of compliance with any other minimum mandatory government retrofit standards, inspections and reports if required as a condition of closing escrow under any Law.

D. ESCROW AND TITLE:

(1) ☐ Buyer ☐ Seller shall pay escrow fee _____
        Escrow Holder shall be _____
(2) ☐ Buyer ☐ Seller shall pay for owner's title insurance policy specified in paragraph 12E _____
        Owner's title policy to be issued by _____
        (Buyer shall pay for any title insurance policy insuring Buyer's lender, unless otherwise agreed in writing.)

E. OTHER COSTS:

(1) ☐ Buyer ☐ Seller shall pay County transfer tax or transfer fee _____
(2) ☐ Buyer ☐ Seller shall pay City transfer tax or transfer fee _____
(3) ☐ Buyer ☐ Seller shall pay HOA transfer fee _____
(4) ☐ Buyer ☐ Seller shall pay HOA document preparation fees _____
(5) ☐ Buyer ☐ Seller shall pay the cost, not to exceed $ _____, of a one-year home warranty plan, issued by _____
        with the following optional coverage: _____
(6) ☐ Buyer ☐ Seller shall pay for _____
(7) ☐ Buyer ☐ Seller shall pay for _____

5. STATUTORY DISCLOSURES (INCLUDING LEAD-BASED PAINT HAZARD DISCLOSURES) AND CANCELLATION RIGHTS:

A. (1) Seller shall, within the time specified in paragraph 14A, deliver to Buyer, if required by Law: (i) Federal Lead-Based Paint Disclosures and pamphlet ("Lead Disclosures"); and (ii) disclosures or notices required by sections 1102 et. seq. and 1103 et. seq. of the California Civil Code ("Statutory Disclosures"). Statutory Disclosures include, but are not limited to, a Real Estate Transfer Disclosure Statement ("TDS"), Natural Hazard Disclosure Statement ("NHD"), notice or actual knowledge of release of illegal controlled substance, notice of special tax and/or assessments (or, if allowed, substantially equivalent notice regarding the Mello-Roos Community Facilities Act and Improvement Bond Act of 1915) and, if Seller has actual knowledge, of industrial use and military ordnance location (C.A.R. Form SSD).

(2) Buyer shall, within the time specified in paragraph 14B(1), return Signed Copies of the Statutory and Lead Disclosures to Seller.

(3) In the event Seller, prior to Close Of Escrow, becomes aware of adverse conditions materially affecting the Property, or any material inaccuracy in disclosures, information or representations previously provided to Buyer of which Buyer is otherwise unaware, Seller shall promptly provide a subsequent or amended disclosure or notice, in writing, covering those items. However, a subsequent or amended disclosure shall not be required for conditions and material inaccuracies disclosed in reports ordered and paid for by Buyer.

Buyer's Initials ( ___ )( ___ )
Seller's Initials ( ___ )( ___ )

Reviewed by _____

Copyright © 1991-2007, CALIFORNIA ASSOCIATION OF REALTORS, INC.
RPA-CA REVISED 1/07 (PAGE 2 OF 8)
CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 2 OF 8)

01/14/2010  19:22                              OAKS.46                              PAGE  04/11

Property Address: __Newport Beach__                              Date: __January 14, 2010__

(4) If any disclosure or notice specified in 5A(1), or subsequent or amended disclosure or notice is delivered to Buyer after the offer is Signed, Buyer shall have the right to cancel this Agreement within 3 Days After delivery in person, or 5 Days After delivery by deposit in the mail, by giving written notice of cancellation to Seller or Seller's agent. (Lead Disclosures sent by mail must be sent certified mail or better.)

(5) Note to Buyer and Seller: Waiver of Statutory and Lead Disclosures is prohibited by Law.

B. NATURAL AND ENVIRONMENTAL HAZARDS: Within the time specified in paragraph 14A, Seller shall, if required by Law (i) deliver to Buyer earthquake guides (and environmental hazards booklet); (ii) even if exempt from the obligation to provide a NHD, disclose if the Property is located in a Special Flood Hazard Area; Potential Flooding (inundation) Area; Very High Fire Hazard Zone; State Fire Responsibility Area; Earthquake Fault Zone; Seismic Hazard Zone; and (iii) disclose any other zone as required by Law and provide any other information required for those zones.

C. MEGAN'S LAW DATABASE DISCLOSURE: Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Seller nor Brokers are required to check this website. If Buyer wants further information, Broker recommends that Buyer obtain information from this website during Buyer's inspection contingency period. Brokers do not have expertise in this area.)

6. CONDOMINIUM/PLANNED UNIT DEVELOPMENT DISCLOSURES:

A. SELLER HAS: 7 (or ___) Days After Acceptance to disclose to Buyer whether the Property is a condominium, or is located in a planned unit development or other common interest subdivision (C.A.R. Form SSD).

B. If the Property is a condominium or is located in a planned unit development or other common interest subdivision, Seller has 3 (or ___) Days After Acceptance to request from the HOA (C.A.R. Form HOA): (i) Copies of any documents required by Law; (ii) disclosure of any pending or anticipated claim or litigation by or against the HOA; (iii) a statement containing the location and number of designated parking and storage spaces; (iv) Copies of the most recent 12 months of HOA minutes for regular and special meetings; and (v) the names and contact information of all HOAs governing the Property (collectively, "CI Disclosures"), Seller shall itemize and deliver to Buyer all CI Disclosures received from the HOA and any CI Disclosures in Seller's possession. Buyer's approval of CI Disclosures is a contingency of this Agreement as specified in paragraph 14B(3).

7. CONDITIONS AFFECTING PROPERTY:

A. Unless otherwise agreed: (i) the Property is sold (a) in its PRESENT physical condition as of the date of Acceptance and (b) subject to Buyer's Investigation rights; (ii) the Property, including pool, spa, landscaping and grounds, is to be maintained in substantially the same condition as on the date of Acceptance; and (iii) all debris and personal property not included in the sale shall be removed by Close Of Escrow.

B. SELLER SHALL, within the time specified in paragraph 7A, DISCLOSE KNOWN MATERIAL FACTS AND DEFECTS affecting the Property, including known insurance claims within the past five years, AND MAKE OTHER DISCLOSURES REQUIRED BY LAW (C.A.R. Form SSD).

C. NOTE TO BUYER: You are strongly advised to conduct investigations of the entire Property in order to determine its present condition since Seller may not be aware of all defects affecting the Property or other factors that you consider important. Property improvements may not be built according to code, in compliance with current Law, or have had permits issued.

D. NOTE TO SELLER: Buyer has the right to inspect the Property and, as specified in paragraph 14B, based upon information discovered in those inspections: (i) cancel this Agreement; or (ii) request that you make Repairs or take other action.

8. ITEMS INCLUDED AND EXCLUDED:

A. NOTE TO BUYER AND SELLER: Items listed as included or excluded in the MLS, flyers or marketing materials are not included in the purchase price or excluded from the sale unless specified in 8B or C.

B. ITEMS INCLUDED IN SALE:
(1) All EXISTING fixtures and fittings that are attached to the Property;
(2) Existing electrical, mechanical, lighting, plumbing and heating fixtures, ceiling fans, fireplace inserts, gas logs and grates, solar systems, built-in appliances, window and door screens, awnings, shutters, window coverings, attached floor coverings, television antennas, satellite dishes, private integrated telephone systems, air coolers/conditioners, pooling equipment, garage door openers/remote controls, mailbox, in-ground landscaping, trees/shrubs, water softeners, water purifiers, security systems/alarms; and
(3) The following items: _____
(4) Seller represents that all items included in the purchase price, unless otherwise specified, are owned by Seller.
(5) All items included shall be transferred free of liens and without Seller warranty.

C. ITEMS EXCLUDED FROM SALE: _____

9. BUYER'S INVESTIGATION OF PROPERTY AND MATTERS AFFECTING PROPERTY:

A. Buyer's acceptance of the condition of, and any other matter affecting the Property, is a contingency of this Agreement as specified in this paragraph and paragraph 14B. Within the time specified in paragraph 14B(1), Buyer shall have the right, at Buyer's expense unless otherwise agreed, to conduct inspections, investigations, tests, surveys and other studies ("Buyer Investigations"), including, but not limited to, the right to (i) inspect for lead-based paint and other lead-based paint hazards; (ii) inspect for wood destroying pests and organisms; (iii) review the registered sex offender database; (iv) confirm the insurability of Buyer and the Property; and (v) satisfy Buyer as to any matter specified in the attached Buyer's Inspection Advisory (C.A.R. Form BIA). Without Seller's prior written consent, Buyer shall neither make nor cause to be made: (i) invasive or destructive Buyer Investigations; or (ii) inspections by any governmental building or zoning inspector or government employee, unless required by Law.

B. Buyer shall complete Buyer Investigations and, as specified in paragraph 14B, remove the contingency or cancel this Agreement. Buyer shall give Seller, at no cost, complete Copies of all Buyer Investigation reports obtained by Buyer. Seller shall make the Property available for all Buyer Investigations. Seller shall have water, gas, electricity and all operable pilot lights on for Buyer's Investigations and through the date possession is made available to Buyer.

Buyer's Initials ( ____ )( ____ )
Seller's Initials ( ____ )( ____ )

Reviewed by _____

Copyright © 1991-2007, CALIFORNIA ASSOCIATION OF REALTORS, INC.
RPA-CA REVISED 11/07 (PAGE 3 OF 8)
CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 3 OF 8)

63

01/14/2010  19:22  ▬▬▬▬  DMX646  PAGE 05/11

16 Harbor Island

Property Address: Newport Beach,                                      Date: JANUARY 14, 2010

10. REPAIRS:

11. BUYER INDEMNITY AND SELLER PROTECTION FOR ENTRY UPON PROPERTY:

12. TITLE AND VESTING:

13. SALE OF BUYER'S PROPERTY:

14. TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS:

Copyright © 1991-2007, CALIFORNIA ASSOCIATION OF REALTORS, INC.
RPA-CA REVISED 1/07 (PAGE 4 OF 8)
CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 4 OF 8)

01/14/2010  19:22  ████████  OHK545  PAGE  06/11

Property Address: _Newport Beach_                                      Date: _January 14, 2010_

D. **EFFECT OF BUYER'S REMOVAL OF CONTINGENCIES:** If Buyer removes, in writing, any contingency or cancellation rights, unless otherwise specified in a separate written agreement between Buyer and Seller, Buyer shall conclusively be deemed to have (i) completed all Buyer investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right; (ii) elected to proceed with the transaction; and (iii) assumed all liability, responsibility and expense for Repairs or corrections pertaining to that contingency or cancellation right, or for inability to obtain financing.

E. **EFFECT OF CANCELLATION ON DEPOSITS:** If Buyer or Seller gives written notice of cancellation pursuant to rights duly exercised under the terms of this Agreement, Buyer and Seller agree to Sign mutual instructions to cancel the sale and escrow and release deposits to the party entitled to the funds, less fees and costs incurred by that party. Fees and costs may be payable to service providers and vendors for services and products provided during escrow. Release of funds will require mutual Signed release instructions from Buyer and Seller, judicial decision or arbitration award. A party may be subject to a civil penalty of up to $1,000 for refusal to sign such instructions if no good faith dispute exists as to who is entitled to the deposited funds (Civil Code §1057.3).

15. **FINAL VERIFICATION OF CONDITION:** Buyer shall have the right to make a final inspection of the Property within 5 (or _____ ) Days Prior to Close Of Escrow, NOT AS A CONTINGENCY OF THE SALE, but solely to confirm (i) the Property is maintained pursuant to paragraph 7A; (ii) Repairs have been completed as agreed; and (iii) Seller has complied with Seller's other obligations under this Agreement.

16. **LIQUIDATED DAMAGES:** If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. If the Property is a dwelling with no more than four units, one of which Buyer intends to occupy, then the amount retained shall be no more than 3% of the purchase price. Any excess shall be returned to Buyer. Release of funds will require mutual, Signed release instructions from both Buyer and Seller, judicial decision or arbitration award.
BUYER AND SELLER SHALL SIGN A SEPARATE LIQUIDATED DAMAGES PROVISION FOR ANY INCREASED DEPOSIT. (C.A.R. FORM RID)

Buyer's Initials _____ / _____        Seller's Initials _____ / _____

17. **DISPUTE RESOLUTION:**

A. **MEDIATION:** Buyer and Seller agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action. Paragraphs 17B(2) and (3) below apply to mediation whether or not the Arbitration provision is initiated. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED.

B. **ARBITRATION OF DISPUTES:** (1) Buyer and Seller agree that any dispute or claim in Law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration, including and subject to paragraphs 17B(2) and (3) below. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of residential real estate Law experience, unless the parties mutually agree to a different arbitrator, who shall render an award in accordance with substantive California Law. The parties shall have the right to discovery in accordance with California Code of Civil Procedure §1283.05. In all other respects, the arbitration shall be conducted in accordance with Title 9 of Part III of the California Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered into any court having jurisdiction. Interpretation of this agreement to arbitrate shall be governed by the Federal Arbitration Act.

(2) EXCLUSIONS FROM MEDIATION AND ARBITRATION: The following matters are excluded from mediation and arbitration: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in California Civil Code §2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; and (iv) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation and arbitration provisions.

(3) BROKERS: Buyer and Seller agree to mediate and arbitrate disputes or claims involving either or both Brokers, consistent with 17A and B, provided either or both Brokers shall have agreed to such mediation or arbitration prior to, or within a reasonable time after, the dispute or claim is presented to Brokers. Any election by either or both Brokers to participate in mediation or arbitration shall not result in Brokers being deemed parties to the Agreement.

"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."

"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."

Buyer's Initials _____ / _____        Seller's Initials _____ / _____

Buyer's Initials _____ / _____
Seller's Initials _____ / _____
Reviewed by _____ Date _____

Copyright © 1991-2001, CALIFORNIA ASSOCIATION OF REALTORS, INC.
RPA-CA REVISED 1/06 (PAGE 5 OF 8)
CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 5 OF 8)

18 Harbor Island

Property Address: _Newport Beach,_                                      Date: _January 16, 2010_

18. **PRORATIONS OF PROPERTY TAXES AND OTHER ITEMS:** Unless otherwise agreed in writing, the following items shall be PAID
CURRENT and prorated between Buyer and Seller as of Close Of Escrow: real property taxes and assessments, interest, rents,
HOA regular, special, and emergency dues and assessments imposed prior to Close Of Escrow, premiums on insurance assumed
by Buyer, payments on bonds and assessments assumed by Buyer, and payments on Mello-Roos and other Special Assessment
District bonds and assessments that are now a lien. The following items shall be assumed by Buyer WITHOUT CREDIT toward the
purchase price: prorated payments on Mello-Roos and other Special Assessment District bonds and assessments and assessments that are now a lien but not yet due. Property will be reassessed upon change of ownership. Any supplemental tax bills
shall be paid as follows: (i) for periods after Close Of Escrow, by Buyer, and (ii) for periods prior to Close Of Escrow, by Seller. TAX
BILLS ISSUED AFTER CLOSE OF ESCROW SHALL BE HANDLED DIRECTLY BETWEEN BUYER AND SELLER. Prorations shall
be made based on a 30-day month.

19. **WITHHOLDING TAXES:** Seller and Buyer agree to execute any instrument, affidavit, statement or instruction reasonably necessary
to comply with federal (FIRPTA) and California withholding Law, if required (C.A.R. Forms AS and AB).

20. **MULTIPLE LISTING SERVICE ("MLS"):** Brokers are authorized to report to the MLS a pending sale and, upon Close Of Escrow, the
terms of the transaction to be published and disseminated to persons and entities authorized to use the information on terms
approved by the MLS.

21. **EQUAL HOUSING OPPORTUNITY:** The Property is sold in compliance with federal, state and local anti-discrimination Laws.

22. **ATTORNEY FEES:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing
Buyer or Seller shall be entitled to reasonable attorney fees and costs from the non-prevailing Buyer or Seller, except as provided in
paragraph 17A.

23. **SELECTION OF SERVICE PROVIDERS:** If Brokers refer Buyer or Seller to persons, vendors, or service or product providers
("Providers"), Brokers do not guarantee the performance of any Providers. Buyer and Seller may select ANY Providers of their own
choosing.

24. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are
incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their
Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous
oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be
given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or
changed, except in writing Signed by Buyer and Seller.

25. **OTHER TERMS AND CONDITIONS,** including attached supplements:
A. [X] Buyer's Inspection Advisory (C.A.R. Form BIA)
B. [X] _____
C. [ ] _____
D. [ ] Sales and resale form with a completed Seller Property Questionnaire (C.A.R. form SPQ) while (section specified in paragraph 7A)
E. _____

26. **DEFINITIONS:** As used in this Agreement:
A. "Acceptance" means the time the offer or final counter offer is accepted in writing by a party and is delivered to and personally
received by the other party or that party's authorized agent in accordance with the terms of this offer or a final counter offer.
B. "Agreement" means the terms and conditions of this accepted California Residential Purchase Agreement and any accepted
counter offers and addenda.
C. "C.A.R. Form" means the specific form referenced or another comparable form agreed to by the parties.
D. "Close Of Escrow" means the date the grant deed, or other evidence of transfer of title, is recorded. If the scheduled close of
escrow falls on a Saturday, Sunday or legal holiday, then close of escrow shall be the next business day after the scheduled
close of escrow date.
E. "Copy" means copy by any means including photocopy, NCR, facsimile and electronic.
F. "Days" means calendar days, unless otherwise required by Law.
G. "Days After" means the specified number of calendar days after the occurrence of the event specified, not counting the calendar
date on which the specified event occurs, and ending at 11:59PM on the final day.
H. "Days Prior" means the specified number of calendar days before the occurrence of the event specified, not counting the
calendar date on which the specified event is scheduled to occur.
I. "Electronic Copy" or "Electronic Signature" means, as applicable, an electronic copy or signature complying with California
Law. Buyer and Seller agree that electronic means will not be used by either party to modify or alter the content or integrity of this
Agreement without the knowledge and consent of the other.
J. "Law" means any law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state or
federal legislative, judicial or executive body or agency.
K. "Notice to Buyer to Perform" means a document (C.A.R. Form NBP), which shall be in writing and Signed by Seller and shall
give Buyer at least 24 hours (or as otherwise specified in paragraph 14C(4)) to remove a contingency or perform as
applicable.
L. "Repairs" means any repairs (including pest control), alterations, replacements, modifications or retrofitting of the Property
provided for under this Agreement.
M. "Signed" means either a handwritten or electronic signature on an original document, Copy or any counterpart.
N. Singular and Plural terms each include the other, when appropriate.

Copyright © 1991-2007, CALIFORNIA ASSOCIATION OF REALTORS, INC.
RPA-CA REVISED 11/07 (PAGE 8 OF 8)
CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 8 OF 8)

Buyer's Initials _____ / _____
Seller's Initials _____ / _____

Reviewed by _____  Date _____



01/14/2010  19:22  ████████  CMX645  PAGE  10/11

10 Harbor Island
Property Address: _____ Beach, _____  Date: January 14, 2010

27. AGENCY:

A. DISCLOSURE: Buyer and Seller each acknowledge prior receipt of C.A.R. Form AD "Disclosure Regarding Real Estate Agency Relationships."

B. POTENTIALLY COMPETING BUYERS AND SELLERS: Buyer and Seller each acknowledge receipt of a disclosure of the possibility of multiple representation by the Broker representing that principal. This disclosure may be part of a listing agreement, buyer-broker agreement or separate document (C.A.R. Form DA). Buyer understands that Broker representing Buyer may also represent other potential buyers, who may consider, make offers on or ultimately acquire the Property. Seller understands that Broker representing Seller may also represent other sellers with competing properties of interest to this Buyer.

C. CONFIRMATION: The following agency relationships are hereby confirmed for this transaction:
Listing Agent _____ (Print Firm Name) is the agent
of (check one): ☐ the Seller exclusively; or ☐ both the Buyer and Seller.
Selling Agent _____ (Print Firm Name) (if not same
as Listing Agent) is the agent of (check one): ☐ the Buyer exclusively; or ☐ the Seller exclusively; or ☐ both the Buyer and Seller. Real Estate Brokers are not parties to the Agreement between Buyer and Seller.

28. JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:

A. The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow instructions of Buyer and Seller to Escrow Holder, which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual instructions to close the escrow: 1, 2, 4, 12, 13B, 14E, 18, 19, 24, 25D and 26B, 28, 29, 30, 32A, 33 and paragraph D of the section titled Real Estate Brokers on page 8. If a Copy of the separate compensation agreement(s) provided for in paragraph 29 or 32A, or paragraph D of the section titled Real Estate Brokers on page 8 is deposited with Escrow Holder by Broker, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s). The terms and conditions of this Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned. Buyer and Seller will receive Escrow Holder's general provisions directly from Escrow Holder and will execute such provisions upon Escrow Holder's request. To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller will execute additional instructions, documents and forms provided by Escrow Holder that are reasonably necessary to close the escrow.

B. A Copy of this Agreement shall be delivered to Escrow Holder within 3 business days after Acceptance (or ☐ _____ ). Buyer and Seller authorize Escrow Holder to accept and rely on Copies and Signatures as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The validity of this Agreement as between Buyer and Seller is not affected by whether or when Escrow Holder Signs this Agreement.

C. Brokers are a party to the escrow for the sole purpose of compensation pursuant to paragraphs 29, 32A and paragraph D of the section titled Real Estate Brokers on page 8. Buyer and Seller irrevocably assign to Brokers compensation specified in paragraphs 29 and 32A, respectively, and irrevocably instruct Escrow Holder to disburse those funds to Brokers at Close Of Escrow or pursuant to any other mutually executed cancellation agreement. Compensation instructions can be amended or revoked only with the written consent of Brokers. Escrow Holder shall immediately notify Brokers: (i) if Buyer's initial or any additional deposit is not made pursuant to this Agreement, or is not good at time of deposit with Escrow Holder; or (ii) if Buyer and Seller instruct Escrow Holder to cancel escrow.

D. A Copy of any amendment that affects any paragraph of this Agreement for which Escrow Holder is responsible shall be delivered to Escrow Holder within 2 business days after mutual execution of the amendment.

29. BROKER COMPENSATION FROM BUYER: If applicable, upon Close Of Escrow, Buyer agrees to pay compensation to Broker as specified in a separate written agreement between Buyer and Broker.

30. TERMS AND CONDITIONS OF OFFER:

This is an offer to purchase the Property on the above terms and conditions. All paragraphs with spaces for initials by Buyer and Seller are incorporated in this Agreement only if initialed by all parties. If at least one but not all parties initial, a counter offer is required until agreement is reached. Seller has the right to continue to offer the Property for sale and to accept any other offer at any time prior to notification of Acceptance. Buyer has read and acknowledges receipt of a Copy of the offer and agrees to the above confirmation of agency relationships. If this offer is accepted and Buyer subsequently defaults, Buyer may be responsible for payment of Brokers' compensation. This Agreement and any supplement, addendum or modification, including any Copy, may be signed in two or more counterparts, all of which shall constitute one and the same writing.

Copyright © 1991–2007, CALIFORNIA ASSOCIATION OF REALTORS, INC.
RPA-CA REVISED 1/07 (PAGE 7 OF 8)
CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 7 OF 8)

Buyer's Initials ( _____ )( _____ )
Seller's Initials ( _____ )( _____ )
Reviewed by _____ Date _____

67

01/14/2010  19:22  ████████  DM645  PAGE  89/11

18 Harbor Island

Property Address: _____    Date: JANUARY 10, 2010

31. EXPIRATION OF OFFER: This offer shall be deemed revoked and the deposit shall be returned unless the offer is Signed by Seller and a Copy of the
Signed offer is personally received by Buyer, or by _____ Kimberly Rith / Bob Blue _____ , who is
authorized to receive it by 5:00 PM on the third Day after this offer is Signed by Buyer (or, if checked, ☐ by
_____ JANUARY 15, 2010 _____ (date), at _____ ☐ AM/☐ PM).

Date ___11/14/10___          Date _____
BUYER _____        BUYER _____
_____ (Print name)         _____ (Print name)
(Address)

32. BROKER COMPENSATION FROM SELLER:
A. Upon Close Of Escrow, Seller agrees to pay compensation to Broker as specified in a separate written agreement between Seller and Broker.
B. If escrow does not close, compensation is payable as specified in that separate written agreement.

33. ACCEPTANCE OF OFFER: Seller warrants that Seller is the owner of the Property, or has the authority to execute this Agreement. Seller accepts the
above offer, agrees to sell the Property on the above terms and conditions, and agrees to the above confirmation of agency relationships. Seller has
read and acknowledges receipt of a Copy of this Agreement, and authorizes Broker to deliver a Signed Copy to Buyer.
☐ (If checked) SUBJECT TO ATTACHED COUNTER OFFER, DATED _____

Date ___1-21-2010___          Date _____
SELLER _____        SELLER _____
GLEN AND _____ AGENCY          _____
(Print name) _____ 14 WENDY AS MANAGER     (Print name)
(Address)

CONFIRMATION OF ACCEPTANCE: A Copy of Signed Acceptance was personally received by Buyer or Buyer's authorized
( _____ ) agent on (date) _____ , at _____ ☐ AM ☐ PM. A binding Agreement is created when
(initials) a Copy of Signed Acceptance is personally received by Buyer or Buyer's authorized agent whether or not confirmed in
this document. Completion of this confirmation is not legally required in order to create a binding Agreement; it is solely
intended to evidence the date that Confirmation of Acceptance has occurred.

REAL ESTATE BROKERS:
A. Real Estate Brokers are not parties to the Agreement between Buyer and Seller.
B. Agency relationships are confirmed as stated in paragraph 37.
C. If specified in paragraph 2A, Agent who submitted the offer for Buyer acknowledges receipt of deposit.
D. COOPERATING BROKER COMPENSATION: Listing Broker agrees to pay Cooperating Broker (Selling Firm) and Cooperating Broker agrees to
accept, out of Listing Broker's proceeds in escrow: (i) the amount specified in the MLS, provided Cooperating Broker is a Participant of the MLS in
which the Property is offered for sale or a Reciprocal MLS; or (ii) ☐ (if checked) the amount specified in a separate written agreement (C.A.R. Form
CBC) between Listing Broker and Cooperating Broker.

Real Estate Broker (Selling Firm) _____          DRE Lic. # _____
By _____ Kimberly Rith DRE Lic. # _____          Date _____
Address 1206 Armory Center Drive Suite 100  City _____  State CA  Zip 92550
Telephone (714)555-0188   Fax (949)555-3333   E-mail kkrith@global.net

Real Estate Broker (Listing Firm) The Real Estate Group _____          License # _____
By _____          License # _____
Address _____ City _____          Date _____
Telephone _____ Fax _____ E-mail _____          State _____ Zip _____

ESCROW HOLDER ACKNOWLEDGMENT:
Escrow Holder acknowledges receipt of a Copy of this Agreement, (if checked, ☐ a deposit in the amount of $ _____ ),
counter offer numbers _____ and _____ , and agrees to act as Escrow Holder subject to paragraph 28 of this Agreement, any
supplemental escrow instructions and the terms of Escrow Holder's general provisions.
Escrow Holder is advised that the date of Confirmation of Acceptance of the Agreement as between Buyer and Seller is _____ .
Escrow Holder _____          Escrow # _____
By _____          Date _____
Address _____
Phone/Fax/E-mail _____
Escrow Holder is licensed by the California Department of ☐ Corporations, ☐ Insurance, ☐ Real Estate.  License # _____

( _____ / _____ ) REJECTION OF OFFER: No counter offer is being made. This offer was reviewed and rejected by Seller on _____
(Seller's Initials) _____ (Date)

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY
PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE,
CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR. REALTOR is a registered collective membership mark which may be used only by
members of the NATIONAL ASSOCIATION OF REALTORS who subscribe to its Code of Ethics.

☐ Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____

RPA-CA REVISED 1/06 (PAGE 8 OF 8)
CALIFORNIA RESIDENTIAL PURCHASE AGREEMENT (RPA-CA PAGE 8 OF 8)

68



**CALIFORNIA ASSOCIATION OF REALTORS®**

**BUYER'S INSPECTION ADVISORY**
(C.A.R. Form BIA-A, Revised 1998)

Property Address: _____ ("Property").

A. IMPORTANCE OF PROPERTY INVESTIGATION: The physical condition of the land and improvements being purchased is not guaranteed by either Seller or Brokers. For this reason, you should conduct thorough investigations of the Property personally and with professionals who should provide written reports of their investigations. A general physical inspection typically does not cover all aspects of the Property nor items affecting the Property that are not physically located on the Property. If the professionals recommend further investigations, including a recommendation by a pest control operator to inspect inaccessible areas of the Property, you should contact qualified experts to conduct such additional investigations.

B. BUYER RIGHTS AND DUTIES: You have an affirmative duty to exercise reasonable care to protect yourself, including discovery of the legal, practical and technical implications of disclosed facts, and the investigation and verification of information and facts that you know or that are within your diligent attention and observation. The purchase agreement gives you the right to investigate the Property. If you exercise this right, and you should, you must do so in accordance with the terms of that agreement. This is the best way for you to protect yourself. It is extremely important for you to read all written reports provided by professionals and to discuss the results of inspections with the professional who conducted the inspection. You have the right to request that Seller make repairs, corrections or take other action based upon items discovered in your investigations or disclosed by Seller. If Seller is unwilling or unable to satisfy your requests, or you do not want to purchase the Property in its disclosed and discovered condition, you have the right to cancel the agreement if you act within specific time periods. If you do not cancel the agreement in a timely and proper manner, you may be in breach of contract.

C. SELLER RIGHTS AND DUTIES: Seller is required to disclose to you material facts known to him/her that affect the value or desirability of the Property. However, Seller may not be aware of some Property defects or conditions. Seller does not have an obligation to inspect the Property for your benefit nor is Seller obligated to repair, correct or otherwise cure known defects that are disclosed to you or previously unknown defects that are discovered by you or your inspectors during escrow. The purchase agreement obligates Seller to make the Property available to you for investigations.

D. BROKER OBLIGATIONS: Brokers do not have expertise in all areas and therefore cannot advise you on many items, such as soil stability, geologic or environmental conditions, hazardous or illegal controlled substances, structural conditions of the foundation or other improvements, or the condition of the roof, plumbing, heating, air conditioning, electrical, sewer, septic, waste disposal, or other systems. The only way to accurately determine the condition of the Property is through an inspection by an appropriate professional selected by you. If Broker gives you referrals to such professionals, Broker does not guarantee their performance. You may select any professional of your choosing. In sales involving residential dwellings with no more than four units, Brokers have a duty to make a diligent visual inspection of the accessible areas of the Property and to disclose the results of that inspection. However, as some Property defects or conditions may not be discoverable from a visual inspection, it is possible Brokers are not aware of them. If you have entered into a written agreement with a Broker, the specific terms of that agreement will determine the nature and extent of that Broker's duty to you. YOU ARE STRONGLY ADVISED TO INVESTIGATE THE CONDITION AND SUITABILITY OF ALL ASPECTS OF THE PROPERTY. IF YOU DO NOT DO SO, YOU ARE ACTING AGAINST THE ADVICE OF BROKERS.

E. YOU ARE ADVISED TO CONDUCT INVESTIGATIONS OF THE ENTIRE PROPERTY, INCLUDING, BUT NOT LIMITED TO THE FOLLOWING:

1. GENERAL CONDITION OF THE PROPERTY, ITS SYSTEMS AND COMPONENTS: Foundation, roof, plumbing, heating, air conditioning, electrical, mechanical, security, pool/spa, other structural and non-structural systems and components, fixtures, built-in appliances, any personal property included in the sale, and energy efficiency of the Property. (Structural engineers are best suited to determine possible design or construction defects, and whether improvements are structurally sound.)

2. SQUARE FOOTAGE, AREA, BOUNDARIES: Square footage, room dimensions, lot size, age of improvements and boundaries. Any numerical statements regarding these items are APPROXIMATIONS ONLY and have not been verified by Seller and cannot be verified by Brokers. Fences, hedges, walls, retaining walls and other natural or constructed barriers or markers do not necessarily identify true Property boundaries. (Professionals such as appraisers, architects, surveyors and civil engineers are best suited to determine square footage, dimensions and boundaries of the Property.)

3. WOOD DESTROYING PESTS: Presence of, or conditions likely to lead to the presence of wood destroying pests and organisms and other infestation or infection. Inspection reports covering these items can be separated into two sections: Section 1 identifies areas where infestation or infection is evident. Section 2 identifies areas where there are conditions likely to lead to infestation or infection. A registered structural pest control company is best suited to perform these inspections.

4. SOIL STABILITY: Existence of fill or compacted soil, expansive or contracting soil, susceptibility to slippage, settling or movement, and the adequacy of drainage. (Geotechnical engineers are best suited to determine such conditions, causes and remedies.)

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
Copyright © 1991-2004, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.
BIA-A REVISED 10/02 (PAGE 1 OF 2)

Buyer's Initials _____ _____
Seller's Initials _____ _____
Reviewed by _____ Date _____



**BUYER'S INSPECTION ADVISORY (BIA-A PAGE 1 OF 2)**

Agent: KIMBERLY _____    Phone: (949) 554-____    Fax: (949) 554-____    Prepared using _____ software
Broker: Nova Real Estate Group 1000 Newport Center Drive Suite 100 NEWPORT BEACH , CA 92660

01/14/2010  19:22                              CMG46                              PAGE  11/11

Property Address:

5. ROOF: Present condition, age, leaks, and remaining useful life. (Roofing contractors are best suited to determine these conditions.)
6. POOL/SPA: Cracks, leaks or operational problems. (Pool contractors are best suited to determine these conditions.)
7. WASTE DISPOSAL: Type, size, adequacy, capacity and condition of sewer and septic systems and components, connection to sewer, and applicable fees.
8. WATER AND UTILITIES; WELL SYSTEMS AND COMPONENTS: Water and utility availability, use restrictions and costs. Water quality, adequacy, condition, and performance of well systems and components.
9. ENVIRONMENTAL HAZARDS: Potential environmental hazards, including, but not limited to, asbestos, lead-based paint and other lead contamination, radon, mold, formaldehyde, fuel or chemical storage tanks, contaminated soil or water, hazardous waste, waste disposal sites, electromagnetic fields, nuclear sources, and other substances, materials, products, or conditions (including mold (airborne, toxic or otherwise), fungus or similar contaminants). (For more information on these items, you may consult an appropriate professional or read the booklets "Environmental Hazards: A Guide for Homeowners, Buyers, Landlords and Tenants," "Protect Your Family From Lead in Your Home" or both.)
10. EARTHQUAKES AND FLOODING: Susceptibility of the Property to earthquake/seismic hazards and propensity of the Property to flood. (A Geologist or Geotechnical Engineer is best suited to provide information on these conditions.)
11. FIRE, HAZARD AND OTHER INSURANCE: The availability and cost of necessary or desired insurance may vary. The location of the Property in a seismic, flood or fire hazard zone, and other conditions, such as the age of the Property and the claims history of the Property and Buyer, may affect the availability and need for certain types of insurance. Buyer should explore insurance options early as this information may affect other decisions, including the removal of loan and inspection contingencies. (An insurance agent is best suited to provide information on these conditions.)
12. BUILDING PERMITS, ZONING AND GOVERNMENTAL REQUIREMENTS: Permits, inspections, certificates, zoning, other governmental limitations, restrictions, and requirements affecting the current or future use of the Property, its development or size. (Such information is available from appropriate governmental agencies and private information providers. Brokers are not qualified to review or interpret any such information.)
13. RENTAL PROPERTY RESTRICTIONS: Some cities and counties impose restrictions that limit the amount of rent that can be charged, the maximum number of occupants, and the right of a landlord to terminate a tenancy. Deadbolt or other locks and security systems for doors and windows, including window bars, may be required in some cities whether they satisfy legal requirements. (Government agencies can provide information about these restrictions and other requirements.)
14. SECURITY AND SAFETY: State and local law may require the installation of locks, access alarms, self-latching mechanisms and/or other measures to decrease the risk to children and other persons of existing swimming pools and hot tubs, as well as various fire safety and other measures concerning other features of the Property. Compliance requirements differ from city to city and county to county. Unless specifically agreed, the Property may not be in compliance with these requirements. (Local government agencies can provide information about these restrictions and other requirements.)
15. NEIGHBORHOOD, AREA, SUBDIVISION CONDITIONS; PERSONAL FACTORS: Neighborhood or area conditions, including schools, proximity and adequacy of law enforcement, crime statistics, the proximity of registered felons or offenders, fire protection, other government services, availability, adequacy and cost of any speed-rail, telephone, cable, internet connections or other telecommunications or other technology services and installations, proximity to commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, protected species, wetland properties, botanical diseases, historic or other governmentally protected sites or improvements, cemeteries, facilities and condition of common areas of common interest subdivisions, and possible lack of compliance with any governing documents or Homeowners' Association requirements, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Buyer.

Buyer and Seller acknowledge and agree that Broker: (i) Does not decide what price Buyer should pay or Seller should accept; (ii) Does not guarantee the condition of the Property; (iii) Does not guarantee the performance, adequacy or completeness of inspections, services, products or repairs provided or made by Seller or others; (iv) Does not have an obligation to conduct an inspection of common areas or areas off the site of the Property; (v) Shall not be responsible for identifying defects on the Property, in common areas, or offsite unless such defects are visually observable by an inspection of reasonably accessible areas of the Property or are known to Broker; (vi) Shall not be responsible for inspecting public records or permits concerning the title or use of Property; (vii) Shall not be responsible for identifying the location of boundary lines or other items affecting title; (viii) Shall not be responsible for verifying square footage, representations of others or information contained in Inspection reports, Multiple Listing Service, advertisements, flyers or other promotional material; (ix) Shall not be responsible for determining the fair market value of the Property or any personal property included in the sale; (x) Shall not be responsible for providing legal or tax advice regarding any aspect of a transaction entered into by Buyer or Seller; and (xi) Shall not be responsible for providing other advice or information that exceeds the knowledge, education and experience required to perform real estate licensed activity. Buyer and Seller agree to seek legal, tax, insurance, title and other desired assistance from appropriate professionals.

By signing below, Buyer and Seller each acknowledge that they have read, understand, accept and have received a Copy of this Advisory. Buyer is encouraged to read it carefully.

Buyer Signature _____ Date _____        Buyer Signature _____ Date _____

Seller Signature _____ PEDRA   MANAGER  1-29-10 ____ Date        Seller Signature _____ Date _____
OAKS, LLC

THE COPYRIGHT LAWS OF THE UNITED STATES (TITLE 17 U.S. CODE) FORBID THE UNAUTHORIZED REPRODUCTION OF THIS FORM, OR ANY PORTION THEREOF, BY PHOTOCOPY MACHINE OR ANY OTHER MEANS, INCLUDING FACSIMILE OR COMPUTERIZED FORMATS.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____

BIA-A REVISED 1/06 (PAGE 2 OF 3)        BUYER'S INSPECTION ADVISORY (BIA-A PAGE 2 OF 3)

**CALIFORNIA ASSOCIATION OF REALTORS**

## COUNTER OFFER No. 1

For use by Seller or Buyer. May be used for Multiple Counter Offer.
(C.A.R. Form CO, Revised 10/04)

Date __January 27, 2010__, at __Newport Beach__, California.

This is a counter offer to the: ☒ California Residential Purchase Agreement, ☐ Counter Offer, or ☐ Other ("Offer"),
dated __January 26, 2010__, on property known as __10 Harbor Island__ ("Property"),
between _____ ("Buyer") and
_____ Richard Richard Richman, Manager _____ ("Seller").

1. **TERMS:** The terms and conditions of the above referenced document are accepted subject to the following:
   A. Paragraphs in the Offer that require initials by all parties, but are not initialed by all parties, are excluded from the final agreement unless specifically referenced for inclusion in paragraph 1C of this or another Counter Offer.
   B. Unless otherwise agreed in writing, down payment and loan amount(s) will be adjusted in the same proportion as in the original Offer.
   C. *1. Purchase Price will be $27,000,000.*
      *2. _____ will be deeded to Seller with a total value of $9,000,000. Both properties will be free and clear and subject to Seller's inspection and approval within 17 days of acceptance.*
      *3. Termination of Purchase Agreement is hereby extended to January 28, 2010 at 5PM.*
      *4. This Counter Offer replaces second counter offer #1 dated January 19, 2010.*
   D. The following attached supplements are incorporated into this Counter Offer: ☒ Addendum No. 1
      ☐ _____

2. **RIGHT TO ACCEPT OTHER OFFERS:** Seller has the right to continue to offer the Property for sale or for other transaction, and to accept any other offer at any time prior to notification of acceptance, as described in paragraph 3. If this is a Seller Counter Offer, Seller's acceptance of another offer prior to Buyer's acceptance and communication of notification of this Counter Offer, shall revoke this Counter Offer.

3. **EXPIRATION:** This Counter Offer shall be deemed revoked and the deposits, if any, shall be returned unless this Counter Offer is signed by the Buyer or Seller to whom it is sent and a Copy of the signed Counter Offer is personally received by the person making this Counter Offer or who is authorized to receive it, by 5:00 PM on the third Day after this Counter Offer is made or, (if checked) by ☐ _____ (date), at _____ ☐ AM ☐ PM. This Counter Offer may be executed in counterparts.

4. ☐ (If checked) **MULTIPLE COUNTER OFFER:** Seller is making a Counter Offer(s) to another prospective buyer(s) on terms that may or may not be the same as in this Counter Offer. Acceptance of this Counter Offer by Buyer shall not be binding unless and until it is subsequently re-Signed by Seller in paragraph 7 below and a Copy of the Counter Offer Signed in paragraph 7 is personally received by Buyer or by _____, who is authorized to receive it, by 5:00PM on the third Day after this Counter Offer is made or, (if checked) by ☐ _____ (date), at _____ ☐ AM ☐ PM. Prior to the completion of all of these events, Buyer and Seller shall have no duties or obligations for the purchase or sale of the Property.

5. **OFFER:** ☐ BUYER OR ☒ SELLER MAKES THIS COUNTER OFFER ON THE TERMS ABOVE AND ACKNOWLEDGES RECEIPT OF A COPY.
   ☐ _____  Date _____
   Re: KRHDH TRUSTEE TRES LLC     Date   1-28-2010

6. **ACCEPTANCE:** I/WE accept the above Counter Offer (if checked ☐ SUBJECT TO THE ATTACHED COUNTER OFFER) and acknowledge receipt of a Copy.
   _____  Date _____  Time _____ ☐ AM ☐ PM
   _____  Date _____  Time _____ ☐ AM ☐ PM

7. **MULTIPLE COUNTER OFFER SIGNATURE LINE:** By signing below, Seller accepts this Multiple Counter Offer.
   NOTE TO SELLER: Do NOT sign in this box until after Buyer signs in paragraph 6. (Paragraph 7 applies only if paragraph 4 is checked.)
   _____  Date _____  Time _____ ☐ AM ☐ PM
   _____  Date _____  Time _____ ☐ AM ☐ PM

8. ( ____ / ____ ) (initials) **Confirmation of Acceptance:** A Copy of Signed Acceptance was personally received by the maker of this Counter Offer, or that person's authorized agent as specified in paragraph 3 (or, if this is a Multiple Counter Offer, the Buyer or Buyer's authorized agent as specified in paragraph 4) on (date) _____, at _____ ☐ AM ☐ PM. A binding Agreement is created when a Copy of Signed Acceptance is personally received by the maker of the Counter Offer, or that person's authorized agent (or, if this is a Multiple Counter Offer, the Buyer or Buyer's authorized agent) whether or not confirmed in this document. Completion of this confirmation is not legally required in order to create a binding Agreement; it is solely intended to evidence the date that Confirmation of Acceptance has occurred.

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1986-2004, CALIFORNIA ASSOCIATION OF REALTORS, INC. ALL RIGHTS RESERVED.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR. REALTOR is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS who subscribe to its Code of Ethics.

Reviewed by _____  Broker or Designee _____  Date _____

CO REVISED 10/04 (PAGE 1 OF 1)

## COUNTER OFFER (CO PAGE 1 OF 1)

| | |
|---|---|
| Agent: VICKI LEE | Phone: 949.554.1347   Fax: 949.554.1347   Prepared using WINForms® software |
| Broker: Home Real Estate Group 1206 Newport Center Drive, Suite 100 | NEWPORT BEACH, CA 92660 |

## ADDENDUM NO. 1 TO COUNTER OFFER NO. 1

This Addendum, and its terms and conditions, are hereby incorporated in and made a part of the Residential Purchase Agreement and Joint Escrow Instructions (the "Agreement") dated January 14, 2010 and Counter Offer No. 1 on property known as 18 Harbor Island, Newport Beach, California 92660 (the "Property"), in which ▇▇▇▇▇▇▇▇ is referred to as "Buyer" and DAKS, LLC is referred to as "Seller". Seller is a debtor in a bankruptcy case pending in the Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), Case No. 8:07-bk-12044-RK (the "Bankruptcy Case"). To the extent that the terms of this Addendum conflict with the terms of the Agreement, the terms of this Addendum shall control.

1.    Verification of Funds; Closing Costs and Home Warranty Plan (Sections 2H and 4E). Buyer shall be deemed to have provided Seller written verification of Buyer's funds and closing costs upon providing Seller with bank and/or brokerage statements and other financial statements and information as reasonably necessary to confirm that Buyer has sufficient funds to pay the initial cash deposit, the increased cash deposit and the balance of the funds necessary to close and to purchase the Property. Buyer shall pay the cost of a home warranty plan, if any.

2.    Bankruptcy Case.

2.1    Approval. Buyer and Seller acknowledge that, under the Bankruptcy Code, the sale of the Property pursuant to the Agreement is subject to approval of the Bankruptcy Court. The provisions in this Section 2 shall govern the procedure and timeline for obtaining such approval.

2.2    Overbid Procedures. Buyer and Seller further acknowledge that to obtain the approval of the sale of the Property pursuant to the Agreement, Seller must demonstrate that it has taken reasonable steps to obtain the highest or best price possible for the Property, including giving notice of the transaction contemplated by the Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Property to responsible bidders, entertaining higher or better offers from responsible bidders and conducting an auction for the sale of the Property. Seller and Buyer shall use reasonable efforts to agree within ten (10) business days of Acceptance to an overbid procedure that will maintain Buyer's confidentiality (subject to Section 10 below) and which complies with the requirements of the Bankruptcy Court; and Seller shall seek to have such overbid procedure approved by the Court as soon as possible.

2.3    Final Approval. Within five (5) business days after Seller's completion of its due diligence and approval as to the condition, insurability and marketable title of the properties commonly known as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇") and ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇, (▇▇▇▇▇▇▇▇▇▇▇▇▇"), Seller shall seek Final Approval (as defined in Section 3 below) from the Bankruptcy Court and thereafter diligently pursue obtaining the Final Approval. Seller shall provide Buyer written notice of the Final Approval within five (5) business days of receipt of the Final Approval from the Bankruptcy Court (the "Final Approval Notice").

3.    Additional Conditions to Closing. Buyer's and Seller's obligations to perform under the Agreement and to consummate and close the transactions contemplated under the Agreement are expressly contingent upon (i) the Bankruptcy Court having entered an order approving the execution of the Agreement and of the consummation of the transactions contemplated thereby, including the sale of the Property to Buyer free and clear of all liens, claims, interests, or encumbrances, including, without limitation, any claims under the State Court Actions (as that term is defined in this Addendum), with all liens, claims, interests and encumbrances attaching to the sale proceeds in order of priority (the "Final Approval"), (ii) Buyer providing a grant deed to contain, among other things, appropriate and customary

representations and warranties for the transfer to the Seller of the ▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓ Property; (iii) Buyer's consent to not sell or offer for sale the property commonly known as ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ for the earlier to occur of one (1) year after the Closing or the Seller's closing on the sale of the ▓▓▓▓▓▓▓▓▓▓▓▓; and (iv) the purchase and sale otherwise complying with the Bankruptcy Code. Escrow Holder shall not close unless and until the foregoing conditions precedent have been satisfied or waived in writing by Buyer and Seller.

4.    **Closing Timelines.**  Closing shall occur on a day that is not less than thirty (30) days after the Final Approval.

5.    **Delivery of Possession; Prorations.**  Buyer as to the ▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓ Property and Seller as to the Property shall cause all occupants or tenants to vacate the subject property prior to or at Closing.  Buyer as to the ▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓▓▓ and Seller as to the Property shall deliver possession to each other at Closing free from any such occupancies or tenancies. The following adjustments and prorations will be made on the date of Closing: all property taxes payable in the year of Closing and special assessments approved by Buyer as to the Property and Seller as to the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, if any, will be prorated and paid for as of the date of Closing; (ii) all gas, electric, sewer, stormwater, and other utility charges will be prorated by Escrow Holder and paid for as of the date of Closing; (iii) all sums due to contractors or service providers incurred in the maintenance or operation of the Property prior to the date of Closing will be paid by Seller on the date of Closing; (iv) all sums due to contractors or service providers incurred in the maintenance or operation of the ▓▓▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ing will be paid by Buyer on the date of Closing; and (v) all sums due under the Leases (as defined in Section 8) will be prorated and paid for as of the date of Closing.

6.    **Excluded Property.**  The following property is excluded from the sale:  any of the personal property located at or used in connection with the Property including, without limitation, furniture, fixtures, art, vehicles, clothes, jewelry, safes, furs, watercraft, two (2) downstairs hallway sconces, two (2) dining room entry hallway sconces, two (2) upstairs hallway sconces, master bedroom light fixtures/chandeliers and chandeliers in middle living area and library area.  Notwithstanding the foregoing, Seller acknowledges that the following property is included in the sale: all built-in appliances, washers, dryers, security systems, drapes, and curtains.

7.    **As-Is Sale.**  The Property is being transferred pursuant to a quit-claim deed, "as-is, where-is", with no representations or warranties being made or given by Seller or any other person or entity, including without limitation any representation or warranty of fitness or merchantability of the Property for any particular purpose, except for those representations and warranties made under the Agreement.

8.    **Tidelands Lease.**  The lease dated May 1, 1996 executed by the County of Orange, as lessor, and Robert McNulty, as lessee, recorded April 1, 1999 as No. 19990240772 and lease recorded July 16, 2001 as No. 20010476486 (collectively, the "Leases"), shall be assigned by Seller and assumed by Buyer with the approval of the Bankruptcy Court, which approval shall be sought by Seller as part of Seller's request for the Final Approval. At Closing, Seller shall pay any past due rentals and other amounts owing under the Leases as of Closing, and Seller shall cure any and all defaults or breaches under the Leases prior to Closing.

9.    **Integrated Purchase Agreement.**  For purposes of clarification only and not to extend the deadlines to perform, at the sole discretion of Seller, Seller reserves the right to prepare for Buyer's consent and approval a purchase agreement that will incorporate all agreed upon terms of sale into an integrated purchase agreement that will be effective as of the date of Acceptance.

73

10.    No Confidentiality.  Buyer acknowledges that Seller is required to give notice of Buyer's offer, Seller's and Buyer's counteroffers, the Agreement, copies thereof and the sale terms, to creditors, equity holders, their affiliates, prospective purchasers, parties in interest and their respective counsel and agents; that Seller will also be required to make certain filings in the Bankruptcy Case and in the State Court Actions (defined below) relating to the sale; that such court filings, hearings and rulings are public in nature; and that Seller shall apply to the Bankruptcy Court for a procedure to protect Buyer's confidentiality, but Buyer acknowledges that Seller shall not be responsible for any disclosures of any kind that may be required to be made as a matter of public record.  Except with respect to disclosures Seller is required to make in the Bankruptcy Case and the State Court Actions, Seller and the brokers shall not disclose to any party, and shall maintain confidential, the existence of this Agreement, the terms of this Agreement, and the identity of Buyer (other than disclosures to Seller's accountants, attorneys, and other advisors).  Seller agrees to file with the Bankruptcy Court redacted versions of the Agreement and related documents so that the identity of Buyer, or information that would lead to the identity of Buyer, is not disclosed, unless otherwise ordered by the Bankruptcy or State Court Actions.  Seller agrees to file a motion seeking entry of an order by the Bankruptcy Court allowing Seller to require parties in interest in the Bankruptcy Case to sign a reasonable confidentiality agreement before Seller furnishes such parties any unredacted versions of the Agreement and related documents that would disclose Buyer's identity.  Seller shall also undertake the measures described above in the State Court Actions to protect Buyer's identity.

11.    State Court Actions.  Pursuant to stipulations and court orders, the sale of the Property is subject to the consent of Richard Golubow, the court approved assister.  In addition to obtaining Bankruptcy Court approval, Seller hereby advises the Buyer that the sale of the Property may be subject to the consent of the family law court presiding over the matter of *In re the Marriage of Debra A. Simon and Arnold H. Simon* ("Family Court Action") and/or the consent of the probate court presiding over the matter of the *Estate of Debra A. Simon* (the "Probate Court Action" and collectively with the Family Court Action, the "State Court Actions").  Seller will make good faith efforts in obtaining, as necessary, consent in the State Court Actions to sell the Property to the Buyer.  Seller shall provide to the Title Company any and all executed or other documents necessary for the Title Company to issue a title policy to Buyer and Buyer's lenders free and clear of the State Court Actions.

12.    Carver Right of First Refusal.  Buyer acknowledges that the sale of the Property may be subject to a right of first refusal in favor of the Carver Trust No. 1, its trustees, and/or Leroy Carver III, and/or their affiliates, successors and assigns (collectively, the "Carver Trust"), that such purported right of first refusal is recorded as public record against the Property and may run with the land; that Seller may give notices of the sale to the Carver Trust relating thereto; and any notice to and exercise of such right of first refusal by the Carver Trust shall not be a breach by Seller of the Purchase Agreement.  Seller shall provide notice of the terms of the Agreement to the Carver Trust within five (5) days of Acceptance.

**[SIGNATURES ON NEXT PAGE]**

74

The foregoing terms and conditions are herby agreed to, and the undersigned acknowledges receipt of a copy of this Addendum.

**BUYER**

Dated: _____

_____

**SELLER:**

Dated:   January 29, 2010

_____
Richard H. Golsbow, as Manager for DAKS, LLC

75



## ADDENDUM NO. 1 TO COUNTER OFFER NO. 2

This Addendum, and its terms and conditions, are hereby incorporated in and made a part of the Residential Purchase Agreement and Joint Escrow Instructions dated January 14, 2010 ("Offer"), as supplemented by Seller's Counter Offer No. 1 dated January 27, 2010 ("Counter Offer No. 1" and collectively with the Offer, referred to herein as the "Agreement"), on property known as 18 Harbor Island, Newport Beach, California 92660 (the "Property"), in which ████████ is referred to as "Buyer" and DAKS, LLC is referred to as "Seller". Seller is a debtor in a bankruptcy case pending in the Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), Case No. 8:07-bk-12044-RK (the "Bankruptcy Case"). This Addendum replaces and supersedes in its entirety the terms of the addendum attached to Counter Offer No. 1. To the extent the terms of this Addendum conflict with the terms of the Agreement, the terms of this Addendum shall control.

1.  **Verification of Down Payment and Closing Costs (Section 2H).** Buyer shall be deemed to have provided Seller written verification of Buyer's funds and closing costs upon providing Seller with a letter from Buyer's lender stating that, based on a review of Buyer's written application, including bank and/or brokerage statements and other financial statements and a current credit report, Buyer has sufficient funds to pay the initial cash deposit, the increased cash deposit and the balance of the funds necessary to close and is prequalified or preapproved for a loan to purchase the Property.

2.  **Bankruptcy Case.**

    2.1    **Approval.** Buyer and Seller acknowledge that, under the Bankruptcy Code, the sale of the Property pursuant to the Agreement is subject to approval of the Bankruptcy Court. The provisions in this Section 2 shall govern the procedure and timeline for obtaining such approval.

    2.2    **Overbid Procedures.** Buyer and Seller further acknowledge that to obtain the approval of the sale of the Property pursuant to the Agreement, Seller must demonstrate that it has taken reasonable steps to obtain the highest or best price possible for the Property, including giving notice of the transaction contemplated by the Agreement to creditors and other interested parties as ordered by the Bankruptcy Court or as required by applicable bankruptcy rules, providing information about the Property to potential bidders, entertaining higher or better offers from potential bidders and, if necessary, conducting an auction for the sale of the Property. Seller and Buyer shall use reasonable efforts to agree within ten (10) business days of Acceptance to an overbid procedure that will maintain Buyer's confidentiality (subject to Sections 6 and 15(H) below) and which complies with the requirements of the Bankruptcy Court and applicable bankruptcy rules; and Seller shall seek to have such overbid procedure approved by the Court as soon as possible (the "Procedures Order"). If Seller and Buyer are unable to agree within ten (10) business days of Acceptance to an overbid procedure that will maintain Buyer's confidentiality, either party shall have the right to terminate this Agreement (and, if Buyer terminates this Agreement, Buyer shall receive a refund of the deposit).

    2.3    **Final Approval.** Within five (5) business days after Seller's completion of its due diligence and approval as to the condition, insurability, value and marketable title of the ████████Property and the ████████Property (as those terms are defined in Section 4.2 below), Seller shall: (a) seek entry of the Procedures Order; and (b) seek Final Approval (as defined in Section 4 below) from the Bankruptcy Court and thereafter diligently pursue obtaining the Final Approval. Seller shall provide Buyer written notice

-1-

of the Final Approval within five (5) business days of receipt of the Final Approval from the Bankruptcy Court (the "Final Approval Notice").

    2.4    <u>Break-Up Fee</u>. If, in connection with the bidding under Subsection 2.2 above, the purchase price (A) equals or exceeds the sum of Twenty Seven Million Thirty Five Thousand Dollars ($27,035,000.00) or (B) constitutes the highest and best bid pursuant to the Bankruptcy Code and related procedures under the Bankruptcy Case, and the Bankruptcy Court approves the sale of the Property to a competing bidder and the sale of the Property to such competing bidder subsequently closes, Seller shall pay Buyer a breakup fee equal to Thirty Five Thousand Dollars ($35,000.00) from the proceeds of the sale to the approved competing bidder at the closing thereof without further order of the Bankruptcy Court.

    3.    <u>Additional Conditions to Closing</u>. Buyer's and Seller's obligations to perform under the Agreement and to consummate and close the transactions contemplated under the Agreement are expressly contingent upon (i)(A) the Bankruptcy Court having entered a final non-appealable order in a form acceptable to Buyer and Seller approving of the execution of the Agreement and of the consummation of the transactions contemplated thereby, including the sale of the Property to Buyer free and clear of all liens, claims, interests, or encumbrances, including, without limitation, any claims under the State Court Actions (as that term is defined in this Addendum) pursuant to 11 U.S.C. § 363(f), with all liens, claims, interests and encumbrances not paid out of escrow attaching to the sale proceeds in order of priority and approving assumption and assignment of the Leases (defined below) to Buyer (the "Final Approval"), and (B) the purchase and sale otherwise complying with the Bankruptcy Code; (ii) any consents or approvals required in the State Court Actions having been given; and (iii) a mutually agreeable form of property deed to be negotiated in good faith by the Buyer and Seller. Escrow Holder shall not close unless and until the foregoing conditions precedent have been satisfied or waived in writing by Buyer and Seller.

    4.    <u>Closing Timelines: Conveyance, Delivery and Possession of the Property.</u>
████████████████ and ███████████████.

    4.1    Closing shall occur on a day that is sixty (60) days after Buyer's receipt of the Final Approval Notice, unless Buyer and Seller consent in writing to an earlier Closing. In the event Closing does not occur within one hundred twenty (120) days after the date of Acceptance due to a failure to obtain the Final Approval through no fault of Buyer, Buyer shall thereafter have the right to terminate the Agreement and receive a refund of the deposit.

    4.2    As partial payment valued at $9 million of the total purchase price for the Property, Buyer shall convey to Seller (or shall cause Buyer's owners, whether direct or indirect, that own the properties to convey to Seller) by property deed the following two properties: that certain property located at ████████████████████████, California, more particularly described on Exhibit A, attached hereto and incorporated herein by this reference (█████████████████"), and that certain property located at ████████████████████████, California, more particularly described on Exhibit B, attached hereto and incorporated herein by this reference (the ██████████████████"). The Agreement is contingent upon Seller's approval in its sole discretion of the condition, insurability, value and marketability of the ██████████████ and the ██████████████, which contingency shall be satisfied or waived by Seller within twenty one (21) days of Acceptance. Seller's failure to notify Buyer of its election to terminate the Agreement within such twenty one (21) days shall be deemed Seller's satisfaction of the condition, insurability, value and marketability of the ██████████████ and the ████████████████. If Seller is not satisfied as to the condition, insurability, value, or marketability of the Property and elects to terminate the Agreement, and Buyer is not otherwise in breach of the Agreement, Escrow Holder shall return the deposit to Buyer.

71461-0001/LEGAL17701590.1

-2-

4.3.    Buyer as to the ██████████and ██████████and Seller as to the Property shall cause all occupants or tenants to vacate the subject property prior to or at Closing. Buyer as to the ████████ Property and ██████████ and Seller as to the Property shall deliver possession to each other at Closing free from any such occupancies or tenancies. The following adjustments and prorations will be made on the date of Closing: all property taxes payable in the year of Closing and special assessments approved by Buyer as to the Property and Seller as to the ████████ Property and ████████ Property, if any, will be prorated and paid for as of the date of Closing; (ii) all gas, electric, sewer, storm water, and other utility charges will be prorated by Escrow Holder and paid for as of the date of Closing; (iii) all sums due to contractors or service providers incurred in the maintenance or operation of the Property prior to the date of Closing will be paid by Seller on the date of Closing; (iv) all sums due to contractors or service providers incurred in the maintenance or operation of the ████████ Property and ████████ Property prior to the date of Closing will be paid by Buyer on the date of Closing; and (v) all sums due under the Leases (as defined in Section 9) will be prorated and paid for as of the date of Closing.

5.    Excluded Property. The following property is excluded from the sale: any of the personal property located at or used in connection with the Property including, without limitation, furniture, fixtures, art, vehicles, clothes, jewelry, safes, furs, watercraft, two (2) downstairs hallway sconces, two (2) dining room entry hallway sconces, two (2) upstairs hallway sconces, master bedroom light fixtures/chandeliers and chandeliers in middle living area and library area. Notwithstanding the foregoing, Seller acknowledges that the following property is included in the sale: all built-in appliances (including refrigerators), washers, dryers, security systems, drapes, curtains, integrated phone system, stereo speakers and related equipment, attached side tables in the entrance to the dining room, and all potted plants and planters at the Property and the stone bench at the front entrance of the Property.

6.    No Confidentiality. Buyer acknowledges that Seller and its broker are required to give notice of Buyer's offer, Seller's and Buyer's counteroffer, the Agreement, copies thereof and the sale terms, to creditors, equity holders, their affiliates, prospective purchasers, parties in interest and their respective counsel and agents; that Seller may also be required to publicly advertise the sale of the Property; that Seller will also be required to make certain filings in the Bankruptcy Case and in the State Court Actions (defined below) relating to the sale; that such court filings, hearings and rulings are public in nature; and that Seller shall apply to the Bankruptcy Court for a procedure to protect Buyer's confidentiality, but Buyer acknowledges that Seller shall not be responsible for any disclosures of any kind that may be required to be made or are made as a matter of public record. Except with respect to disclosures Seller is required to make in the Bankruptcy Case and the State Court Actions and other proceedings and/or filings with public agencies relating to the sale, Seller and the brokers shall not disclose to any party, and shall maintain confidential, the existence of this Agreement, the terms of this Agreement, and the identity of Buyer (other than disclosures to Seller's accountants, attorneys, and other advisors). Seller agrees to file with the Bankruptcy Court redacted versions of the Agreement and related documents so that the identity of Buyer, or information that would lead to the identity of Buyer, is not disclosed, unless otherwise ordered by the Bankruptcy or State Court Actions. Seller agrees to file a motion seeking entry of an order by the Bankruptcy Court allowing Seller to require parties in interest in the Bankruptcy Case to sign a reasonable confidentiality agreement before Seller furnishes such parties any unredacted versions of the Agreement and related documents that would disclose Buyer's identity. Seller shall also undertake the measures described above in the State Court Actions to protect Buyer's identity.

7.    State Court Actions. Pursuant to stipulations and court orders, the sale of the Property is subject to the consent of Richard Golubow, the court approved assister. In addition to obtaining Bankruptcy Court approval, Seller hereby advises the Buyer that the sale of the Property may be subject to the consent of the family law court presiding over the matter of *In re the Marriage of Debra A. Simon*

-3-

*and Arnold H. Simon* ("Family Court Action") and/or the consent of the probate court presiding over the matter of the *Estate of Debra A. Simon* (the "Probate Court Action" and collectively with the Family Court Action, the "State Court Actions"). Seller will make good faith efforts in obtaining, as necessary, consent in the State Court Actions to sell the Property to the Buyer. Seller shall provide to the Title Company any and all executed or other documents necessary for the Title Company to issue a title policy to Buyer and Buyer's lenders free and clear of the State Court Actions.

8.  **As-Is Sale.**  The Property and all personal property which is part of the sale is being transferred "as-is, where-is", with no representations or warranties being made or given by Seller or any other person or entity, including without limitation any representation or warranty of fitness or merchantability of the Property or the personal property, for any particular purpose, except for those representations and warranties made under the Agreement and the deed transferring title to the Property. The ████████ Property, the ████████ Property, and associated personal property, if any, are being transferred "as-is, where-is", with no representations or warranties being made or given by Buyer or the parties conveying the properties or any other person or entity, including without limitation any representation or warranty of fitness or merchantability of the properties for any particular purpose, except for those representations and warranties made under the Agreement and the deed transferring title to the ████████ and the ████████ Property.

9.  **Tidelands Lease.**  The lease dated May 1, 1996 executed by the County of Orange, as lessor, and Robert McNulty, as lessee, recorded April 1, 1999 as No. 19990240772 and lease recorded July 16, 2001 as No. 20010476486 (collectively, the "Leases"), shall be assigned by Seller and assumed by Buyer pursuant to an assignment agreement reasonably acceptable to Seller and Buyer, with the approval of the Bankruptcy Court, which approval is a condition to closing pursuant to Section 3 and which shall be sought by Seller as part of Seller's request for the Final Approval. At Closing, Seller shall pay any past due rentals and other amounts owing under the Leases as of Closing, and Seller shall cure any and all defaults or breaches under the Leases prior to Closing. The Final Approval shall provide, among other things, that Buyer will not be liable for any obligations, commitments or liabilities of, or claims against, Seller (whether absolute, accrued or contingent) related to the Leases or the leased premises arising before Closing regardless of whether such claim is made or asserted prior to or after Closing.

10.  **Title Review (Section 12A).**

10.1  **Property.**  Within ten (10) business days of receipt of an ALTA form preliminary commitment for title insurance and of legible copies of all exceptions to title shown in the preliminary commitment, Buyer shall advise Seller by written notice what exceptions to title, if any, are disapproved by Buyer. Seller will have five (5) days after receipt of Buyer's notice to give Buyer notice that (i) Seller will remove disapproved exceptions or (ii) Seller elects not to remove disapproved exceptions. If Seller fails to give Buyer notice before the expiration of the five (5) day period, Seller will be deemed to have elected to remove the disapproved exceptions. If Seller elects not to remove any non-monetary disapproved exceptions, Buyer will have five (5) days to notify Seller of Buyer's election either to proceed with the purchase and take the Property subject to those exceptions, or to terminate the Agreement and receive a refund of the deposit. At Closing, Seller shall convey the Property to Buyer subject only to the exceptions approved by Buyer. Without limiting the generality of the foregoing, Seller shall provide to the Title Company any and all executed and other documents necessary for the Title Company to issue a title policy to Buyer and Buyer's lenders free and clear of the State Court Actions.

10.2  ████████ and the ████████ Property.  Within ten (10) business days of receipt of an ALTA form preliminary commitment for title insurance and of legible copies of

-4-

all exceptions to title shown in the preliminary commitment, Seller shall advise Buyer by written notice what exceptions to title, if any, are disapproved by Seller. Buyer will have five (5) days after receipt of Seller's notice to give Seller notice that (i) Buyer will remove disapproved exceptions or (ii) Buyer elects not to remove disapproved exceptions. If Buyer fails to give Seller notice before the expiration of the five (5) day period, Buyer will be deemed to have elected to remove the disapproved exceptions. If Buyer elects not to remove any non-monetary disapproved exceptions, Seller will have five (5) days to notify Buyer of Seller's election either to proceed with the purchase and take the ████████████ and the ████████████ subject to those exceptions, or to terminate the Agreement. At Closing, Buyer shall convey the ████████ Property and the ████████████ to Seller subject only to the exceptions approved by Seller.

11.    **Carver Right of First Refusal.** Buyer acknowledges that the sale of the Property may be subject to a right of first refusal in favor of the Carver Trust No. 1, its trustees, and/or Leroy Carver III, and/or their affiliates, successors and assigns (collectively, the "Carver Trust"), that such purported right of first refusal is recorded as a public record against the Property and may run with the land; that Seller may give notices of the sale to the Carver Trust relating thereto; and any notice to and exercise of such right of first refusal by the Carver Trust shall not be a breach by Seller of the Purchase Agreement. Seller shall provide notice of the terms of the Agreement to the Carver Trust within five (5) days of Acceptance, provided however, Seller shall maintain Buyer's confidentiality, subject to Sections 6 and 15(H) herein.

12.    **Resolution of Disputes in Bankruptcy Court.** Section 17 of the Agreement is deleted in its entirety. All disputes arising out of the Agreement shall be resolved by the Bankruptcy Court, which the parties agree has exclusive jurisdiction over the Agreement and the parties hereto.

13.    **Brokers; Commissions.** Neither party has had any contact or dealings regarding the Property, or any communication in connection with the subject matter of this transaction, through any licensed real estate broker or other person who can claim a right to a commission or finder's fee as a procuring cause of the purchase and sale contemplated by the Agreement, except Horn Real Estate Group. If any other broker or finder perfects a claim for a commission or finder's fee based on any other contract, dealings or communication, the party through whom the broker or finder makes his or her claim will be responsible for that commission or fee and shall indemnify, defend and hold harmless the other party from and against any liability, cost or damages (including attorneys' fees and costs) arising out of that claim. Seller shall pay all commissions due to the agents of Seller and Buyer. Buyer may elect prior to closing, at Buyer's option, to pay the commission payable to Buyer's agent directly to Buyer's agent and to reduce the purchase price by the commission amount paid to Buyer's agent, in lieu of having Seller pay for the same commission to Buyer's agent. Nothing herein is an admission of liability to any broker nor the right of Seller to dispute any commission or fee, nor the waiver of the obligation of any such broker or other person to pursue any such claim in accord with applicable bankruptcy law in the Bankruptcy Case.

14.    **Assignment.** Buyer shall have the right, at any time prior to closing, to assign the Agreement to an entity owned by Buyer or owned by individuals that directly or indirectly own Buyer provided however that Buyer is not relieved of any liability of obligations herein and the Agreement.

15.    **Other Modifications to Agreement.** The Offer is amended as follows:

A.    Section 2(I) is amended to revise the loan contingency period to 21 days after Acceptance.

B.    Section 4(B)(4) is amended to provide that Seller shall pay for a City of Newport Beach R.B.R.

-5-

C.      Section 4(E) is amended to provide that Buyer shall pay the cost of a home warranty plan, if any.

D.      Section 9(B) is amended to clarify that removal of the contingency or cancellation of the Agreement shall be at the sole discretion of Buyer, within the specified times provided herein and the Agreement.

E.      Sections 12(A) and 12(B) are deleted in their entirety and replaced with the following: "Within the time specified in paragraph 14, Buyer shall be provided a current preliminary title report."

F.      Section 14(B)(1) is amended to provide that Buyer has 21 days after Acceptance to perform Buyer's actions in Section 14.

G.      Section 14(E)(3) is amended to provide that, if Buyer cancels the Agreement as provided in such section, all deposits of Buyer will be promptly returned to Buyer.

H.      Section 20 is deleted in its entirety and replaced with the following: "Except as provided in Section 6 of this Addendum, Brokers shall keep confidential, and shall not disclose, the non-public terms of this Agreement (including, without limitation, the identity of the owners of the parties), whether prior to or after closing."

I.      Section 28(A) is amended by deleting the following: "Buyer and Seller will receive Escrow Holder's general provisions directly from Escrow Holder and will execute such provisions upon Escrow Holder's request. To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only."

J.      Section 29 is deleted in its entirety.

K.      Section 30 is amended by deleting the following provision: If this offer is accepted and Buyer subsequently defaults, Buyer may be responsible for payment of Brokers' compensation.

L.      The parties shall execute a Residential Purchase Agreement and Joint Escrow Instructions for the transfer of the ████████Property and ████████████ identifying DAKS, LLC as the buyer and an affiliate of ████████████as the seller on such terms as those in the Agreement and this Addendum and mutually acceptable to Buyer and Seller within seven (7) days of Acceptance. Notwithstanding the foregoing, it is expressly understood that the Seller's due diligence period set forth in paragraph 4.2 of this Addendum shall remain twenty-one (21) days after Acceptance.

16.     Integrated Purchase Agreement. For purposes of clarification only and not to extend the deadlines to perform, at the sole discretion of Seller, Seller reserves the right to prepare for Buyer's consent and approval a purchase agreement that will incorporate all agreed upon terms of sale into an integrated purchase agreement that will be effective as of the date of Acceptance.

-6-

71461-0001/LEGAL17701590.1

82

The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledges receipt of a copy of this Addendum.

**BUYER**

Dated: 2/14/2010

**SELLER:**

DAKS, LLC

Dated: February 12, 2010

-7-

71461-0001/LEGAL17701590.1

## EXHIBIT A

### Legal Description of ██████████ Property

All that certain real property situated in the ██████████, ██████████, described as follows:

71461-0001/LEGAL17701590.1



**EXHIBIT B**

**Legal Description of ▋▋▋▋▋ Property**

All that certain real property situated in the ▋▋▋▋▋▋, ▋▋▋▋▋▋, described as follows:

# EXHIBIT "2"

1. HA55D-26-17'
2. Lower Newport Bay

3. RECORDING REQUESTED BY
4. AND WHEN RECORDED RETURN TO:

5. _____
6. _____
7. _____
8. _____

9. MEMORANDUM OF LEASE

10. THIS MEMORANDUM OF LEASE ("Memorandum") is entered into _____,2001,
11. Between COUNTY OF ORANGE ("COUNTY") and DAKS LLC, a California LLC ("TENANT")
    For the purpose of recordation in order to give constructive notice of the
12. existence of that certain Lease ("Lease") dated     May 1, 1996.
    by and between COUNTY and TENANT.  This Memorandum is not intended to and
13. does not modify the Lease nor does it recite all the terms and conditions
14. of the Lease.

15. COUNTY and TENANT hereby acknowledge the existence of the Lease and agree as
16. follows:

17.     1.    PREMISES.  Pursuant to the terms of the Lease, which terms are
              incorporated herein by this reference, COUNTY has leased to
18.           TENANT that certain area (the "Premises") described as Parcel 1,
              Tract 802 and shown on Exhibit "A" (map), which Exhibit is
19.           attached hereto and incorporated herein by this reference.

20.     2.    TENANT has exclusive, private enjoyment of the Premises for
21.           residential yard, landscaping and non-permanent recreational
              purposes as an adjunct to the residence of those single family
22.           residences that adjoin the Premises and can exclude public access
              during the term of the Lease, consistent with Chapter 715, of the
23.           Statutes of 1984, State of California.

24.     3.    TERM.  The term of this Lease commenced   May 1, 1996  and shall
25.           continue thereafter   until the termination date of March 31, 2037.

26.     4.    RENT.  The Lease provides for payment of annual rent.

27. "COUNTY"                              "TENANT"  DAKS LLC
                                                    a California LLC
28. COUNTY OF ORANGE                       By:_____
29. By:_____                   Arnold H. Simon, Member
       Vicki L. Wilson, Director          By:_____
30.    Public Facilities & Resources Dept.

EXHIBIT A2



## CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

STATE OF CALIFORNIA )SS
COUNTY OF Los Angeles )

On July 11. 2001 before me, Germaine Cresmer , Notary Public
personally appeared Arnold H. Simon
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument
the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature Germaine Cresmer
7.11.2001.

GERMAINE CRESMER
COMM. #1258120
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires March 25, 2004

---

### OPTIONAL SECTION
### CAPACITY CLAIMED BY SIGNER

Though statute does not require the Notary to fill in the data below, doing so may prove invaluable to persons relying on the
document.

[   ] INDIVIDUAL

[   ] CORPORATE OFFICER(S) _____ TITLE(S)

[   ] PARTNER(S) - [   ] LIMITED    [   ] GENERAL

[   ] ATTORNEY-IN-FACT

[   ] TRUSTEE(S)

[   ] GUARDIAN/CONSERVATOR

[   ] OTHER _____

SIGNER IS REPRESENTING:

_____        _____
Name of Person or Entity                 Name of Person or Entity

---

### OPTIONAL SECTION

Though the date requested here is not required by law, it could prevent fraudulent reattachment of this form.

THIS CERTIFICATE MUST BE ATTACHED TO THE DOCUMENT DESCRIBED BELOW

TITLE OR TYPE OF DOCUMENT: Memorandum of Lease

NUMBER OF PAGES 2              DATE OF DOCUMENT 7.11.01.

SIGNER(S) OTHER THAN NAMED ABOVE _____

89

## ACCEPTANCE

The undersigned Assignee(s) named in the foregoing Assignment (if more than one, then jointly and severally) hereby accept(s) said Assignment and hereby agree(s) with and for the benefit of Lessor, under the Lease described in said Assignment, to keep, perform and be bound by all of the terms, convenants and conditions contained in said Lease on the part of the Lessee therein to be kept and performed, to all intents and purposes as though the undersigned Assignee(s) was/were the original Lessee thereunder.

The undersigned Assignee(s) further covenant(s) and agree(s) that he (she or they) have/has examined the Leased land and that no representation or warranties have been made by Lessor or any person or agent acting for Lessor in connection with the leased land. Assignee(s) accept(s) the leased land "AS IS." Assignee(s) shall indemnify and hold Lessor free and harmless from liability for any loss and from any costs, expenses and other charges arising from or in connection with any defect upon or in connection with the leased land, whether caused by an act or omission of Lessor or any prior Lessor, or arising from any cause whatever.

DATED: 7/11/01

ASSIGNEE:
DAKS LLC, a California Limited Liability Company

By: _____
      Arnold H. Simon, Member

### CONSENT TO ASSIGNMENT OF LEASE

The County of Orange, Lessor under the herein described Lease, acting by and through its designated officer, does hereby consent to the Assignment of Lease herein pursuant to the terms and conditions set forth in ARticle 15 of the Lease.

THE COUNTY OF ORANGE:

By: _____

90

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGEMENT

STATE OF CALIFORNIA                               )SS
COUNTY OF Los Angeles _____ )
On July 11, 2001 _____ before me. Germaine Cresmer, Notary Public _____
personally appeared Arnold H. Simon _____
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument
and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument
the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature Germaine Cresmer
                                7.11.2001.

```
GERMAINE CRESMER
COMM. #1258120
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires MARCH 28, 2004
```

---

### OPTIONAL SECTION
### CAPACITY CLAIMED BY SIGNER

Though statute does not require the Notary to fill in the data below, doing so may prove invaluable to persons relying on the document.

[   ] INDIVIDUAL

[   ] CORPORATE OFFICER(S) _____ TITLE(S)

[   ] PARTNER(S) - [   ] LIMITED    [   ] GENERAL

[   ] ATTORNEY-IN-FACT

[   ] TRUSTEE(S)

[   ] GUARDIAN/CONSERVATOR

[   ] OTHER _____

SIGNER IS REPRESENTING:

_____          _____
Name of Person or Entity                      Name of Person or Entity

---

### OPTIONAL SECTION

Though the date requested here is not required by law, it could prevent fraudulent reattachment of this form.

### THIS CERTIFICATE MUST BE ATTACHED TO THE DOCUMENT DESCRIBED BELOW

TITLE OR TYPE OF DOCUMENT: _____

NUMBER OF PAGES _____ DATE OF DOCUMENT _____

SIGNER(S) OTHER THAN NAMED ABOVE _____

BRADLEY L. JACOBS - COUNTY ASSESSOR
COUNTY OF ORANGE
P.O. BOX 1948, SANTA ANA, CA 92702

Escrow: 19992-DM

PRELIMINARY CHANGE OF OWNERSHIP REPORT
THIS REPORT IS NOT A PUBLIC DOCUMENT

(To be completed by transferee (buyer prior to transfer of subject property in accordance with Section 480.3 of the Revenue and Taxation Code.)
This report is not a public document.

SELLER/TRANSFEROR: Robert J. McNulty

BUYER/TRANSFEREE: DAKS LLC, a California Limited Liability Co.

ASSESSOR'S PARCEL NUMBER(S): 050-230-42 ent.(if applicable)
LEGAL DESCRIPTION:  LOT\ TRACT\
PROPERTY ADDRESS: OR LOCATION: 18 Harbor Island
            Newport Beach, CA 92660
Mail Tax Information To: (Name): DAKS LLC, a California Limited Liability Co.
            (Address): 18 Harbor Island
            Newport Beach, CA 92660

| FOR RECORDER'S USE ONLY |
| --- |

| FOR ASSESSOR'S USE ONLY |  |
| --- | --- |
| CLUSTER | |
| OC1 _____ | OC2 _____ |
| DT _____ | INT _____ |
| RC _____ | SPS _____ |
| DTTS _____ | #PCL _____ |

A preliminary Change of Ownership Report must be filed with each conveyance in the County Recorder's office for the county where the property is located; this particular form may be used in all counties of 58 California.

The property which you acquired may be subject to a supplemental assessment in an amount to be determined by the Orange County Assessor.  For further information on your supplemental tax obligation, please call the Orange County Assessor at (714) 834-3031.

PART I: TRANSFER INFORMATION   Please answer all questions

[  ]Yes  [  ]No   A. Is this transfer solely between husband and wife? (addition of a spouse, death of a spouse, divorce settlement, etc.)
[  ]Yes  [  ]No   B. Is this transaction only a correction of the name(s) of the person(s) holding title to the property?
                  (For example,a name change upon marriage.)
[  ]Yes  [  ]No   C. Is this document recorded to create, terminate, or reconvey a lender's interest in the property?
[  ]Yes  [  ]No   D. Is this transaction recorded only to create, terminate, or reconvey a security interest (e.g. coreigner)?
[  ]Yes  [  ]No   E. Is this document recorded to substitute a trustee under a deed of trust, mortgage, or similar document?
[  ]Yes  [  ]No   F. Did this transfer result in the creation of a joint tenancy in which the seller (transferor) remains as one of the joint tenants?
[  ]Yes  [  ]No   G. Does this transfer return property to the person who created the joint tenancy (original transferor)?
                  H. Is this transfer of property:
[  ]Yes  [  ]No       1. to a trust for the benefit of the grantor, or grantor's spouse?
[  ]Yes  [  ]No       2. to a trust revocable by the transferor?
[  ]Yes  [  ]No       3. to a trust from which the property reverts to the grantor within 12 years?
[  ]Yes  [  ]No   I. If this property is subject to a lease, is the remaining lease term 35 years or more including written options?
[  ]Yes  [  ]No   J. Is this a transfer from parents to children or from children to parents?
[  ]Yes  [  ]No   K. Is this transaction to replace a principal residence by a person 55 years of age or older?
[  ]Yes  [  ]No   L. Is this transaction to replace principal residence by a person who is severely disabled as defined by Revenue and Taxation Code
                  Section 69.5?

If you checked yes to J, K, or L, an applicable claim form must be filed with the County Assessor.
Please provide any other information that would help the Assessor to understand the nature of the transfer.

IF YOU HAVE ANSWERED "YES" TO ANY OF THE ABOVE QUESTIONS EXCEPT J, K, OR L, PLEASE SIGN
AND DATE, OTHERWISE COMPLETE BALANCE OF THE FORM.

PART II: OTHER TRANSFER INFORMATION
A. Date of transfer if other than recording date: _____
B. Type of transfer.   Please check appropriate item.
   [  ]Purchase  [  ]Foreclosure  [  ]Gift  [  ]Trade or Exchange  [  ]Merger, Stock, or Partnership Acquisition
   [  ]Contract of Sale - Date of Contract _____
   [  ]Creation of a Lease  [  ] Assignment of a Lease  [  ]Termination of a Lease  [  ] Other (please explain): _____
   Date Lease Began _____
   Original term in years (including written options) _____
   Remaining term in years (including written options) _____
C. Was only a partial interest in the property transferred?  [  ]Yes  [  ]No  If "Yes" indicate the percentage transferred: _____ %

AS-SV25 SBB-ASD AH 502-A FRONT 1-8-92

92

# PRELIMINARY CHANGE OF OWNERSHIP REPORT

**Escrow: 19992-DM**

Please answer, to the best of your knowledge, all applicable questions, sign and date. If a question does not apply, indicate with `N/A`.

## PART III: PURCHASE PRICE & TERMS OF SALE

A. CASH DOWN PAYMENT or Value of Trade or Exchange (excluding closing cost)      Amount $ _____

B. FIRST DEED OF TRUST @ _____ % Interest for _____ years. Payments/Mo. = $ _____    (Prin. & Int.)    Amount $ _____
[ ] FHA      [ ] Fixed Rate      [ ] New Loan
[ ] Conventional      [ ] Variable Rate      [ ] Assumed Existing Loan Balance
[ ] VA      [ ] All Inclusive D.T. $ _____ Wrapped)      [ ] Bank or Savings & Loan
[ ] Cal-Vet      [ ] Loan Carried by Seller      [ ] Finance Company
Balloon Payment [ ] Yes [ ] No   Due Date _____      Amount $ _____

C. SECOND DEED OF TRUST @ _____ % Interest for _____ years. Payments/Mo. = $ _____    (Prin. & Int.)    Amount $ _____
[ ] Bank or Savings & Loan      [ ] Fixed Rate      [ ] New Loan
[ ] Loan Carried by Seller      [ ] Variable Rate      [ ] Assumed Existing Loan Balance
Balloon Payment [ ] Yes [ ] No   Due Date _____      Amount $ _____

D. OTHER FINANCING - Is other financing involved not covered in (B) and (C) above? [ ] Yes [ ] No      Amount $ _____
Type _____ @ _____ % Interest for _____ years. Payments/Mo. = $ _____    (Prin. & Int. only)
[ ] Bank or Savings & Loan      [ ] Fixed Rate      [ ] New Loan
[ ] Loan Carried by Seller      [ ] Variable Rate      [ ] Assumed Existing Loan Balance
Balloon Payment [ ] Yes [ ] No   Due Date _____      Amount $ _____

E. IMPROVEMENT BOND [ ] Yes [ ] No    Outstanding Balance: Amount $ _____

F. TOTAL PURCHASE PRICE (or acquisition price, if traded or exchanged, include real estate commission if paid).
                        Total Items A through E    $ _____

G. PROPERTY PURCHASED: [ ] Through a broker; [ ] Direct from seller; [ ] Other _____
If purchased through a broker, provide broker's name and phone no.: _____
Please explain any special terms or financing and any other information that would help the assessor understand purchase price and terms of sale.

_____
_____
_____

## PART IV: PROPERTY INFORMATION

A. IS PERSONAL PROPERTY INCLUDED IN PURCHASE PRICE (other than a mobilehome subject to local property tax)? [ ] Yes [X] No
If `Yes`, enter the value of the personal property included in the purchase price $ _____    (Attach itemized list of personal property).

B. IS THIS PROPERTY INTENDED AS YOUR PRINCIPAL RESIDENCE? [ ] Yes [X] No
If `Yes`, enter date of occupancy _____ / _____ 20 ____ or intended occupancy _____ / _____ 20 ____
          month      day             month      day

C. TYPE OF PROPERTY TRANSFERRED:
[X] Single-Family Residence      [ ] Agricultural      [ ] Timeshare
[ ] Multiple-family residence (no. of Units: _____)      [ ] Co-op/Own-your-own      [ ] Mobilehome
[ ] Commercial/Industrial      [ ] Condominium      [ ] Unimproved lot
[ ] Other (Description): _____

D. DOES THE PROPERTY PRODUCE INCOME? ( ) Yes (X) No

E. IF THE ANSWER TO QUESTION 'D' IS YES, IS THE INCOME FROM:
[ ] Lease/Rent    [ ] Contract    [ ] Mineral Rights    [ ] Other-explain _____

F. WHAT WAS THE CONDITION OF PROPERTY AT THE TIME OF SALE? [X] Good [ ] Average [ ] Fair [ ] Poor
Enter here, or on an attached sheet, any other information that would assist the Assessor in determining value of the property such as the physical condition of the property, restrictions, etc.

_____
_____

*I certify that the foregoing is true, correct and complete to the best of my knowledge and belief.*

Signed _____           Date _____

Please Print Name of New Owner/Corporate Officer   DAKS, LLC, Arnold Simon, Member

Phone Number where you are available from 8:00 a.m. - 5:00 p.m. (   ) _____

(NOTE: The Assessor may contact you for further information)

*IF A DOCUMENT EVIDENCING A CHANGE OF OWNERSHIP IS PRESENTED TO THE RECORDER FOR RECORDATION WITHOUT THE CONCURRENT FILING OF A PRELIMINARY CHANGE OF OWNERSHIP REPORT, THE RECORDER MAY CHARGE AN ADDITIONAL RECORDING FEE OF TWENTY DOLLARS ($20.00).*
AS-SV25 SBE-ASD AH 502-A BACK 1-8-92

1  HA55D-26-17 (Parcel 1)
   Lower Newport Bay
2  (Tidelands)

3                          LEASE

4                    Table of Contents

5    Clause Number and Name                              Page

6    1.  Definitions                                       1

7    2.  Premises                                          1

8    3.  Termination of Prior Agreements                   1

9    4.  Limitations of the Leasehold                      1

10   5.  Use                                               2

11   6.  Term                                              3

12   7.  Rent                                              3

13   8.  Revision of Rent                                  3

14   9.  Reappraisal of Rent                               4

15   10. Rent Payment Procedure                            6

16   11. Charge for Late Payment                           6

17   12. Construction and/or Alteration by Tenant          7

18   13. Maintenance Obligations of Tenant                 7

19   14. Insurance                                         7

20   15. Assigning, Subletting and Encumbering             9

21   16. State Lands Commission Leasing Policy            10

22   17. Notices                                          10

23   18. Memorandum of Lease                              11

24   19. Attachments to Lease                             11

25

26

27

28   BP:cv/htPCGSA59.WP(4/17/96)                    HA55D-26-17 (Parcel 1)
                                                    Lower Newport Bay

HA55D-26-17 (Parcel 1)
Lower Newport Bay
(Tidelands)

LEASE

THIS LEASE, hereinafter referred to as "Lease", is made _____ 1996, by and between COUNTY OF ORANGE, hereinafter referred to as "LESSOR," and William G. Simon and Alice Marie Simon, Trustees, the Simon Living Trust; UDT Restated 8/13/93, hereinafter referred to as "TENANT," without regard to number and gender.

1.    DEFINITIONS (MA2.1 S)

The following words in this Lease have the significance attached to them in this clause unless otherwise apparent from context:

"Board, of Supervisors" means the Board of Supervisors of the County of Orange, a political subdivision of the State of California.

"Director" means the Director of Harbors, Beaches and Parks, Environmental Management Agency of the County of Orange, or his/her designee, or upon written notice to TENANT, such other person or entity as shall be designated by the Board of Supervisors.

"Real Estate Director" means the Director, Real Estate, General Services Agency, of the County of Orange, or his/her designee, or upon written notice to TENANT, such other person or entity as shall be designated by the Board of Supervisors.

"Auditor-Controller" means the Auditor-Controller, County of Orange, or his/her designee, or upon written notice to TENANT, such other person or entity as shall be designated by the Board of Supervisors.

2.    PREMISES (PMA3.1 N)

LESSOR leases to TENANT that certain property hereinafter referred to as "Premises" shown on "Exhibit A," attached hereto and by reference made a part hereof, and described as those filled tidelands lying between the extension of the sidelines of Parcel 1 of Tract 802 from the adjudicated mean high tide line to the United States bulkhead line, excepting therefrom those lands lying below the existing mean high tide line. Use of submerged "water covered" tidelands areas is not provided for herein.

3.    TERMINATION OF PRIOR AGREEMENTS (PMA4.1 S)

It is mutually agreed that this Lease shall terminate and supersede any prior lease agreements between the parties hereto covering all or any portion of the Premises.

4.    LIMITATION OF THE LEASEHOLD (PMA5.1 N)

This Lease and the rights and privileges granted TENANT in and to the Premises are subject to all covenants, conditions, restrictions, and exceptions of record or apparent, including those which are set out in the Tidelands Grant by the State of California to the County of Orange (Chapter 415, of the State of 1975, State of

BP:cv/ht PCGSA59.WP(4/17/96)

HA55D-26-17 (Parcel 1)
Lower Newport Bay

-1-

95

California). Nothing contained in this Lease or in any document related hereto shall be construed to imply the conveyance to TENANT of rights in the Premises which exceed those owned by LESSOR, or any representation or warranty, either expressed or implied, relating to the nature or condition of the Premises of LESSOR's interest therein. TENANT acknowledges that TENANT has conducted a complete and adequate investigation of the Premises and that TENANT has accepted the Premises in its "as is" condition.

5.  USE (PMB1.1 N)

    a.  TENANT shall have the exclusive, private enjoyment of the Premises for residential yard, landscaping and non-permanent recreational purposes as an adjunct to the residence of those single family residences that adjoin the Premises and can exclude public access during the term of the Lease, consistent with Chapter 715, of the Statutes of 1984, State of California.

        As used in this Lease, landscaping and non-permanent recreational improvements include the following:

        a.  Patios and deck;

        b.  Walks and steps, including dock access walks;

        c.  Planters and garden walls not exceeding 36 inches in height above natural grade;

        d.  Benches;

        e.  Statues;

        f.  Landscaping;

        g.  Sprinkler systems;

        h.  Yard lighting; and

        i.  Any and all improvements existing as of March 1, 1996 including the portion of the swimming pool and ancillary pool equipment on the Premises.

TENANT agrees not to use Premises for any other purpose nor to engage in or permit any other activity within or from the Premises.

    b.  TENANT shall obtain prior written consent of LESSOR before the placement of any improvements not listed above. Consent of LESSOR shall be obtained through its Environmental Management Agency, Harbors, Beaches and Parks, 300 N. Flower St., Santa Ana, CA 92702 or at any address the Director may hereafter designate.

BP:cv/htPCGSA59.WP(4/17/96)

55D-26-17 (Parcel 1)
Lower Newport Bay

-2-

6.    TERM (PMB2.1 S)

The term of this Lease shall commence on the date first above written and expire on March 21, 2037. TENANT understands and agrees that this Lease is subject to automatic termination as provided in Clause 15 (INSURANCE).

7.    RENT (PMC1.1 S)

Prior to execution of this Lease, TENANT agrees to pay the sum of $28,847 for the period from the execution date of this Lease through March 21, 1997. On or before March 22 of each year thereafter so long as tenancy continues TENANT agrees to pay the sum of $28,847 per year as rent to LESSOR for use of the Premises by TENANT. Said rent shall be adjusted pursuant to Clause 8 (REVISION OF RENT) and Clause 9 (REAPPRAISAL OF RENT). In the event the obligation to pay rent terminates on some date other then March 22 of any year, the rent shall be prorated to reflect the actual period of tenancy.

TENANT may elect at its option to submit monthly rent payments to LESSOR in the amount of one-twelfth (1/12th) of the total annual rent amount due. Such monthly payments shall commence on March 22 of any year and shall be due to LESSOR on or before the 22nd day of each month for twelve consecutive months.

8.    REVISION OF RENT (PMC4.2 N)

Every three years the rent specified in Clause 7 (RENT) shall be subject to automatic adjustments in proportion to change in the Consumer Price Index for Los Angeles--Anaheim--Riverside, CA (All Urban Consumers--All Items 1982-84=100) promulgated by the Bureau of Labor Statistics of the U.S. Department of Labor (INDEX).

The first automatic adjustment shall be effective on March 22, 1997 and subsequent adjustments shall be effective on the March 22 anniversary date every third year thereafter (2000, 2003, etc.). Adjusted rent shall be calculated by means of the following formula:

$$A = \$\underline{\quad * \quad} \times \frac{B}{C}$$

A = Adjusted Rent

B = INDEX for the fourth month prior to the month in which each rental rate adjustment is to become effective.

For calculating the 1997 adjustment,

C = Monthly Index for March 1994 = 152.5

For calculating subsequent adjustments, C shall equal the Monthly Index for the most recent effective date of reappraised rent as set forth in Clause 9 (REAPPRAISAL OF RENT) (March 1998, March 2008, March 2018 and March 2028).

For calculating 1997 adjustment * = Base rent established for March 1996 ($28,847).

BP:cv/htPCGSA59.WP(4/17/96)                                    HA55D-26-17  (Parcel 1)
                                                               Lower Newport Bay
-3-

1   For calculating subsequent adjustment, * shall equal the rent established for the
    most recent effective date of reappraised rent as set forth in Clause 9
2   (REAPPRAISAL OF RENT) (March 22, 1998, March 22, 2008, March 22, 2018, and
    March 22, 2028).
3
    Notwithstanding the foregoing, in no event shall the annual rent be reduced by
4   reason of such adjustment.

5   In the event that the INDEX is not issued or published for the period for which such
    annual rent is to be adjusted and computed hereunder, or that the Bureau of Labor
6   Statistics of the United States Department of Labor should cease to publish said index
    figures, then any similar index published by any other branch or department of the
7   United States Government shall be used and if none is so published, then another index
    generally recognized and authoritative shall be substituted by LESSOR.
8
    9.   REAPPRAISAL OF RENT (N)
9
    LESSOR and TENANT agree that rent payable pursuant to Clause 7 (RENT) and as adjusted
10  by Clause 8 (REVISION OF RENT) of this Lease, shall be subject to periodic adjustment
    by reappraisal every ten (10) years to be effective on the following dates:
11
              March 22, 1998,
12            March 22, 2008,
              March 22, 2018,
13            March 22, 2028,

14  It is the intent of LESSOR and TENANT that rent payable pursuant to Clause 7 (RENT) of
    this Lease, shall be calculated by the following formula:
15
          Rent =   reappraised value of the Premises x .375 (thirty-seven and one-half
16                 percent) x .09 (nine percent)

17  Note:    (.375 is based upon 62.5% discount for land utilization i.e., 1.0 − .625
             = .375; .09 is based upon rate of return.)
18
    LESSOR and TENANT shall begin the appraisal process to determine rent adjustment six
19  months prior to the effective date of said rent adjustment and shall use the following
    procedure:
20
    (1)  LESSOR and TENANT shall, no less than 180 days prior to the next scheduled
21       rent adjustment, each employ a qualified real estate appraiser.  LESSOR shall
         use its reasonable efforts to provide TENANT written notice of its obligation
22       to employ an appraiser thirty (30) days prior to the date by which the
         appraiser must be employed.  LESSOR's failure to provide such notice shall
23       not relieve TENANT of obligation to employ an appraiser as set forth in this
         Lease.  The term "qualified real estate appraiser," as used herein shall mean
24       and refer to a real estate appraiser designated as a "senior" member or
         equivalent by a nationally recognized appraisal organization, hereinafter
25       referred to as "appraiser," and who has at least five years experience
         appraising this type of property.
26

27

28  BP:cv/htPCGSA59.WP(4/17/96)                                   HA55D-26-17 (Parcel
                                                                  Lower Newport L
                                    -4-

                                    98

    a. In the event TENANT fails to employ an appraiser prior to this 180-day period and provide written notice to LESSOR of said employment, then the appraiser employed by the LESSOR shall be the sole appraiser responsible for determining the value of the Premises and his opinion shall be binding upon LESSOR and TENANT.

    b. LESSOR and TENANT shall be individually responsible for the fee of the appraiser which it employs.

(2) After selection of the appraiser(s), the Real Estate Director shall immediately fix a time and place for a pre-appraisal meeting with the Real Estate Director, TENANT, and the appraiser(s).

    a. At or before the pre-appraisal meeting, the Real Estate Director shall provide the appraiser(s) with a "Scope of Work."

    b. The appraiser(s) shall, within 120 days after the pre-appraisal meeting, prepare and deliver to LESSOR and TENANT two copies of a fully documented written report, prepared in accordance with the Scope of Work, containing the appraiser's independent opinion of the value of the Premises.

(3) The rent adjustment shall be determined as follows:

    a. If only one appraisal is submitted within the 120-day period, then the rent adjustment shall be based on the estimated value of the Premises as set forth in that appraisal. The rent shall then be determined using the formula set forth above in this Clause 9 (REAPPRAISAL OF RENT).

    b. If two appraisals are submitted within the 120-day period, then the rent adjustment shall be on the mathematical average of the estimated value of the Premises of the two appraisals, provided the lower of the two appraisal values is equal to or greater than ninety percent (90%) of the higher of the two appraisal values. The rent shall then be determined using the formula set forth above in this Clause 9 (REAPPRAISAL OF RENT).

(4) In the event two appraisals are submitted but the value of the lower is less than ninety percent (90%) of the higher of the two values, the Real Estate Director shall independently select a third appraiser.

    a. The third appraiser shall then have sixty (60) days after its appointment to prepare and deliver to LESSOR and TENANT two (2) copies of a fully documented written report prepared in accordance with the Scope of Work containing that appraiser's independent opinion of the value of the Premises. LESSOR and TENANT shall each pay one half of the fee of the third appraiser.

    b. In the event the third appraisal is required, the reappraised value for determining the rent adjustment shall be based on the mathematical average of the two appraisals with the closest estimated values and the

1

2
Rent shall then be determined by using the formula set forth above in this Clause 9 (REAPPRAISAL OF RENT).

3
(5) LESSOR and TENANT agree to be bound to the herein described rent adjustment without further dispute.

4

5
In no event shall adjusted rent be less than rent payable immediately prior to the subject rent reappraisal date.

6

7
Should the adjusted annual rent be determined subsequent to the effective date thereof, said adjusted annual rent shall be retroactive to that date. TENANT shall pay all retroactive rent, without penalty, within 30 days after receipt of notice from LESSOR of the amount of retroactive rent due.

8

9
(6) Appraisals or discount factors used for the purposes of rent calculation or adjustment, as provided in this Lease, shall be used only to set consideration for this Lease subject to terms and conditions hereof.

10
10.  RENT PAYMENT PROCEDURE (PMC6.2 N)

11

12

13
In the event TENANT pays rent on an annual basis, LESSOR shall use its reasonable efforts to provide TENANT with a written statement of the rent due on or before thirty (30) days prior to the date each rent payment is due. LESSOR's failure to provide such written notice shall in no way relieve TENANT of its obligation to pay all rent required by this Lease as and when due.

14

15

16

17
Rent payments shall be delivered or sent by U.S. Mail to County of Orange, Office of the Auditor-Controller, Post Office Box 567 (630 North Broadway), Santa Ana, California 92702.  The designated place of payment may be changed at any time by LESSOR upon ten (10) days written notice to TENANT.  Rent payments shall be made payable to the County of Orange. TENANT assumes all risk of loss if payments are made by mail.

18

19

20

21
All rental shall be paid in lawful money of the United States of America, without offset or deduction or prior notice or demand.  No payment by TENANT or receipt by LESSOR of a lesser amount than the rent due shall be deemed to be other than on account of the rent due, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and LESSOR shall accept such payment without prejudice to LESSOR's right to recover the balance of said rent or pursue any other remedy in this Lease.

22
11.  CHARGE FOR LATE PAYMENT (PMC7.1 S)

23

24

25
TENANT hereby acknowledges that the late payment of rent or any other sums due hereunder will cause LESSOR to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include but are not limited to costs such as administrative processing of delinquent notices, increased accounting costs, etc.

26

27
Accordingly, if any payment of rent as specified in Clause 7 (RENT) or of any other sum due LESSOR is not received by LESSOR by the due date,   late charge of one and one-half percent (1.5%) of the payment due and unpaid plus       shall be added to the

28
BP:cv... : :.iS/.59.WP(4/17/96)

HA55D-26-17  (Parcel 1)
Lower Newport Bay

-6-

100

payment, and the total sum shall become immediately due and payable to LESSOR. An additional charge of one and one-half percent (1.5%) of said payment, excluding late charges, shall be added for each additional month that said payment remains unpaid.

TENANT and LESSOR hereby agree that such late charges represent a fair and reasonable estimate of the costs that LESSOR will incur by reason of TENANT's late payment. Acceptance of such late charges (and/or any portion of the overdue payment) by LESSOR shall in no event constitute a waiver of TENANT'S default with respect to such overdue payment, or prevent LESSOR from exercising any of the other rights and remedies granted hereunder.

12. CONSTRUCTION AND/OR ALTERATION BY TENANT (PMD2.1 N)

No structures, improvements, or facilities other than those listed in Clause 5 (USE) of this Lease shall be constructed, erected, altered, or made within the Premises without prior written consent of Director. Any conditions relating to the manner, method, design and construction of said structures, improvements, or facilities fixed by the Director shall be conditions hereof as though originally stated herein.

All improvements constructed by TENANT within the Premises shall be constructed in strict compliance with detailed plans and specifications approved by Director.

13. MAINTENANCE OBLIGATIONS OF TENANT (PME2.1 S)

TENANT shall, to the satisfaction of Director, keep and maintain the Premises and all improvements of any kind which may be erected, installed or made thereon in good condition and in substantial repair. It shall be TENANT's responsibility to take all steps necessary or appropriate to maintain such a standard of condition and repair.

TENANT expressly agrees to maintain the Premises in a safe and clean condition, to the reasonable satisfaction of Director and in compliance with all applicable laws.

If TENANT fails to maintain or make repairs or replacements as required, Director shall notify TENANT in writing of said failure. Should TENANT fail to correct the situation within three days after receipt of written notice, Director may make the necessary correction or cause it to be made and the cost thereof, including but not limited to the cost of labor, materials, and equipment and administration, shall be paid by TENANT within ten (10) days of receipt of a statement of said cost from Director. Director may, at his option, choose other remedies available herein, or by law.

14. INSURANCE (PME5.1.3 N)

TENANT fully understands that it is extremely important that TENANT shall maintain insurance acceptable to Real Estate Director in full force and effect throughout the term of this Lease. The policy or policies of insurance maintained by TENANT shall provide the following limits and coverages:

| Coverage | Minimum Limit |
|---|---|
| General Comprehensive Liability | $500,000 |

BP:cv/htPCGSA59.WP(4/17/96)

HA55D-26-17  (Parcel 1)
Lower Newport Bay

-7-

1 | Insurance shall be in force the first day of the term of this Lease.

2 | Each liability insurance policy required by this Lease shall contain the following three clauses:

3 |

4 | A.   "This insurance shall not be cancelled, limited in scope of coverage or non-renewed until after 30 days written notice has been given to the County of Orange, General Services Agency/Real Estate, 14 Civic Center Plaza, Santa

5 |      Ana, California 92702-4106.

6 | B.   "County of Orange and the State of California are added as additional named insureds as respects activities of the named insured at or from Premises

7 |      leased from the County of Orange."

8 | C.   "It is agreed that any insurance maintained by the County of Orange and the State of California will apply in excess of, and contribute with, insurance

9 |      provided by this policy."

10 | TENANT agrees to maintain insurance necessary to satisfy Real Estate Director that all provisions of this Lease have been complied with, and to keep such insurance in effect

11 | and to deposit certificates of insurance upon demand with the Real Estate Director during the entire term of this Lease.

12 |

13 | THIS LEASE SHALL AUTOMATICALLY TERMINATE AT THE SAME TIME TENANT'S INSURANCE COVERAGE IS TERMINATED.  IF, WITHIN TEN (10) DAYS AFTER TERMINATION UNDER THIS CLAUSE, TENANT OBTAINS AND PROVIDES EVIDENCE OF THE REQUIRED INSURANCE COVERAGE ACCEPTABLE TO REAL

14 | ESTATE DIRECTOR, THIS LEASE MAY BE REINSTATED AT THE SOLE DISCRETION OF REAL ESTATE DIRECTOR.   IF REINSTATED, TENANT SHALL PAY FIVE HUNDRED DOLLARS ($500) TO COVER THE

15 | PROCESSING COSTS INCURRED BY REAL ESTATE DIRECTOR.

16 | Real Estate Director shall retain the right at any time to review the coverage, form, and amount of the insurance required hereby.  If, in the opinion of Real Estate

17 | Director, insurance provisions in this Lease do not provide adequate protection for LESSOR, Real Estate Director may require TENANT to obtain insurance sufficient in

18 | coverage, form, and amount to provide adequate protection.  Real Estate Director's requirements shall be reasonable but shall be designed to assure protection from and

19 | against the kind and extent of the risks, with respect to the Premises and allowable uses thereof, which exist at the time a change in insurance is required.

20 |

21 | Real Estate Director shall notify TENANT in writing of changes in the insurance requirements; and if TENANT does not deliver copies of acceptable insurance policies

22 | with Real Estate Director incorporating such changes within thirty days of receipt of such notice, this Lease shall be in default without further notice to TENANT, and

23 | LESSOR shall have the sole right to terminate this Lease in addition to other remedies available.

24 | The procuring of such required policy or policies of insurance shall not be construed to limit TENANT's liability hereunder nor to fulfill the indemnification provisions

25 | and requirements of this Lease.

26 |

27 |

28 | BP:cv/htPCGSA59.WP(4/17/96)

HA55D-26-17 (Parcel 1)
Lower Newport Bay

15. ASSIGNING, SUBLETTING AND ENCUMBERING (N)

A. Assignment

TENANT shall not transfer interest in this Lease without the prior written
approval of the Director except as provided in paragraph C below of this
Clause. As a condition of the Director's approval, TENANT shall notify the
Director of the identity of the proposed TENANT and provide a copy of
documentation of the transfer of interest.

Approval shall not be withheld or delayed provided said transfer of interest
occurs concurrently with the transfer of ownership of the adjacent and
contiguous residential property and the proposed transfer of interest is to
the Grantee of such residential property.

In the event TENANT has provided Director proper notice, as set forth in
Clause 17 (NOTICES), of transfer of its interest in this Lease, and Director
has not responded to TENANT within sixty (60) days of receipt of such notice,
Director's approval of said transfer shall be deemed granted provided copies
of documentation of said transfer have been received by the Director as set
forth in this Clause.

Upon written approval of transfer of its interest, TENANT is released of any
obligations of this Lease, provided no default of the terms of this Lease
exists including payment of all rent due to LESSOR as set forth in Clause 7
(RENT) and Clause 11 (CHARGE FOR LATE PAYMENT).

Failure to obtain Director's approval or deemed approval of transfer of
interest shall render such transfer void.

Occupancy of the Premises by a prospective transferee or assignee without
approval of the transfer or assignment by the Director shall constitute a
breach of this Lease.

Any document used for the purpose of transfer or assignment of the Premises
or any part thereof, shall not be inconsistent with the provisions of this
Lease and in the event of any such inconsistency, the provisions of this
Lease shall control.

B. Subletting

Prior approval of the Director shall be required for TENANT to enter into
subleases with those residents whose properties adjoin the Premises. All
subleases shall be between TENANT and sublessee; the entry into sub-subleases
is prohibited and shall constitute a breach of this Lease.

C. Encumbrances

TENANT shall not pledge, hypothecate, mortgage or encumber its interest in
this Lease except to convey a security interest to a lender whose loan is
also secured by the residential property which is adjacent and contiguous
with the premises. The prior written consent of the LESSOR shall not be

required for transfer of LESSEE's interest in the Lease to or from any such lender subject to the following covenants and conditions:

1.  Said loan and all rights acquired thereunder shall be subject to each and all of the covenants, conditions and restrictions set forth in this Lease and to all rights and interests of LESSOR hereinunder.

2.  In the event of any conflict between the provisions of this Lease and the provisions of any loan document, the provisions of this Lease shall control.

3.  In the event any such lender subsequently acquires TENANT's interest in this Lease as a result of a foreclosure of its security interest, or an assignment in lieu thereof, such lender shall remain liable for the payment of rent and performance of all other terms, covenants and conditions hereunder only until lender assigns its interest in this Lease.

16.  STATE LANDS COMMISSION LEASING POLICY

LESSOR and TENANT acknowledge that the consideration for this Lease and any other terms and conditions provided in this Lease do not necessarily reflect the leasing policy of the State Lands Commission. The method for determining rent provided in this Lease shall not be used for the purpose of establishing rent in any future agreements involving filled or unfilled tide or submerged land.

17.  NOTICES (PMF8.1 S)

All notices pursuant to this Lease shall be addressed as set forth below or as either party may hereafter designate by written notice and shall be sent through the United States mail in the State of California, duly registered or certified, return receipt requested, with postage prepaid. If any notice is sent by registered or certified mail as aforesaid, the same shall be deemed to have been served or delivered twenty-four (24) hours after mailing thereof as above provided. Notwithstanding the above, LESSOR may also provide notices to TENANT by personal delivery or by regular mail and any such notice so given shall be deemed to have been given upon receipt.

| LESSOR | TENANT |
|---|---|
| County of Orange | William G. Simon |
| Environmental Management Agency | Alice M. Simon |
| Director, Harbors, Beaches and Parks | 18 Harbor Island |
| 300 N. Flower St. | Newport Beach, CA   92660 |
| Santa Ana, CA 92702-4048 | |

and

County of Orange
Director, GSA/Real Estate
14 Civic Center Plaza
Santa Ana, CA 92702

18. MEMORANDUM OF LEASE (N)

In order to impart constructive notice of TENANT's obligations under the terms of this
Lease, TENANT shall cause any prospective transferee or assignee to sign the
"Memorandum of Lease", in a form as shown on "Exhibit B", attached hereto and made a
part hereof, and have the signature notarized.  The signed and notarized Memorandum of
Lease shall be submitted to the Director as part of the documentation of the transfer
of interest as set forth in Clause 15 (ASSIGNING, SUBLETTING AND ENCUMBERING).

LESSOR shall provide access to and/or a copy of the Lease to TENANT and successors
upon request to the following office:

     County of Orange
     Director
     GSA/Real Estate
     14 Civic Center Plaza
     Santa Ana, CA 92702

19. ATTACHMENTS TO LEASE (MF9.1 S)

This Lease includes the following, which are attached hereto and made a part hereof:

GENERAL CONDITIONS--(21 Clauses)

EXHIBIT A (Location Map)

EXHIBIT B (Memorandum of Lease)

//

//

//

BP:cv/htPCGSA59.WP(4/17/96)

HA55D-26-17 (Parcel 1)
Lower Newport Bay

-11-

105

1  IN WITNESS WHEREOF, the parties have executed this Lease the day and year first above
2  written.

3                                            TENANT

4                                            William G. Simon and Alice Marie Simon,
                                             Trustees, The Simon Living Trust;
5                                            UDT Restated 8/13/93

6
7                                            By _William G. Simon_____

8                                            By _Alice Marie Simon_____

9

10  APPROVED AS TO FORM:
    County Counsel
11
12
    By _____ 4/19/96
13

14  RECOMMENDED FOR APPROVAL:

15  General Services Agency
    Real Estate
16

17
    By _____
18

19

20
    SIGNED AND CERTIFIED THAT A COPY OF          LESSOR
21  THIS DOCUMENT HAS BEEN DELIVERED TO          COUNTY OF ORANGE
    THE CHAIRMAN OF THE BOARD
22
23  By _____                     By _____
        KATHLEEN E. GOODNO MAY 0 1 1996              Chairman, Board of Supervisors
24  Acting Clerk of the Board of Supervisors
         of the County of Orange
25

26

27

28  BP:cv/htPCGSA59.WP(4/17/96)                          HA55D-26-17 (Parcel
                                                         Lower Newport Ba.

                              -12-
                              106

## General Conditions
(4 pages)

Clauses Number and Name

1. Time

2. Lease Organization

3. Permits and Licenses

4. Amendments

5. Unlawful Use

6. Inspection

7. Hold Harmless

8. Taxes and Assessments

9. Successors in Interest

10. Circumstances Which Excuse Performance

11. Partial Invalidity

12. Utilities

13. Waiver of Rights

14. Default in Terms of Lease by Tenant

15. Reservations to Lessor

16. Holding Over

17. Condition of Demised Premises Upon Termination

18. Disposition of Abandoned Property

19. Quitclaim of Tenant's Interest Upon Termination

20. Lessor's Right to Re-enter

21. Removal of Improvements

P:cv/htPCGSA59.WP(4/17/96)

HA05D-26-17 (Parcel 1)
Lower Newport Bay

1

I.  GENERAL CONDITIONS

2

3   1.   TIME (PMG1.2 S)

4   Time is of the essence of this Lease.

5   2.   LEASE ORGANIZATION (PMG5.2 S)

6   The various headings and numbers herein, the grouping of provisions of this Lease into
    separate clauses and paragraphs, and the organization hereof, are for the purpose of
7   convenience only and shall not be considered otherwise.

8   3.   PERMITS AND LICENSES (PMG3.1 S)

9   TENANT shall be required to obtain any and all approvals, permits, and/or licenses
    which may be required in connection with the operation of the Demised Premises as set
    out herein.  No permit, approval, or consent given by LESSOR, in its governmental
10  capacity, shall affect or limit TENANT'S obligations hereunder, nor shall any
    approvals or consents given by LESSOR as a party to this Lease, be deemed approval as
11  to compliance or conformance with applicable governmental codes, laws, rules, or
    regulations.
12

13  4.   AMENDMENTS (PMG6.2 S)

14  This Lease sets forth all of the agreements and understandings of the parties with
    regard to its subject matter and any modification must be written and properly
15  executed by both parties.

16  5.   UNLAWFUL USE (PMG7.2 S)

17  TENANT agrees no improvements shall be erected, placed upon, operated, nor maintained
    within the Premises, nor any business conducted or carried on therein or therefrom in
18  violation of the terms of this Lease, or of any regulation, order of law, statute,
    bylaw, or ordinance of a governmental agency having jurisdiction.

19  6.   INSPECTION (PMG9.2 S)

20  LESSOR or its authorized representative shall have the right at all reasonable times
    to inspect the Premises to determine if the provisions of this Lease are
21  being complied with.

22  7.   HOLD HARMLESS (PMG10.2 N)

23  TENANT hereby waives all claims and recourse against LESSOR and the State of
    California including the right of contribution for loss or damage of persons or
24  property arising from, growing out of or in any way connected with or related to this
    agreement except claims arising from the concurrent active or sole negligence of the
25  State of California or LESSOR, or their officers, agents, and employees.

26  TENANT hereby agrees to indemnify, hold harmless and defend the State of California
27  and LESSOR and their officers, agents, and employees,    that any and all claims,

28  B:....:ntPCGSA59.WP(4/17/96)                                    HA55D-26-17  (Parcel 1)
                                                                     Lower Newport Bay
                                      -1-
                                      108

1 loss, demands, damages, cost, expenses or liability costs arising out of the operation
2 or maintenance of the property described herein except for liability arising out of
the concurrent active or sole negligence of the State of California and/or LESSOR,
3 their officers, agents, or employees. In the event the State of California and/or
LESSOR is named as co-defendant, TENANT shall notify LESSOR of such fact and shall
4 represent the State of California and/or LESSOR in such legal action unless the State
of California and/or LESSOR undertakes to represent itself as co-defendant in such
5 legal action, in which event TENANT shall pay to the State of California and/or LESSOR
its litigation costs, expenses, and attorney's fees. In the event judgment is entered
6 against the State of California and/or LESSOR and TENANT because of the concurrent
active negligence of the State of California and/or LESSOR and TENANT, their officers,
7 agents, or employees, an apportionment of liability to pay such judgment shall be made
by a court of competent jurisdiction. Neither party shall request a jury
8 apportionment.

9 LESSOR agrees to indemnify and hold harmless TENANT, its officers, agents and
employees against any and all claims, loss, demands, damages, costs, expenses or
10 liability arising from, growing out of or in any way connected with or related to this
agreement and arising out of the concurrent active or sole negligence of the LESSOR or
11 its officer's, agents or employees.

12 8.  TAXES AND ASSESSMENTS (PMG11.2 N)

13 This lease may create a possessory interest which is subject to the payment of taxes
levied on such interest. It is understood and agreed that all taxes and assessments
14 (including but not limited to said possessory interest tax) which become due and
payable upon the Premises shall be the full responsibility of TENANT, and TENANT shall
15 cause said taxes and assessments to be paid promptly.

16 9.  SUCCESSORS IN INTEREST (PMG12.2)

17 Unless otherwise provided in this Lease, the terms, covenants, and conditions
contained herein shall apply to and bind the heirs, successors, executors,
18 administrators, and assigns of all the parties hereto, all of whom shall be jointly
and severally liable hereunder.

19 10. CIRCUMSTANCES WHICH EXCUSE PERFORMANCE (PMG13.2 S)

20 If either party hereto shall be delayed or prevented from the performance of any act
21 required hereunder by reason of acts of God, restrictive governmental laws or
regulations, or other cause without fault and beyond the control of the party.
22 obligated (financial inability excepted), performance of such act shall be excused for
the period of the delay and the period for the performance of any such act shall be
23 extended for a period equivalent to the period of such delay. However, nothing in
this clause shall excuse TENANT from the prompt payment of any rental or other charge
24 required of TENANT except as may be expressly provided elsewhere in this Lease.

25 11. PARTIAL INVALIDITY (PMG14.2 S)

26 If any term, covenant, condition, or provision of this Lease is held by a court of
competent jurisdiction to be invalid, void, or unenforceable, the remainder of the

27

28 BP:cv/htPCGSA59.WP(4/17/96)                                    HA55D-26-17 (Parcel 1)
                                                                Lower Newport Bay
                              -2-
                              109

1 | provisions hereof shall remain in full force and effect and shall in no way be
affected, impaired, or invalidated thereby.

2

3 | 12. UTILITIES (PME1.1 S)

4 | TENANT shall be responsible for and pay, prior to the delinquent date, all charges for
utilities supplied to the premises.

5 | 13. WAIVER OF RIGHTS (PMG15.2 S)

6 | The failure of LESSOR or TENANT to insist upon strict performance of any of the terms,
covenants, or conditions of this Lease shall not be deemed a waiver of any right or
7 | remedy that LESSOR or TENANT may have, and shall not be deemed a waiver of the right
to require strict performance of all the terms, covenants, and conditions of the
8 | Lease.

9 | 14. DEFAULT IN TERMS OF THE LEASE BY TENANT (PMG16.2 N)

10 | Should TENANT default in the performance of any covenant, condition, or agreement
contained in this Lease and such default is not corrected within a reasonable time (as
11 | determined by LESSOR) after TENANT receives written notice of default from LESSOR,
LESSOR may terminate this Lease. All rights of TENANT and those who claim under
12 | TENANT, stemming from this Lease, shall end at the time of such termination.

13 | 15. RESERVATIONS TO LESSOR (PMG18.2 S)

14 | The Premises are accepted as is and where is by TENANT subject to any and all existing
easements and encumbrances. LESSOR reserves the right to install, lay, construct,
15 | maintain, repair, and operate such sanitary sewers, drains, storm water sewers,
pipelines, manholes, and connections; water, oil, and gas pipelines; telephone and
16 | telegraph power lines; and the appliances and appurtenances necessary or convenient in
connection therewith, in, over, upon, through, across, and along the Premises or any
17 | part thereof as may be necessary to serve the Premises, and to enter the Premises for
any and all such purposes. LESSOR also reserves the right to grant franchises,
18 | easements, rights of way, and permits in, over, upon, through, across, and along any
and all portions of the Premises as may be necessary to serve the Premises.

19

20 | LESSOR agrees that rights granted to third parties by reason of this clause shall
contain provisions that the surface of the land shall be restored as nearly as
21 | practicable to its original condition upon the completion of any construction.

22 | LESSOR further agrees that should the exercise of these rights temporarily interfere
with the use of any or all of the Premises by TENANT, the rental shall be reduced in
proportion to the interference with TENANT's use of the Premises.

23

24 | 16. HOLDING OVER (PMG19.2 S)

25 | In the event TENANT shall continue in possession of the Premises after the term of
this Lease, such possession shall not be considered a renewal of this Lease but a
26 | tenancy from month to month and shall be governed by the conditions and covenants
contained in this Lease.

27

28 | BP:cv/htPCGSA59.WP(4/17/96)

-3-

HA55D-26-17 (Parcel 1)
Lower Newport Bay

1   17. CONDITION OF DEMISED PREMISES UPON TERMINATION (PMG20.2 S).

2   Except as otherwise agreed to herein, upon termination of this Lease, TENANT shall
    redeliver possession of said Premises to LESSOR in substantially the same condition
3   that existed immediately prior to TENANT'S entry thereon, reasonable wear and tear,
    flood, earthquakes, war, and any act of war, excepted.
4
    18. DISPOSITION OF ABANDONED PERSONAL PROPERTY (PMG21.2 S)
5
    If TENANT abandons the Premises or is dispossessed thereof by process of law or
6   otherwise, title to' any personal property belonging to TENANT and left on the
    Premises 15 days after such abandonment or dispossession shall be deemed to have been
7   transferred to LESSOR. LESSOR shall have the right to remove and to dispose of such
    property without liability therefor to TENANT or to any person claiming under TENANT,
8   and shall have no need to account therefor.

9   19. QUITCLAIM OF TENANT'S INTEREST UPON TERMINATION (PMG22.2 S)

10  Upon termination of this Lease for any reason, including but not limited to
    termination because of default by TENANT, TENANT -shall execute, acknowledge, and
11  deliver to LESSOR within 30 days after- receipt of written demand therefor, a good and
    sufficient deed whereby all right, title, and interest of TENANT in the Premises is
12  quitclaimed to LESSOR. Should TENANT fail or refuse to deliver the required deed to
    LESSOR, LESSOR may prepare and record a notice reciting the failure of TENANT to
13  execute, acknowledge and deliver such deed and said notice shall be conclusive
    evidence of the termination or this Lease and of all right of TENANT or those claiming
14  under TENANT in and to the Premises.

15  20. LESSOR'S RIGHT TO RE-ENTER (PMG23.2 S)

16  TENANT agrees to yield and peaceably deliver possession of the Premises to LESSOR on
    the date of termination of this Lease, whatsoever the reason for such termination.
17
    Upon giving written notice of termination to TENANT, LESSOR shall have the right to
18  re-enter and take possession of the Premises on the date such termination becomes
    effective without further notice of any kind and without institution of summary or
19  regular legal proceedings. Termination of the Lease and re-entry of the Premises by
    LESSOR shall in no way alter or diminish any obligation of TENANT under the lease
20  terms and shall not constitute an acceptance or surrender.

21  TENANT waives any and all right of redemption under any existing or future law or
    statute in the event of eviction from or dispossession of the Premises for any lawful
22  reason or in the event LESSOR re-enters and takes possession of the premises in a
    lawful manner.
23
    21. REMOVAL OF IMPROVEMENTS (PMD6.1 N)
24
    All improvements constructed or placed within the Premises by TENANT must, upon
25  completion, be free and clear of all liens, claims, or liability for labor or
    material. LESSOR retains the right to require TENANT, at TENANT's cost, to remove all
26  TENANT improvements located on the Premises at the expiration .. termination of this
    Lease.
27

28  BP:cv/htPCG:.: ..WP(4/17/96)                                          1A55D-26-17 (Parcel 1)
                                                                          Lower Newport Bay

                                          -4-

                                          111

# EXHIBIT "3"



# Chicago Title Company

Commercial/Industrial Division,
2365 Northside Drive, Suite 500, San Diego, CA 92108 (619) 521-3400 ·

**Title Department:**

Chicago Title Company
Attn: Katherine Leicht
Email: Katherine.Leicht@ctt.com
Phone: (619) 521-3493
Fax: (619) 521-3691
Order No.: 930019082-U23

**Title Department:**

Chicago Title Company
Attn: Janine Hudson
Email: Janine.hudson@ctt.com
Phone: (619) 230-6366

## PRELIMINARY REPORT

Property Address:  18 Harbor Island
　　　　　　　　　Newport Beach, CA

Dated as of:  February 9, 2010 at 7:30 am

In response to the application for a policy of title insurance referenced herein, Chicago Title Company hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said Policy forms.

The printed Exceptions and Exclusion from the coverage and Limitations on Covered Risks of said Policy or Policies are set forth in Attachment One. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One. Copies of the policy forms should be read. They are available from the office which issued this report.

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

The policy(s) of title insurance to be issued hereunder will be policy(s) of Chicago Title Insurance Company

*Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.*

*It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.*

CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY

Order No.: 930019082-U23

# SCHEDULE A

1.    The estate or interest in the land hereinafter described or referred to covered by this report is:

A fee as to Parcel 1 & an easement more fully described below as to Parcel 2 a Leasehold Estate created by that certain lease dated May 1, 1996, executed by County of Orange, Lessor, & by Robert J. Mcnulty, as lessee, for a term of 41 years commencing May 1, 1996, recorded April 1, 1999 as Instrument No. 19990240772, & that certain lease recorded July 16, 2001 as Instrument No. 20010476486, both of Official Records, upon the terms, covenants, and conditions provided in an unrecorded lease therein referred to.

Assignment of the lessee's interest under said lease.

Assignor: Robert J. Mcnulty, an unmarried man assignee: Daks LLC, a California limited liability company recorded: July 16, 2001 as Instrument No. 20010476483, Official Records

(as to Parcel 3)

2.    Title to said estate or interest at the date hereof is vested in:

Daks LLC, a California limited liability company, subject to proceedings pending in the Bankruptcy Court where a petition for relief was filed

| | |
|---|---|
| Name of Debtor: | Daks LLC, a California limited liability company |
| Date of Filing: | July 9, 2007 |
| U.S. District Court: | Central |
| Case No.: | 07-12044 |

3.    The land referred to in this report is situated in the State of California, County of Orange and is described in the Legal Description, attached hereto:

END OF SCHEDULE A

Order No.: 930019082-U23

# LEGAL DESCRIPTION

PARCEL 1:

PARCEL 1, IN THE CITY OF NEWPORT BEACH, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON <u>PARCEL MAP NO. 83-711, FILED IN BOOK 182, PAGES 43 AND 44</u> OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2:

A NON-EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS OVER AND ACROSS THE PRIVATE ROADWAYS AS SHOWN ON THE <u>MAP OF TRACT NO. 802, RECORDED IN BOOK 24, PAGE 7,</u> MISCELLANEOUS MAPS, RECORDS OF ORANGE COUNTY, CALIFORNIA.

PARCEL 3:

ALL OF THAT CERTAIN LAND SITUATED IN SECTION 34, FRACTIONAL TOWNSHIP 6 SOUTH, RANGE 10 WEST, SAN BERNARDINO MERIDIAN, IN THE CITY OF NEWPORT BEACH, COUNTY OF ORANGE, STATE OF CALIFORNIA, BOUNDED SOUTHEASTERLY BY THE NORTH & WEST LINES OF PARCEL 1 AS SHWON ON PARCEL MAP NO. 83-711 FILED IN BOOK 182, PAGES 43 & 44 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; BOUNDED ON THE SOUTHERLY SIDE BY THE WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF SAID PARCEL 1; BOUNDED ON THE WESTERLY SIDE BY THAT PORTION OF THE BULKHEAD LINE EXTENDING FROM U.S. BULKHEAD STATION NO. 145 TO U.S. BULKHEAD STATION NO. 138, AS SAID BULKHEAD LINE AND BULKHEAD STATIONS ARE LAID OUT AND SHOWN ON A MAP OF HARBOR LINES, NEWPORT BAY HARBOR, CALIFORNIA, FILE NO. 972/1-3, SHOWING HARBOR LINES APPROVED BY THE DEPARTMENT OF THE ARMY ON FEBRUARY 15, 1951, SAID MAP BEING ON FILE IN FILE INDEX #6877 IN THE OFFICE OF THE ORANGE COUNTY SURVEYOR; BOUNDED ON THE NORTHERLY SIDE BY THAT PORTION OF THE BULKHEAD LINE EXTENDING FROM U.S. BULKHEAD STATION NO. 138 TO U.S. BULKHEAD STATION NO. 139, AS LAID OUT AND SHOWN ON SAID NEWPORT BAY HARBOR MAP; AND BOUNDED ON THE EASTERLY SIDE BY THE NORTHERLY PROLONGATION OF THE WESTERLY LINE OF LOT A OF TRACT NO. 802, AS SHOWN ON A MAP THEREOF FILED IN BOOK 24, PAGE 7 MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THAT PORITON THEREOF BOUNDED WESTERLY BY SAID BULKHEAD LINE EXTENDING FROM U.S. BULKHEAD STATION NO. 145 TO U.S. BULKHEAD STATION NO. 138; BOUNDED NORTHERLY BY SAID BULKHEAD LINE EXTENDING ROM U.S. BULKHEAD STATION NO. 138 TO U.S. BULKHEAD STATION 139: & BOUNDED SOUTHEASTERLY BY THE ARC OF A CURVE HAVING A RADIUS OF 40.00 FEET, SAID CURVE BEING CONCAVE SOUTHEASTERLY AND TANGENT TO BOTH THE BULKHEAD LINE SEGMENTS DESCRIBED ABOVE.

APN: 050-230-42

END OF LEGAL DESCRIPTION

Order No.: 930019082-U23

## SCHEDULE B

At the date hereof, items to be considered and exceptions to coverage in addition to the printed Exceptions and Exclusions in said policy form would be as follows:

1. Property taxes, including any assessments collected with taxes, for the fiscal year 2010 - 2011 that are a lien not yet due.

2. Property taxes, including any assessments collected with taxes, for the fiscal year 2009 - 2010

| | |
|---|---|
| 1st Installment: | $83,498.53 (Not Paid-Delinquent) |
| Penalty: | $8,349.85 (Due after December 10) |
| 2nd Installment: | $83,498.53 |
| Penalty and Cost: | $8,372.85 (Due after April 10) |
| Homeowners Exemption: | $None |
| Code Area: | 07001 |

494982.40

Assessors Parcel Number:   050-230-42

3. Said property has been declared tax defaulted for non-payment of delinquent taxes for fiscal year 2007 - 2008 (and subsequent years, if any)

| | |
|---|---|
| Amount To Redeem: | $311,262.64 |
| If Paid By: | $February 28, 2010 |

If payment is to be made through this title order, in order to insure that payment is received by the Tax Collector in a timely manner, good funds must be in possession of this company at least 3 business days prior to the above date.

4. The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Part 0.5, Chapter 3.5 or Part 2, Chapter 3, Articles 3 and 4 respectively (commencing with Section 75) of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A; or as a result of changes in ownership or new construction occurring prior to date of policy.

5. Rights and easements for commerce, navigation and fishery, affecting that portion of said land within the waters of Newport Bay.

6. Any adverse claim based upon the assertion that some portion of said land is tide or submerged lands, or has been created by artificial means or has accreted to such portion so created.

7. Any rights, interest, or easements in favor of the public, which exists or is claimed to exist over a portion of said land which presently is, or has ever in the past, been covered by water.

8. Easements in, over and across the 30 foot private roadways (including 7 foot easements for sewer and public utilities) and the 15 foot and 5 foot private walkway easements, as shown on the map of Tract No. 802 as per map recorded in Book 24, page 7 of Miscellaneous Maps, in the office of the county recorder of said county, and as reserved in deeds of record.

CLTA Preliminary Report Form - Modified (11-17-06)

Order No.: 930019082-U23

# SCHEDULE B
(continued)

9.   Covenants, conditions and restrictions ("but omitting, except to the extent that said covenant or restriction is controlled or permitted by any applicable federal or state law, any covenants or restrictions, if any, based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, medical condition, national origin, source of income, or ancestry" as set forth in the document

Recorded:                    June 21, 1938 in Book 942, page 341 of Official Records

Note: Section 12956.1 of the government code provides the following: "If this document contains any restriction based on race, color, religion, sex, sexual orientation, familial status, marital status, disability, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."

Note: If you should request a copy of the document referred to above, California Law requires that a county recorder, title insurance company, escrow company, real Estate broker, real Estate agent, or association that provides a copy of a declaration, governing document, or deed to any person shall place a cover Page over, or stamp on the first Page of the previously recorded document or documents a statement, in at least 14-point boldface type, relating to unlawful restrictions.

Modification(s) of said covenants, conditions and restrictions

Recorded:                    December 22, 1949 in Book 1944, page 124 of Official Records

"All such covenants, conditions and restrictions contained therein have been terminated except for the covenants, conditions and restrictions appearing in subparagraphs (g) and (h) thereof".

An instrument executed by harbor island community association, a California corporation, recorded April 27, 1956, in book 3490, page 519, Official Records, quitclaimed to the record owner:

"All right, title and interest of the association in and to said lot 18 acquired and now held by reason of any breach of the above referred to set-back condition, and the association hereby releases, waives and quitclaims all reversionary rights and rights of forfeiture and reentry which it now has resulting from any breach of said condition or from the continuance of any breach of such condition. The effect of this instrument being limited to releasing and quitclaiming any and all rights of the association accrued or hereafter accruing solely with respect to any breach of said set-back condition."

10.  Any lien or charge that may be assessed against said land, for establishing underground conduit systems, as set forth in an instrument by and between the owners of lots in said tract and Harbor Island Community Assn., recorded June 28, 1958 in Book 4330, page 307 of Official Records.

11.  An easement for the purpose shown below and rights incidental thereto as set forth in a document.

Granted To:              Southern California Edison Company
Purpose:                 public utilities

CLTA Preliminary Report Form - Modified (11-17-06)

Order No.: 930019082-U23

## SCHEDULE B
(continued)

| | |
|---|---|
| Recorded: | in Book 4336, page 546 of Official Records |
| Affects: | A portion of said land lying within a strip of land 30 feet in width shown as "private roadways", on the map of said tract No. 802 |

12. An easement for the purpose shown below and rights incidental thereto as set forth in a document.

| | |
|---|---|
| Granted To: | Pacific Telephone and Telegraph Company |
| Purpose: | public utilities, ingress, egress |
| Recorded: | in Book 4397, page 154 of Official Records |
| Affects: | A portion of said land lying within a strip of land 30 feet in width shown as "private roadways" on the map of said Tract No. 802 |

13. An agreement to provide a main telephone conduit system and telephone service to said land, executed by the then record owner of said land and the Pacific Telephone and Telegraph Company, recorded in Book 4539, page 393, Official Records.

14. Covenants, conditions and restrictions ("but omitting, except to the extent that said covenant or restriction is controlled or permitted by any applicable federal or state law, any covenants or restrictions, if any, based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, medical condition, national origin, source of income, or ancestry" as set forth in the document

Recorded:                    November 3, 1983 as Instrument No. 83-486813 of Official Records

Note: Section 12956.1 of the government code provides the following: "If this document contains any restriction based on race, color, religion, sex, sexual orientation, familial status, marital status, disability, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."

Note: If you should request a copy of the document referred to above, California Law requires that a county recorder, title insurance company, escrow company, real Estate broker, real Estate agent, or association that provides a copy of a declaration, governing document, or deed to any person shall place a cover Page over, or stamp on the first Page of the previously recorded document or documents a statement, in at least 14-point boldface type, relating to unlawful restrictions.

15. Covenants, conditions and restrictions ("but omitting, except to the extent that said covenant or restriction is controlled or permitted by any applicable federal or state law, any covenants or restrictions, if any, based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, medical condition, national origin, source of income, or ancestry" as set forth in the document

Recorded:                    September 17, 1984 as Instrument No. 84-384406 and re-recorded September 17, 1984 as Instrument No. 84-432455, both of Official Records

Order No.: 930019082-U23

## SCHEDULE B
(continued)

Note: Section 12956.1 of the government code provides the following: "If this document contains any restriction based on race, color, religion, sex, sexual orientation, familial status, marital status, disability, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."

Note: If you should request a copy of the document referred to above, California Law requires that a county recorder, title insurance company, escrow company, real Estate broker, real Estate agent, or association that provides a copy of a declaration, governing document, or deed to any person shall place a cover Page over, or stamp on the first Page of the previously recorded document or documents a statement, in at least 14-point boldface type, relating to unlawful restrictions.

Modification(s) of said covenants, conditions and restrictions

Recorded:                    March 25, 1988 as Instrument No. 88-136378 of Official Records

16.  An easement for the purpose shown below and rights incidental thereto as set forth in a document.

| Granted To: | Southern California Edison Company |
| Purpose: | public utilities |
| Recorded: | May 12, 1987 as Instrument No. 87-266771 of Official Records |
| Affects: | the Easterly 12 feet of the Southerly 16 feet of said land |

17.  A document entitled "Right of First Refusal to Purchase Property" on the terms and conditions contained therein, Recorded January 9, 1991, as Instrument No. 91-011185, Official Records.

The effect of an "Interspousal Transfer Deed" dated June 15, 1993 executed by Julia A. Carver in favor of Leroy L. Carver III, as his sole and separate property, recorded July 19, 1993, as Instrument No. 93-0478473, Official Records.

First amendment to right of first refusal to purchase property dated January 8, 1991, subordination and settlement agreement and request for notice dated as of May 20, 1993 and recorded March 11, 1994, as Instrument No. 94-0174642, Official Records.

A document entitled "Subordination Agreement ", dated July 27, 2001 executed by Daks, LLC, a California limited liability company and Elizabeth C. Adams, not personally but solely as trustee of Carver Trust No. 1 created pursuant to a trust agreement dated September 22, 1988, and Leroy L. Carver, III, a married man, subject to all the terms, provisions and conditions therein contained, recorded August 1, 2001, as Instrument No. 2001-0527208, Official Records.

18.  The terms, provisions and conditions of that certain "Judgement, Pursuant to Stipulation" filed in the Orange County Superior Court, case no. 661446, on June 18, 1993, in the matter of 18 harbor island corporation, a California corporation vs Leroy L. Carver III, Elizabeth C. Adams, individually and as trustee of Carver Trust No. 1, a certified copy of which was recorded March 11, 1994, as Instrument No. 94-0174641, Official Records

Order No.: 930019082-U23

# SCHEDULE B
(continued)

19.   A claim of lien in favor of the County of Orange and/or the City of Newport Beach, for Pier Permits, as disclosed to this company in writing.

20.   A Deed of Trust to secure an indebtedness in the original amount shown below.

| | |
|---|---|
| Amount: | $6,000,000.00 |
| Dated: | March 19, 2002 |
| Trustor: | Daks, LLC, a California limited liability company |
| Trustee: | Seaside Financial Corporation |
| Beneficiary: | First Federal Bank of California, a federally chartered savings bank |
| Loan Number: | 00049353416 |
| Recorded: | March 27, 2002 as Instrument No. 2002-0255362 of Official Records |

A Notice of Default under the terms of the Deed of Trust

| | |
|---|---|
| Executed By: | Seaside Financial Corporation, by T. D. Service Company as agent for the Trustee by Servicelink, as agent for T. D. Service Company |
| Recorded: | June 25, 2007 as Instrument No. 2007-000402712 of Official Records |

21.   A pending court action as disclosed by a recorded notice.

| | |
|---|---|
| Plaintiff: | Debra A. Simon |
| Defendant: | Arnold H. Simon |
| County: | Orange |
| Court: | Superior |
| Case No.: | 04D000159 |
| Nature of Action: | Said action affects the title to the following real property located in orange county as hereinafter described; that the object of said action is to obtain a decree of the court dissolving the marriage between the petitioner and respondent and dividing their community property, and the real property hereinafter described is claimed and contended to be community property of the parties in which the petitioner has an interest |
| Recorded: | January 12, 2004 as Instrument No. 2004-00022182 of Official Records |

Reference is hereby made to said document for full particulars.

First Amendment to Stipulation re Management of Equity Interest in Daks, LLC and Appointment of Assister; order thereon in Case No. 04D000159 as disclosed by Order granting Debtor in possession's motion to approve First Amendment to Stipulation re Management of Equity Interest in Daks, LLC and Appointment of Assister in Bankruptcy Case No. 8:07-bk-12044 RK recorded October 14, 2009 as Instrument No. 2009-000560671 of Official Records.

22.   Notice of Delinquent Assessments and Lien therefore payable to the Homeowners' Association pursuant to the Declaration herein above referred to under exception number 14.

Order No.: 930019082-U23

# SCHEDULE B
(continued)

| | |
|---|---|
| Amount: | $3,667.95 |
| Recorded: | November 29, 2007 as Instrument No. 2007-000705956 of Official Records |

23.  A Deed of Trust to secure an indebtedness in the original amount shown below.

| | |
|---|---|
| Amount: | $2,800,000.00 |
| Dated: | August 3, 2009 |
| Trustor: | Daks, LLC, a California limited liability company |
| Trustee: | Chicago Title Company, a California corporation |
| Beneficiary: | YSA, LLC, a California limited liability company |
| Loan Number: | Not shown |
| Recorded: | August 3, 2009 as Instrument No. 2009-000416926 of Official Records |

24.  A Lien for Unsecured Property Taxes filed by the Tax Collector of the County shown, for the amount set forth, and any other amounts due

| | |
|---|---|
| County: | Orange |
| Fiscal Year: | 2008 |
| Taxpayer: | Daks, LLC |
| County Identification No.: | 08-4462560 |
| Amount: | $3,148.62 |
| Recorded: | November 5, 2008 as Instrument No. 2008-513000 of Official Records |

25.  A Lien for Unsecured Property Taxes filed by the Tax Collector of the County shown, for the amount set forth, and any other amounts due

| | |
|---|---|
| County: | Orange |
| Fiscal Year: | 2009 |
| Taxpayer: | Daks, LLC |
| County Identification No.: | 627038 |
| Amount: | $3,165.12 |
| Recorded: | October 13, 2009 as Instrument No. 2009-00546444 of Official Records |

26.  A document subject to all the terms, provisions and conditions therein contained.

| | |
|---|---|
| Entitled: | Notice of Legal Proceedings and Judicial Lien |
| Recorded: | October 23, 2009 as Instrument No. 2009-0578730 of Official Records |

Reference is hereby made to said document for full particulars.

27.  Matters which may be disclosed by an inspection and/or by a correct ALTA/ACSM Land Title Survey of said land that is satisfactory to this Company, and/or by inquiry of the parties in possession thereof.

CLTA Preliminary Report Form - Modified (11-17-06)

Order No.: 930019082-U23

# SCHEDULE B
## (continued)

This office must be notified at least 7 business days prior to the scheduled closing in order to arrange for an inspection of the land; upon completion of this inspection you will be notified of the removal of specific coverage exceptions and/or additional exceptions to coverage.

28. Any rights of parties in possession of said land, based on any unrecorded lease, or leases.

This Company will require a full copy of any unrecorded lease, together with all supplements, assignments, and amendments for review.

END OF SCHEDULE B

Order No.: 930019082-U23

# INFORMATIONAL NOTES

Note No. 1:  The policy of title insurance will include an arbitration provision. The Company or the insured may demand arbitration. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Please ask your escrow or title officer for a sample copy of the policy to be issued if you wish to review the arbitration provisions and any other provisions pertaining to your Title Insurance coverage.

Note No. 2:  The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than the amount, if any, set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.

Note No. 3:  Your open order request indicates that a Limited Liability Company will be acquiring, encumbering or conveying real property in your transaction.  Under the provisions of "the California Limited Liability Act, effective September 30, 1994" the following will be required:

1.    A copy of the Articles of Organization (and all amendments, if any) that has been filed with the Secretary of State.

2.    The requirement that this Company be provided with a copy of the Operation Agreement. The copy provided must be certified by the appropriate manager or member that it is a copy of the current operating agreement.

3.    If the Limited Liability Company is member-managed then this Company must be provided with a current list of the member names.

Note No. 4:  Before issuing any policy of title insurance, this Company will require that a full copy of any Unrecorded Lease referred to herein be furnished to this Company, together with all Supplements, Assignments and Amendments.

GP

Order No.: 930019082-U23

# INFORMATIONAL NOTES
(continued)

ATTACHMENT ONE

PRIVACY STATEMENT

## IMPORTANT INFORMATION:

**For those of you receiving this report by electronic delivery the Privacy Statement and Exclusions From Coverage are linked to this report. Please review this information by selecting the link. For those of you who are receiving a hard copy of this report, a copy of this information has been submitted for your review.**

CLTA Preliminary Report Form - Modified (11-17-06)

# CHICAGO TITLE INSURANCE COMPANY

### Fidelity National Financial Group of Companies' Privacy Statement
July 1, 2001

We recognize and respect the privacy of today's consumers and the requirements of applicable federal and state privacy laws. We believe that making you aware of how we use your non-public personal information ("Personal Information"), and to whom it is disclosed, will form the basis for a relationship of trust between us and the public that we serve. This Privacy Statement provides that explanation. We reserve the right to change this Privacy Statement from time to time consistent with applicable privacy laws.

**In the course of our business, we may collect Personal Information about you from the following sources:**

- From applications or other forms we receive from you or your authorized representative;
- From your transactions with, or from the services being performed by, us, our affiliates or others;
- From our Internet web sites;
- From the public records maintained by government entities that we wither obtain directly from those entities, or from our affiliates or others; and
- From consumer or other reporting agencies

**Our Policies Regarding The Protection Of The Confidentiality And Security Of Your Personal Information**

We maintain physical, electronic and procedural safeguards to protect your Personal Information from unauthorized access or intrusion. We limit access to the Personal Information only to those employees who need such access in connection with providing products or services to you or for other legitimate business purposes.

**Our Policies and Practices Regarding the Sharing of Your Personal Information**

We may share your Personal Information with our affiliates, such as insurance companies, agents, and other real estate settlement service providers. We may also disclose your Personal Information:

- to agents, brokers or representatives to provide you with services you have requested;
- to third-party contractors or service providers who provide services or perform marketing or other functions on our behalf; and
- to others with whom we enter into joint marketing agreements for products or services that we believe you may find of interest.

In addition, we will disclose your Personal Information when your direct or give us permission, when we are required by law to do so, or when we suspect fraudulent or criminal activities. We also may disclose your Personal Information when otherwise permitted by applicable privacy laws such as, for example, when disclosure is needed to enforce our rights arising out of any agreement, transaction or relationship with you.

One of the important responsibilities of some of our affiliated companies is to record documents in the public domain. Such documents may contain your Personal Information.

**Right To Access Your Personal Information And Ability To Correct Errors Or Request Change Or Deletion**

Certain states afford you the right to access your Personal Information and, under certain circumstances, to find out to whom your Personal Information has been disclosed. Also, certain states afford you the right to request correction, amendment or deletion of your Personal Information. We reserve the right, where permitted by law, to charge a reasonable fee to cover the costs incurred in responding to such requests.

All requests must be made in writing to the following address:

Privacy Compliance Officer
Fidelity National Financial, Inc.
601 Riverside Drive
Jacksonville, FL 32204

**Multiple Products or Services:**

If we provide you with more than one financial product or service, you may receive more that one privacy notice from us. We apologize for any inconvenience this may cause you.

Privacy Statement (10-21-03)

## ATTACHMENT ONE

### AMERICAN LAND TITLE ASSOCIATION
### RESIDENTIAL TITLE INSURANCE POLICY (6-1-87)
### EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning:

   - land use
   - improvements on the land
   - land division
   - environmental protection

This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date.

This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.

2. The right to take the land by condemning it, unless:

   - a notice of exercising the right appears in the public records on the Policy Date
   - the taking happened prior to the Policy Date and is binding on you if you bought the land without knowing of the taking

3. Title Risks:

   - that are created, allowed, or agreed to by you
   - that are known to you, but not to us, on the Policy Date – unless they appeared in the public records
   - that result in no loss to you
   - that first affect your title after the Policy Date – this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks

4. Failure to pay value for your title.

5. Lack of a right:

   - to any land outside the area specifically described and referred to in Item 3 of Schedule A
     OR
   - in streets, alleys, or waterways that touch your land

This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

In addition to the Exclusions you are not insured against loss, costs, attorneys' fees, and the expenses resulting from:

1. Any right, interests, or claims of parties in possession of the land not shown by the public records.

2. Any easements or liens not shown by the public records. This does not limit the lien coverage in Item 8 of Covered Title Risks.

3. Any facts about the land which a correct survey would disclose and which are not shown by the public records. This does not limit the forced removal coverage in Item 12 of Covered Title Risks.

4. Any water rights or claims or title to water in or under the land, whether or not shown by the public records.

### CALIFORNIA LAND TITLE ASSOCIATION STANDARD COVERAGE POLICY - 1990
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;

   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

   (c) resulting in no loss or damage to the insured claimant;

   (d) attaching or created subsequent to Date of Policy; or

   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### SCHEDULE B, PART I
### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

Attachment One (11-17-06)

## ATTACHMENT ONE
### (CONTINUED)

**AMERICAN LAND TITLE ASSOCIATION LOAN POLICY (10-17-92)**
**WITH ALTA ENDORSEMENT-FORM 1 COVERAGE**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

    (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.  Defects, liens, encumbrances, adverse claims or other matters:

    (a) created, suffered, assumed or agreed to by the insured claimant;

    (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

    (c) resulting in no loss or damage to the insured claimant;

    (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material or

to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at Date of Policy); or

    (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6.  Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

7.  Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:

    (i) the transaction creating the interest of the insured mortgage being deemed a fraudulent conveyance or fraudulent transfer; or

    (ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine or equitable subordination; or

    (iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:

        (a) to timely record the instrument of transfer; or

        (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.  Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

### 2006 ALTA LOAN POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i) the occupancy, use, or enjoyment of the Land;

    (ii) the character, dimensions, or location of any improvement erected on the Land;

    (iii) the subdivision of land; or

    (iv) environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters

    (a) created, suffered, assumed, or agreed to by the Insured Claimant;

    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

    (c) resulting in no loss or damage to the Insured Claimant;

    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or

Attachment One (11-17-06)

## ATTACHMENT ONE
### (CONTINUED)

(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

  (a) a fraudulent conveyance or fraudulent transfer, or

  (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records;

  (b) Proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

### AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY (10-17-92)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

  (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

  (a) created, suffered, assumed or agreed to by the insured claimant;

  (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

  (c) resulting in no loss or damage to the insured claimant;

  (d) attaching or created subsequent to Date of Policy; or

  (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.

4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:

  (i) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or

  (ii) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:

    (a) to timely record the instrument of transfer; or

    (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage Policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records. Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

Attachment One (11-17-06)

## ATTACHMENT ONE
### (CONTINUED)

### 2006 ALTA OWNER'S POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   (i) the occupancy, use, or enjoyment of the Land;

   (ii) the character, dimensions, or location of any improvement erected on the Land;

   (iii) the subdivision of land; or

   (iv) environmental protection;

   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters

   (a) created, suffered, assumed, or agreed to by the Insured Claimant;

   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

   (c) resulting in no loss or damage to the Insured Claimant;

   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or

   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is

   (a) a fraudulent conveyance or fraudulent transfer; or

   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

### CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (10-22-03)
### ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (10-22-03)
### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:

   a. building

   b. zoning

   c. Land use

   d. improvements on the Land

   e. Land division

   f. environmental protection

   This Exclusion does not apply to violations or the enforcement of these matters if notice of the violation or enforcement appears in the Public Records at the Policy Date.

   This Exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 17 or 24.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at the Policy Date.

3. The right to take the Land by condemning it, unless:

   a. a notice of exercising the right appears in the Public Records at the Policy Date; or

   b. the taking happened before the Policy Date and is binding on You if You bought the Land without Knowing of the taking.

4. Risks:

   a. that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;

   b. that are Known to You at the Policy Date, but not to Us, unless they appear in the Public Records at the Policy Date;

   c. that result in no loss to You; or

   d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.d, 22, 23, 24 or 25.

5. Failure to pay value for Your Title.

6. Lack of a right:

   a. to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and

   b. in streets, alleys, or waterways that touch the Land.

   This Exclusion does not limit the coverage described in Covered Risk 11 or 18.

Attachment One (11-17-06)

## ATTACHMENT ONE
### (CONTINUED)

### LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

- For Covered Risk 14, 15, 16 and 18, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 14: | 1.00% of Policy Amount or $ 2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 15: | 1.00% of Policy Amount or $ 5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 16: | 1.00% of Policy Amount or $ 5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount or $ 2,500.00 (whichever is less) | $ 5,000.00 |

### ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (10/13/01)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the Land; (iii) a separation in ownership or a change in the dimensions or areas of the Land or any parcel of which the Land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the Public Records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without Knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:

   (a) created, suffered, assumed or agreed to by the Insured Claimant;

   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

   (c) resulting in no loss or damage to the Insured Claimant;

   (d) attaching or created subsequent to Date of Policy (this paragraph does not limit the coverage provided under Covered Risks 8, 16, 18, 19, 20, 21, 22, 23, 24, 25 and 26); or

   (e) resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the Land is situated.

5. Invalidity or unenforceability of the lien of the Insured Mortgage, or claim thereof, which arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, except as provided in Covered Risk 27, or any consumer credit protection or truth in lending law.

6. Real property taxes or assessments of any governmental authority which become a lien on the Land subsequent to Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 7, 8(e) and 26.

7. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This exclusion does not limit the coverage provided in Covered Risk 8.

8. Lack of priority of the lien of the Insured Mortgage as to each and every advance made after Date of Policy, and all interest charged thereon, over liens, encumbrances and other matters affecting the title, the existence of which are Known to the Insured at:

   (a) The time of the advance; or

   (b) The time a modification is made to the terms of the Insured Mortgage which changes the rate of interest charged, if the rate of interest is greater as a result of the modification than it would have been before the modification. This exclusion does not limit the coverage provided in Covered Risk 8.

9. The failure of the residential structure, or any portion thereof to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at Date of Policy.

# Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment. Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate. As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative. These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount. These discounts only apply to transactions involving services rendered by the FNF Family of Companies. This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company. The discount will only be applicable to the FNF Company as indicated by the named discount.

| | |
|---|---|
| **FNF Underwritten Title Companies** | **FNF Underwriters** |
| CTC – Chicago Title Company | CTIC – Chicago Title Insurance Co. |

## Available Discounts

### CREDIT FOR PRELIMINARY TITLE REPORTS AND/OR COMMITMENTS ON SUBSEQUENT POLICIES
Where no major change in the title has occurred since the issuance of the original report or commitment, the order may be reopened within 12 - 36 months and all or a portion of the charge previously paid for the report or commitment may be credited on a subsequent policy charge within the following time period from the date of the report.

### FEE REDUCTION SETTLEMENT PROGRAM
Eligible customers shall receive a $20.00 reduction in their title and/or escrow fees charged by the Company for each eligible transaction in accordance with the terms of the Final Judgments entered in The People of the State of California.

### DISASTER LOANS
The charge for a Lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within 24 months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be 50% of the appropriate title insurance rate.

### CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be 50% to 70% of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be 32% to 50% of the appropriate title insurance rate, depending on the type of coverage selected.

### SHORT TERM RATE
The Short Term Rate is a reduction of the charges shown in the Insurance Tables which is allowable only when the current order is placed within 60 months from the date of issuance of a prior CLTA or ALTA Form of Policy of any qualified title insurer and provided further that the grantor, borrower, lender, lessor or assignor is insured by or under the terms of a prior policy, or is the vested owner of the interest insured by said policy. The short term rate is 64% to 92% of the appropriate title insurance rate depending on the type of coverage selected.

### EMPLOYEE RATE
No charge shall be made to employees (including employees on approved retirement) of the Company or its underwritten, subsidiary or affiliated title companies for policies or escrow services in connection with financing, refinancing, sale or purchase of the employees' bona fide home property. Waiver of such charges is authorized only in connection with those costs which the employee would be obligated to pay, by established custom, as a party to the transaction.

## (continued)

You may be entitled to receive a $20.00 discount on escrow services if you purchased, sold or refinanced residential property in California between May 19, 1995 and November 1, 2002. If you had more than one qualifying transaction, you may be entitled to multiple discounts.

If your previous transaction involved the same property that is the subject of your current transaction, you do not have to do anything; the Company will provide the discount, provided you are paying for escrow or title services in this transaction.

If your previous transaction involved property different from the property that is subject of your current transaction, you must - prior to the close of the current transaction - inform the Company of the earlier transaction, provide the address of the property involved in the previous transaction, and the date or approximate date that the escrow closed to be eligible for the discount.

Unless you inform the Company of the prior transaction on property that is not the subject of this transaction, the Company has no obligation to conduct an investigation to determine if you qualify for a discount. If you provide the Company information concerning a prior transaction, the Company is required to determine if you qualify for a discount which is subject to other terms and conditions.

Notice

(continued)



Description: Orange, CA Assessor Map 50.23 Selected Pages 1 Page 1
Order: MLM000 Comment:

PLEASE COMPLETE THIS INFORMATION.

RECORDING REQUESTED BY:

Christopher Celentino, Esq.

AND WHEN RECORDED MAIL TO:

Christopher Celentino, Esq.
Duane Morris LLP
101 West Broadway, Ste. 900
San Diego, CA 92101

**Recorded in Official Records, Orange County
Tom Daly, Clerk-Recorder**

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖ 27.00

**2009000578730 04:30pm 10/23/09**

**215 28 N20 8**

**0.00 0.00 0.00 0.00 21.00 0.00 0.00 0.00**

*THIS SPACE FOR RECORDER'S USE ONLY*

NOTICE OF LEGAL PROCEEDINGS AND JUDICIAL LIEN

(Please fill in document title(s) on this line)

THIS PAGE ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION

(Additional recording fee applies)

ORANGE COUNTY RECORDER

9/95
Rec.Form #R25

134

## NOTICE OF LEGAL PROCEEDINGS AND JUDICIAL LIEN

NOTICE IS HEREBY GIVEN that the real property commonly known as 18 Harbor Island, Newport Beach, California 92660 (hereinafter referred to, together with related improvements and leasehold interests, as the "Harbor Island Property") may be subject to the jurisdiction of the United States Bankruptcy Court for the Central District of California, Santa Ana Division, in the action *In Re DAKS*, Case No. 8:07-12044-RK.

NOTICE IF HEREBY FURTHER GIVEN THAT the Harbor Island Property may be subject to the jurisdiction of the Superior Court of the State of California for the County of Orange in the action *In re Simon*, Case No. 04D000159.

NOTICE IF HEREBY FURTHER GIVEN THAT the Harbor Island Property may be subject to the jurisdiction of the Orange County Superior Court in the probate proceeding *Estate of Debra Simon*, Orange County Superior Court Case No. 30-2009-00304155-PR-PW-LJC.

NOTICE IF HEREBY FURTHER GIVEN THAT, prior to her death, Ms. Debra Simon claimed in the above referenced marital dissolution and bankruptcy proceedings an interest in the Harbor Island Property. The estate of Ms. Simon may continue to claim that same interest. Duane Morris LLP was counsel for Debra Simon and, in accordance with the terms of a written fee agreement entered into with Ms. Simon, Duane Morris LLP has and claims a lien ahead of others on any and all property division claims and recovery of monies and/or property made by Ms. Simon and/or her Estate to secure payment for legal services rendered and costs and expenses advanced on Ms. Simon's behalf. I certify under penalty of perjury under the laws of the State of California that attached are a true and correct copy of judicial liens filed by Duane Morris LLP in the *In Re DAKS* and *In re Simon* matters.

Dated: October 21, 2009                              DUANE MORRIS LLP

                                                     By:    Christopher Celentino
                                                            John P. Cooley

DM3\1186509 1

135

STATE OF CALIFORNIA )
                    )ss.
COUNTY OF SAN DIEGO )

On <u>October 21, 2009</u> before me, *M. Seton Carr* , a Notary Public, personally appeared <u>John P. Cooley</u> who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature *M. Seton Carr, Notary Public*

M. SETON CARR
Commission # 1866282
Notary Public - California
San Diego County
My Comm. Expires Jun 29, 2013

2

EXHIBIT A

1  CHRISTOPHER CELENTINO SBN 131688
   KATHRYN M.S. CATHERWOOD SBN 149170
2  DUANE MORRIS LLP
   101 West Broadway, Ste. 900
3  San Diego, California 92101
   Telephone: (619) 744-2200
4  Facsimile: (619) 744-2201

5  Attorneys for Creditor Debra Simon

6

7

8            UNITED STATES BANKRUPTCY COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10                  (SANTA ANA DIVISION)

11

12  In re                          )   Case No. SA 07-12044-RK
                                    )   Chapter 11
13  DAKS LLC,                       )
                                    )
14          Debtor.                 )   NOTICE OF ATTORNEYS' LIEN
                                    )
15  _____)

16       TO EACH PARTY AND TO THEIR COUNSEL OF RECORD AND TO ALL OTHER

17  PERSONS OR ENTITIES INTERESTED IN THIS ACTION:

18       YOU ARE HEREBY NOTIFIED THAT Duane Morris LLP was counsel for creditor Debra

19  Simon until her recent death. In accordance with the terms of a written fee agreement entered into

20  with Ms. Simon, Duane Morris LLP has and claims a lien ahead of all others on any and all

21  recoveries of money made by Debra Simon and/or her estate in this action to secure payment for

22  legal services rendered and costs and expenses advanced on Ms. Simon's behalf.

23

24  Dated: October 15, 2009              DUANE MORRIS LLP

25

26                              By: /s/ Christopher Celentino
                                    Christopher Celentino
27                                  Kathryn M.S. Catherwood
                                    Counsel for Debra A. Simon
28

    DM1\1893925.1                    1
                          Notice of Attorney's Lien
              Case No. SA-07-12044-RK, Adv. No. 8:07-AP-01331-RK

# EXHIBIT B

1 | Christopher Celentino (SBN 131688)
John P. Cooley (SBN 162955)
2 | **DUANE MORRIS LLP**
101 West Broadway, Suite 900
3 | San Diego, CA 92101
Telephone: 619.744.2200
4 | Facsimile: 619.744.2201
E-mail:    ccelentino@duanemorris.com
5 |
Attorneys for Debra A. Simon
6 |

7 |

8 |                    **SUPERIOR COURT OF CALIFORNIA**

9 |                         **COUNTY OF ORANGE**

10 | In Re the Marriage of:                      Case No. 04D000159

11 | DEBRA A. SIMON,                             **NOTICE OF ATTORNEYS' LIEN**

12 |              Petitioner,

13 |        v.

14 | ARNOLD H. SIMON,

15 |              Respondent.

16 | _____

17 | DAKS, INC.,

18 |              Claimant,

19 |

20 |

21 |        TO EACH PARTY AND TO THEIR COUNSEL OF RECORD AND TO ALL OTHER

22 | PERSONS OR ENTITIES INTERESTED IN THIS ACTION:

23 |        YOU ARE HEREBY NOTIFIED THAT Duane Morris LLP was counsel for Petitioner

24 | Debra Simon until her recent death. In accordance with the terms of a written fee agreement entered

25 | into with Ms. Simon, Duane Morris LLP has and claims a lien ahead of others on any and all

26 | ///

27 | ///

28 | ///

DM3\1153950.1

RECYCLED PAPER

1 | property division claims and recovery of monies and/or property made by Debra Simon and/or her
2 | estate in this action to secure payment for legal services rendered and costs and expenses advanced
3 | on Ms. Simon's behalf.
4 |
5 | Dated: October 15, 2009                    **DUANE MORRIS** LLP
6 |
7 |                                   By: _____
   |                                        Christopher Celentino
8 |                                        John P. Cooley
   |                                        Attorneys for Debra A. Simon
9 |
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

DM3\1153950.1

Notice of Attorneys' Lien; Case No. 04D000159

**RECYCLED PAPER**

| In re:<br>DAKS LLC, Debtor | Case No. 8:07-bk-12044-RK<br>Chapter 11 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067

A true and correct copy of the foregoing document described as NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING AND APPROVING: (1) SALE OF REAL PROPERTY AND CERTAIN PERSONAL PROPERTY ASSETS PURSUANT TO 11 U.S.C. § 363 FREE AND CLEAR OF ALL LIENS, CLAIMS, AND INTERESTS; AND (2) ASSUMPTION AND ASSIGNMENT OF LEASE UNDER 11 U.S.C. § 365; MEMORANDUM OF POINTS AND AUTHORITIES, AND RELATED RELIEF; DECLARATIONS OF RICHARD H. GOLUBOW AND VICKI LEE IN SUPPORT THEREOF will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On April 28, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Kathryn M Catherwood    kmcatherwood@duanemorris.com
- Christopher Celentino    ccelentino@duanemorris.com
- Melissa M Coyle    mcoyle@erlaw.com
- Anthony A Friedman    aaf@lnbrb.com
- Oscar Garza    ogarza@gibsondunn.com
- Kenneth A Glowacki    kglowacki@gibsondunn.com
- Kenneth A Glowacki, Jr    KGlowacki@gibsondunn.com
- Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Gil Hopenstand    gh@lnbrb.com
- Jeanne M Jorgensen    jjorgensen@pj-law.com, esorensen@pj-law.com
- Thomas H Prouty    thomas.prouty@troutmansanders.com, tina.diego@troutmansanders.com
- Craig M Rankin    cmr@lnbrb.com
- Daniel H Reiss    dhr@lnbrb.com
- Jacqueline L Rodriguez    jlr@lnbrb.com
- John P Schafer    jps@mandersonllp.com
- Wendy Shapnick    wshapnick@erlaw.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:** On April 28, 2010, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

### See Attached Service List-All Entities Served Via United States Mail Unless Noted Otherwise

**Served via Federal Express/**
**Overnight Express**
Hon. Robert Kwan
U.S. Bankruptcy Court
Courtroom 5D
411 West Fourth Street
Santa Ana, CA 92701

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on April __, 2010, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 28, 2010 | John Berwick | |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*March 2009*

**F 9013-3.1**

## ** SERVED VIA NEF

DAKS, LLC
c/o Arnold Simon
525 Seventh Avenue, Suite 307
New York, NY 10018-4930

DAKS, LLC
c/o Arnold Simon
205 West 39th Street, 5th Floor
New York, NY 10018-0101

U.S. Trustee - Santa Ana
411 West Fourth Street
Suite 9041
Santa Ana, CA 92701-8000

American International Companies
Private Client Group
70 Pine Street, 21st Floor
New York, NY 10270-0002

County of Orange
Dept. of Treasurer & Tax Collector
P.O. Box 1982
Santa Ana, CA 92702

County of Orange
RDMD - Attn: Catherine Lapid
300 North Flower Street
Santa Ana, CA 92702-4048

County of Orange
Environmental Management Agency
300 North Flower Street
Santa Ana, CA 92703-5001

Debra A. Simon
18 Harbor Island
Newport Beach, CA 92660-7201

First Federal Bank of California
402 Wilshire Boulevard
Santa Monica, CA 90401

Franchise Tax Board
Special Procedures
P.O. Box 2952
Sacramento, CA 95812-2952

Internal Revenue Service
Attn: Mia Bak
Insolvency I Stop 5022
300 N. Los Angeles St., #4062
Los Angeles, CA 90012-9903

Leroy L. Carver III
Pacific Farms USA, LP
P.O. Box 51505
Eugene, OR 97405-0909

Rocker, Cynthia
c/o Peter Hermes - Hermes & Glavin
1880 Century Park East, Suite 914
Los Angeles, CA 90067-1612

Special Litigation Counsel
Gary Waldron, Esq./Sherry S. Bragg, Esq.
Waldron & Olson, LLP
23 Corporate Plaza Drive, Suite 200
Newport Beach, CA 92660-7957

Harbor Island Community Association
c/o Total Property Management, Inc.
2 Corporate Park, Suite 200
Irvine, CA 92606

NJ Division of Taxation
Division of Taxation
P.O. Box 642
Trenton, NJ 08646-0642

RSN-Counsel for YSA, LLC
Paul Gale, Esq.
Ross, Dixon & Bell
5 Park Plaza, Suite 1200
Irvine, CA 92614-8592

RSN-Counsel for Debra A. Simon
Stephen Kolody, William Glucksman
Kolodny & Anteau
9100 Wilshire Blvd, 9th Fl., West Tower
Beverly Hills, CA 90212-3425

RSN-Counsel for Orange County Treasurer-Tax
Collector and County of Orange
James C. Harman, Senior Deputy
Orange County Counsel
333 West Santa Ana Blvd., Suite 407
PO Box 1379
Santa Ana, CA 92702-1379
RSN-Counsel for YSA, LLC
Oscar Garza, Esq. **
Kenneth A. Glowacki, Jr., Esq. **
Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, CA 92612-4412

RSN-Counsel for First Federal Bank of CA
Melissa Coyle, Esq. **
Epport, Richman & Robbins, LLP
1875 Century Park Est, Suie 800
Los Angeles, CA 90067

RSN-Counsel to YSA, LLC
Jacqueline Le, Esq.
PICOCO, LLC
4343 Von Karman Ave., 3rd Floor
Newport Beach, CA 92660

RSN-Counsel for Leroy L. Carver III
Glenn D. Dassoff, Esq./John Schafer, Esq.
Paul, Hastings, Janofsky & Walker LLP
695 Town Center Drive, 17th Floor
Costa Mesa, CA 92626

RSN-Counsel for Coldwell Banker
Residential Brokerage
Jeanne M. Jorgensen, Esq. **
Page & Jorgensen LLP
1101 Dove Street, Suite 220
Newport Beach, CA 92660

Assister
Richard H. Golubow, Esq. **
WinthropCouchot, P.C.
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660

Counsel-Estate of Debra Simon
Christopher Celentino, Esq. **
Duane Morris LLP
101 West Broadway, Suite 900
San Diego, CA 92101-8285

Real Estate Broker
Willis Allen Real Estate
Attn: Sarah Flynn-Tudor
1131 Wall Street
La Jolla, CA 92037

Real Estate Broker
Hom Real Estate Group
Attn: Vicki Lee
1200 Newport Center Drive, Suite 100
Newport Beach, CA 92660

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 21126
Philadelphia, PA 19114-0326

Santa Ana Division
411 West Fourth Street, Suite 2030
Santa Ana, CA 92701-4500

Coldwell Banker-Residential Brokerage
c/o Rich Meaney
Nexus Companies
1 MacArthur Place, Suite 300
Santa Ana, CA 92707-5942

Elizabeth C. Adams/Trustee
c/o Glenn D. Dassoff
Paul, Hastings, Janofsky & Walker LLP
695 Town Center Drive, 17th Floor
Costa Mesa, CA 92626-1924

Internal Revenue Service
Insolvency Stop 5503
2400 Avila Road
Laguna Niguel, CA 92677

Anne Milgram
Attorney General of New Jersey
Richard J. Hughes Complex
P.O. Box 106
Trenton, NJ 08625-0106

Counsel-Harbor Island Community Ass.
Nathan T. McIntyre
McIntyre Law Group
P.O. Box 1098
Huntington Beach, CA 92647-1098

Securities & Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, CA 90036-5627

Arnold Simon
525 Seventh Avenue, Suite 307
New York, NY 10018-4930

County of Orange
James C. Harman, Sr. Deputy
10 Civic Center Plaza, Suite 407
Santa Ana, CA 92701-4017

Chriss W. Street
Orange County Treasurer-Tax Collector
Attn: Bankruptcy Unit
P.O. Box 1438
Santa Ana, CA 92702-1438

Address pursuant to Proof of Claim
Coldwell Banker Residential Brokerage **
c/o Jeanne M. Jorgensen
Page & Jorgensen LLP
5160 Campus Drive
Newport Beach, CA 92660

Employment Development Department
Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA 94280-0001

YSA, LLC
c/o Katherine C. Piper, Esq.
Steptoe & Johnson LLP
2121 Avenue of the Stars, Suite 2800
Los Angeles, CA 90067-5052

Arnold Simon
205 West 39th Street, 5th Floor
New York, NY 10018-0101

Cynthia Rocker
2 Jarden
Newport Coast, CA 92657-0106

State of New Jersey
Division of Taxation Bankruptcy Unit
P.O. Box 245
Trenton, NJ 08646-0245

State of New Jersey
Division of Taxation
Compliance Activity
P.O. Box 245
Trenton, NJ 08695